UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAR **3 1** 2008



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Romes Austin )
Fed.Reg.#00070-000 )
F.C.I. - Gimer )
P.O.Box-6000 )
Glenville, WV 26351, )
)
         Plaintiff, )
)
                              ) C
)
    v.                        ) J
)
)
Edward F. Reilly, Jr., et al., )
)
         Defendants. )
)
)

CASE RE-ASSIGNED
APR 2 2 2008
TO:LAMBERTH RCL
Case: 1:08-cv-00553
Assigned To: Unassigned
Assign. Date: 3/31/2008
Description: Pro Se Gen Civil

Seeking Declaratory and
Injunctive Relief.

Seeking Damages :$5,000,000.00

CIVIL ACTION FOR DEPRIVATION OF RIGHTS
PURSUANT TO 42 U.S.C. § 1983

This action is brought by the above-named individual to
recover damages and to enjoin and declare unconstitutional depri-
vations of the Ex Post Facto Clause and his Fifth and Fourteenth
Amendment rights by the United States Parole Commission (U.S.P.C.),
its agents, and employees acting under the color of state law, of
which has created a significant risk of increased punishment by
subjecting plaintiff to prolonged incarceration in violation of
the United States Constitution.

JURISDICTION

Jurisdiction in this case is by virtue of 28 U.S.C. § § 1331,
and 1343, which states;

        1331;"The district court shall have
        original jurisdiction of all
        civil actions arising under the
        Constitution, law, or treaties
        of the United States." Id.

**RECEIVED**

MAR 1 2 2008

Clerk, U.S. District and
Bankruptcy Courts

-1-

1343; "The district courts shall have
original jurisdiction of any civil
action authorized by law to be
commenced by any person." Id.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On July 6, 1982, the Honorable Peter H. Wolf of the Superior Court sentenced plaintiff to a term of imprisonment of Fourteen years to Fifty years pursuant to case #F2391-81(D), for Assault with intent to Rob while armed, in violation of D.C. Code § 22-501, and § 22-4502. (see attached Judgement & Commitment)

2. On October 18, 1984, plaintiff was sentenced in the Superior Court to a term of imprisonment of Seven years to Twenty Five years pursuant to case #F-6049-83(C), for Murder II, in violation of D.C. Code § 22-2404. (See attached Judgement & Commitment as ex's. 1&2)

3. Under District of Columbia law, plaintiff became eligible for parole on November 14, 1997.[1] (See Sentence Monoriting Computation Data dated May 15, 2007, attached as exhibit #3)

4. On November 7, 1997, the D.C. Board of Parole conducted plaintiff's initial parole hearing in accordance with Title 28 District of Columbia Municipal Regulations (D.C.M.R.), sections 204.

5. Plaintiff's hearing was held under, and in accordance to, Tiile 28 D.C.M.R. § 200 (1987), parole guidelines. In that hearing, the D.C. Board of Parole (D.C.B.O.P.), denied plaintiff parole and ordered that he be reconsidered for parole by 11/14/2000.(See attached as exhibit # 4 ). In its Order, the DCBOP Ordered that plaintiff complete a number of programs in order to be reconsidered for parole at his rehearing on 11/14/2000.

---

[1] Plaintiff was actually eligible for parole on 11/07/1997, as stated on his Notice of Action (NOA) dated the same. (see attached as exhibit # 4 ).

-2-

those programs were listed on plaintiff's NOA, which were as follows;

Program Participation
Work Detail
No New Discp. Reports
Psych. Counseling

Psychological evaluation
Comp.Subs. Abuse Program
Communic/Conflic Resolu.

Plaintiff completed the aforementioned programs thus complying with the DCBOP's Order.

6. On August 5, 1998, the United States parole Commission and the Defendants and/or their predecessors (U.S.P.C.) assumed the responsibility for making parole release decisions for all eligible D.C. Code offenders, including plaintiff.(See National Capital Revitalization and Self-Government Act, Pub. Law. No. 105-133 § 11231(c), 11 Stat. 712 (1997). The U.S.P.C. promulgated guidelines ("the 2000 Guidelines") to be used in parole determination for D.C. Code Offenders, including Plaintiff, who had his first initial hearings prior to August 5, 1998 in accordance with, 28 C.F.R. § 2.80(a)(4).

7. Plaintiff was supposed to have his rehearing on or around November 14, 2000, however, for reasons not disclosed in the record plaintiff's rehearing was not held until December 17,2001. At the hearing the USPC calculated plaintiff's Salient Factor Score (SFS) as a 2 at his last hearing and pursuant to the DCBOP guidelines his SFS was now a 1, because 1 point was deducted for ordinary program-achievement.

8. The USPC denied plaintiff's request for parole on January 18, 2002, stating that, "those guidelines (DCBOP) indicate that parole should be granted at this time.

-3-

Furthermore, the commission went on to state; "After consideration of all factors and information presented, a departure from the guidelines at this consideration is warranted because your offense was particulary aggravated in that you were involved in a robbery in which you shot not only your codefendant but also an innocent victim and were subsequently involved in a murder-for-hire in which you were paid to murder the husband of a woman for money." [Furthermore], "Your commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if release at this time." Id. at NOA dated 1/18/02. Thus, the U.S.P.C. "Den[ied] parole. Continue for a rehearing in December 2004, after service of 36 months from your hearing date of 12/17/01."

9. On December 7, 2004, plaintiff was given a rehearing as Ordered by the U.S.P.C., and on December 23, 2004, the U.S.P.C. once again denied plaintiff parole. In summary, the U.S.P.C. relied on the same set of facts verbatim and "continue[d] (plaintiff) to a Three-Year Reconsideration Hearing in December 2007." Id. at NOA dated 12/23/04. It must be noted that at the aforementioned hearing the U.S.P.C. stated that "parole should be granted at this time." Id.

10. On November 21, 2007, plaintiff's, rehearing was held in compliance with the December 2004, NOA issued by the U.S.P.C., and once again the U.S.P.C. denied plaintiff parole. In fact the U.S.P.C. used the same (1)one point for negative institution behavior that it used in 2004. In fact, the U.S.P.C. increased plaintiff's Grid Score to 2 points which is in direct violation of the Regulations set fourth in Title 28 of the D.C.M.R., and once again, the U.S.P.C. relied on the same set of facts verbatim, to deny plaintiff parole eventhough the guidelines "indicate parole should be granted."

-4-

On Decmber 14, 2007, the U.S.P.C. ordered that plaintiff "Continue for a rehearing in November 2010, after service of 36 months." Id. at NOA dated 12/14/2007 (See attached as exhibit #5)

11. With a total point score o 1 point plaintiff would have been presumed suitable for parole at his rehearing under the 1987 regulations with a high level of supervision. See 28 D.C.M.R. § 204.18.

12. Under the DCBOP's 1987 regulations, plaintiff would have begun his last two rehearings with a total point score of 0 from his previous hearings because he would have received a one point deduction because of sustained program achievement, producing a total point score of 0. See 28 D.C.M.R. § app.2-2, attached as exhibit #  )

13. With a total point score of 0, plaintiff would have been presumed suitable for parole at his last two rehearings under the 1987 Regulations in accordance with 28 D.C.M.R. § 204.18.

### THE U.S.P.C. HAS VIOLATED PLAINTIFF'S RIGHTS UNDER THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION

The U.S.P.C., its agents, and employees has violated the EX Post Facto Clause of the United States Constitution when they replaced the parole regulations, guidelines, policies, and practices of the District of Columbia Board of Parole (DCBOP) with their own regulations, guidelines, policies, and practices of which they applied retroactively to plaintiff thereby creating a significant risk of increasing plaintiff's punishment. Thus, the U.S.P.C. by applying its own parole regulations, guidelines, policies, and practices, instead of those of the DCBOP, created a significant risk of prolonging plaintiff's incarceration and thereby, violated the Ex Post Facto Clause.

-5-

## UNDISPUTED MATERIAL FACTS

1. Plaintiff is serving a prison sentence for violating D.C. Code. He has been incarcerated on this current sentence for almost 27 years.

2. For almost ten years, since August 5, 1998, the USPC has conducted parole hearings and decided the requests for parole, of all persons convicted of violating D.C. Code.

3. Before August 5, 1998, the DCBOP conducted the parole hearings of D.C. Code offenders located in District of Columbia correctional facilities, including plaintiff's hearing.

4. Before August 5, 1998, the USPC conducted the parole hearings of D.C. Code offenders located in federal prisons.

5. On August 5, 1998, the USPC took over the DCBOP's responsibilities for D.C. Code offenders. Approximately 10 years before that, this Court ruled that the USPC was obligated to apply the parole guidelines of the DCBOP, and not the federal parole guide lines,at the hearings of D.C. Code offenders when the USPC conducted the hearings. Cosgrove v. Thornburgh, 703 F.Supp. 995 (D.D.C. 1998).

6. Plaintiff has served the "minimum sentence" imposed by the sentencing court for his offenses(i.e., the period of incarceration an inmate must serve before becoming eligible for parole).

7. Under the parole statutes, regulations, policies, and practices of the DCBOP, after plaintiff served his minimum sentence he was assumed (not just presumed) to have satisfied accountability for his crime, i.e., the need for punishment and general deterrence, and whether he had the required programming ordered by the Board.

The only remaining questions under the DCBOP practices were if plaintiff was suitable for parole, (i.e., whether he participated in rehabilitating himself by programming), and if so, whether his case involved "unusual circumstances" that warranted a departure from that presumption.

8. Under the DCBOP's parole practices, plaintiff would have been presumed suitable at his first rehearing if he had indeed completed what the DCBOP Ordered him to complete as it related to programming. (of which plaintiff completed) Thus, to overcome that presumption of suitability, the USPC would have needed to indentify "unusual circumstances" that warranted ignoring the presumption.

9. Because the USPC used its own parole regulations (even though they claim they did not) policies, practices, and criteria to determine plaintiff's suitability for parole and ignore the DCBOP's practices, plaintiff has languished in federal prison for years past the time when he would have been presumed suitable for parole under the DCBOP's practices.

10. In the case at bar, the USPC has applied its parole practices to determine parole suitability. This is true because under the DCBOP's parole practices, its regulations place significant weight on institutional conduct and rehabilitative accomplishments. whereas, under the USPC's practices its regulations create a significant risk of increasing plaintiff's stay in prison, because the federal regulations determine the appropriateness of parole based upon measures that focus solely on pre-incarceration behavior. An example given would be an acquisition of a B.A. Degree, which would have been a favorable factor affecting plaintiff's suitability for parole under the DCBOP's regulations, but would be irrelevant under the federal (USPC's) regulations.

. . .(See <u>Fletcher v. Reilly</u>, 433 F.3d 867 (D.C. Cir. 2006)(holding "Retroactively applied parole or reparole regulation or guideline violates Ex Post Facto Clause if it creates significant risk of prolonging inmate's incarceration.") Id. at 868.

11. Under the USPC parole practices, instead of presuming that plaintiff was suitable for parole (of which the USPC did state on paper) the presumption that would have applied if the D.C. parole practices were applied to plaintiff's case, the USPC presumed that plaintiff was unsuitable for parole at this time. Based on this reversed presumption, the USPC has increased by over ten years, the minimum period of incarceration that plaintiff needed to serve to establish that he is presumed suitable for parole under the DCBOP's practices.

12. In the case at bar, the USPC ignored the DCBOP's practices for departing from suitability presumptions. Instead, contrary to the DCBOP's practices, which did not contain an offense severity aspect and solely looked to the risk of recidivism, the USPC incorporated into its own practices factors for overcomming the presumptions that were premised on the severity of the plaintiff's current offense (under the guise of DCBOP's regulations) and aimed at increasing plaintiff's punishment for his crime(s).

<u>TRANSFER OF PAROLE AUTHORITY FROM THE DCBOP TO THE USPC</u>

13. On August 5, 1997, Congress enacted the National Capital Revitalization and Self-Government Improvement Act ("Revitalization Act"), Pub. L. No. 105-33,§11231, 111 Stat. 712 (1997); (see <u>Fletcher v. Reilly</u>, 433 F.3d 867, 870 (D.C. Cir. 2006)). The Revitalization Act abolished the DCBOP, see Pub. L. No. 105-33 § 11231(b), and . . .

. . .directed the USPC to conduct parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations of the District of Columbia," Id. at § 11231(c), (See also Teachey v. Carver, 736 A.2d 998, 1006 (D.C. App. 1999);(See also, D.C. Code § 24-131 (formerly, § 24-1231(c)) (emphasis added).

14. On August 5, 1998, the USPC assumed the responsibility for making parole release decisions for all eligible D.C. Code offenders. Between 1998 and 2000, despite the requirements of the Revitalization Act that the USPC apply D.C. parole practices, the USPC published new parole regulations and guidelines that it deemed applicable to any D.C. Code offender. However, the USPC on its suface, claims to apply the DCBOP's guidelines.(See 28 C.F.R. § 2.80(a)(4).

15. At the time that plaintiff committed his crime for which he is currently imprisoned and at the time plaintiff was sentenced, the DCBOP administered parole proceedings for D.C. Code offenders in the custody of the District of Columbia. Before, August 5, 1998, the USPC conducted the parole hearings for D.C. Code offenders who were in the custody of the United States Government, but in such circumstances, the USPC was required to apply the DCBOP's practices which were found by this Court to have the force and effect of law. (See Cosgrove v. Thornburgh, 703 F.Supp. 995, 1003-04 (D.D.C. 1988)).

16. before the USPC took over in 1998, the DCBOP applied mandatory guidelines and practices when it conducted parole hearings and made parole determinations. Many of the guidelines and practices were codified as municipal regulations, which carefully prescribed the method and criteria that the DCBOP used to render its decisions on parole requests.

D.C. PAROLE BOARD GUIDELINES AND
LEGISLATIVE INTENT OF D.C. PAROLE PRACTICES

17. The DCBOP (and for certain D.C. Code offenders in federal prison facilities, the USPC) made parole decisions for D.C. Code offenders using guidelines that it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 (the "1987 regulations")("DCMR"). (See 28 DCMR § § 100-531.12.

18. By adopting formal regulations, the DCBOP "sought to structure the exercise of the paroling authority's discretion." Id. at Report on the Development of Paroling Policy Guidelines for the District  of Columbia Board of Parole (the "D.C. Guidelines Report") at 1, Cosgrove v. Thornburgh, C.A. No. 80-0516, as exhibit    )

19. The DCBOP believed that the guidelines were "a significant step toward a more coherent parole decision-making process that w[ould] lead both to **increased consistency** in parole release decisions and **enhanced accountability** of the Board." Id.(emphasis added).

20. As its guide for determining whether an incarcerated individual would be paroled or reparoled, the DCBOP used the criteria set forth in the guidelines. See Id. at 2.("[T]he use of guidelines should be seen as an effort to make explicit those factors that will be considered in each individual case.")(emphisis in original).

21. Although the DCBOP noted that the guidelines were not necessarily "a finished or static product" and made minimal revisions to the 1987 regulations through changes to the regulations and through the issuance of formal policy statements, the DCBOP retained the basic structure of the regulations until it was abolished in 1988. Id.

-10-

22. When it drafted the 1987 Regulations, the DCBOP hoped that, among other things, the guidelines would:

> a. "[p]romot[e] consistent parole decision-making";
>
> b. "[m]ake more explicit the paroling policies of the Board of Parole";
>
> c. "[i]ncorporat[e] a concern for fairness by ensuring that the time served [wa]s proportionate to the sentence imposed by the court and the risk posed by the offender"; and
>
> d. "[a]chiev[e] the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilitation." Id.

23. In furtherance of these objectives, the DCBOP employed three guiding principles in drafting the 1987 Regulations. See Id. at 2-4

24. The first guiding priciple was that"the touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involvement in criminal behavior." Id. at 2. The DCBOP felt that this focus of the guidelines best enable it to meet its duty to protect the public. Id.

25. The second guiding principle, and of great importance in this case, was that retribution or general deterrence was not included among the goals that the D.C. parole practices were to effectuate. see Id at 2. ("The second principle behind the guidelines is that the court addresses the purposes of retribution and general deterrence through the sentence it imposes in adult cases."). Such concerns, the DCBOP felt, were left to the sentencing court, and "[a]s a matter of policy, the [DCBOP] d[id] not and w[ould] not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." Id. at 3-4.

26. The DCBOP explicitly rejected pattering its guideline "after the federal grid which includes an offense severity scale." Id. at 17 (explaining that, in adopting guidelines, the DCBOP specifically looked to jurisdictions with a "guideline structure that would be more compatible with the D.C. Board's philosophy of leeting the court-imposed sentence serve as its offense severity indicant").

27. The third guiding priciple was that the DCBOP parole prac- tices should plainly evidence "a rehabilitative focus." Fletcher, 433 F.3d at 871; see D.C. Guidelines report at 4 ("Guidlines oriented to the assesment of risk and institutional performance, therefore touching on the need for progress towards rehabilitation, will be consistent with the intent of this Act.")

28. In Cosgrove, this Court factually distinguished the 1987 Regulations from the federal guidelines enacted in 1976, explaining that while the federal guidelines were "primarily concerned with punishment and the public safety," the D.C. guidelines "emphasize[d] early release of an offender **who respond[ed] favorably to rehabil- itative efforts.**" Cosgrove,703 F.Supp. at 1003.

<u>THE D.C. PAROLE BOARD'S 1987
REGULATIONS FOCUSED ON RISK FACTORS</u>

29. Under its practices and the 1987 regulations, the DCBOP "employed an analytic framework that relied on both 'pre and post incarceration factors.'" Fletcher, 433 F.3d at 871 (quoting, 28 DCMR § 204.1 (Weil)(28 DCMR § 204.1-204.18 are attached as exhibit  ).

30. The DCBOP used four factors to determine suitability for parole: two pre-incarceration factors, (i) the degree of risk and (ii)the type of risk; and two post-incarceration factors, (iii) institutional adjustment and (iv) program participation. See D.C. Guidelines Report at 5; Cosgrove, 703 F.supp. at 1003.

31. The DCBOP intentionally did not employ an offense severity factor in its guidelines, and according to M. Stover who wrote a memorandum in 1992 ("1992 memorandum") at 2 (Aug. 21. 1992)("[T]he D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served.")(attached as Exqhibit # 3).

32. The DCBOP's philosophy was to let the "court-imposed sentence serve as its offense severity indicant." D.C. guidelines report at 17; See also 1992 Stover mem. at 2-3("[T]he D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of accountability for the offense, and apply a point system. . .to determine whether or not the prisoner is suitable for parole upon the completion of the minimumter.")

33. The DCBOP did not look to the seriousness of the offense for which a D.C. Code offender was imprisoned, and it assumed that society's punishment and deterrence interests in an inmate's sentence, i.e., the offense accountability characteristics of the sentence, were addressed by the sentencing court. See D.C. Guidelines report at 4 ("[T]he Board of parole does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge."); Id. at Memorandum from Michael A. Stover, General Counsel USPC, to Michael Gaines, Chairman, USPC(1998 Stover memorandum) at 3 (June 26, 1998)

-13-

. . .("the guidelines of the D.CBOP clearly focus exclusively on the issue of risk")(attached as exhibit # ); Cosgrove v. Meese, No. 80-0516 (mar. 18, 1988)(Chairperson of the D.C. parole Board in 1988 testifying that the 1987 Regulations are premised on the priciple that the court addresses the purposes of retrobution and general deterrence indentified in the D.C. Guidelines Report at 3-4)(excerpts attached as exhibit ); 63 Fed. Reg. 39172, 39174 (July 21, 1998)(recognizing that the "parole function for the D.C. Code offenders rests on a primise somewhat different from that of the federal parole guidelines" and under which "the minimum term of imprisonment imposed by the court [is treated] as the usual measure of basic accountability for the offense of conviction")[1]

DEGRE OF RISK: THE FIRST FACTOR CONSIDERED BY THE DCBOP

34. The first factor that the DCBOP considered was the degree of risk posed by a D.C. Code offender, that is, the likelihood that the offender would commit another crime if released on parole. See D.C. Guidelines report at 5.

---

1/The USPC recognized this basic premise of the DCBOP's guidelines in part in the 2000 Guidelines, but it has failed to abide by this priciple in its parole decisions with respect to plaintiff. See C.F.R. § 2.73("It is the policy of the Commission with respect to District of Columbia Code offenders that the minimum term imposed by the sentencing court presumptively satisfies the need for punishment for the crime of which the prisoner has been convicted and that the responsibility of the Commission is to account for the degree and the seriousness of the risk that the release of the prisoner would entail.") Instead, as demonstrated below, the USPC parole practices presume that all cases involving death of the victim are "exceptional cases" to which the presumption does not apply as it relates to 28 C.F.R. § 2.73.

35. The "Degree of Risk" was the primary factor of the guide-lines, applicable in all cases," and was based on the Salient Factor Score (SFS), which was an "actuarial risk assessment device that relie[d] exclusively on information known at the time of incarceration." Id.; See 28 DCMR § 204.3.

36. In calculating a prisoner's SFS, the DCBOP considered six pre-incarceration factors: (1) prior convictions and adjudications, (2) prior commitments of more than 30 days, (3) age at the commission of current offense, (4) recent commitment-free period, (5) status of prisoner at time of current offense, and (6) history of opiate dependence. (See Fletcher, 433 F.3d at 871 (Citing DCMR § 204.4-204.16).)

37. The DCBOP weighed these factors "by a formula to determine the candidate's risk catagory, aclled a Sailient Factor Score'". Id. (Citing 28 DCMR 204.17, app 2-1)

38. A parole candidate's SFS placed the candidate into one of four catagories (10-9 = low risk, 8-6 = fair risk, 5-4 = moderate risk, and 3-0 = high risk) from which the DCBOP would determine a baseline number of points or, (Base Point Score) -0 for low risk. 1 for fair risk, 2 for moderate risk, and 3 for high risk. D.C. Guidelines Report at 5; See 28 DCMR § 204.17, app. 2-1

39. The higher a candidate's SFS, the lower the risk that parole candidate would become a recidivist and the lower  the base point score with which the candidate began for purposes of the DCBOP's further calculations. See 28 DCMR § 204.17, app. 2-1

-15-

40. The DCBOP then would take a candidate's base point score and adjust it using the remaining pre-incarceration factor, i.e., type of risk, and two post-incarceration factors - institutional adjustment and program participation - and arrive at a point Assignment Grid Score ("total point score"). D.C. Guidelines Report at 5-6.

## THE TYPE OF RISK: THE SECOND FACTOR CONSIDERED BY THE DCBOP

41. The second factor that the DCBOP considered was the type of risk posed by a D.C. Code offender, that is, what type of crime an offender would commit if he/she were to commit another crime while released on parole. See D.C. Guidelines Report at 5.

42. The "Type of Risk" factor under the 1987 Regulations was "an aggravatin factor applicable to those cases in which the Board ha[d] made findings that the current offense, or the offender's pattern of past offenses, involved violence, weapons, drug trafficking." Id. This factor recognized that "if an offender has already indicated through past behavior that he or she is capable of committing a type of crime that is considered particulary serious . . ., we should be willing to tolerate a lesser degree of risk." Id. at 21 (emphasis on original).

43. To account for the type of risk posed by a prole candidate based on his current or past offenses, the DCBOP chose three types of offense behaviors that it would count as parole indicants: (1) violence, (2) use of weapons, and (3) drug trafficking. Id. at 21-22; See 28 DCMR § 204.18 & App. 2-1.

44. Under the 1987 Regulations, the DCBOP increased the base point score that it derived from the candidate's SFS by a maximum of one point if it determined that the parole candidate's "current offense, or two prior felony convictions involve[d] **any or all of the [following] listed behaviors**": violence, the use of a weapon, and drug trafficking. D.C. Guidelines Report at 21-22 (emphsis added); See 28 DCMR § 204.18 & App. 2-1.

45. Under the DCBOP's practices, the highest point score a parole candidate could have based on the Candidate's SFS and Type of Risk assessment, and before adjusting for institutional adjustment and program achievement, was a 4 (3, the highest possible base point score, plus 1, the only, and maximum, number that can be added for type of risk). See 28 DCMR § 204.18 & App. 2-1.

INSTITUTIONAL ADJUSTMENT: THE THIRD FACTOR CONSIDERED BY THE DCBOP

46. The third factor that the DCBOP considered was institutional adjustment – whether the D.C. Code offender had received any serious disciplinary infractions since the offender had been imprisoned for the current offense. See D.C. Guidelines Report at 5.

47. After calculating a parole candidate's SFS and the corresponding risk category and base point score adjusting that score to account for the type of risk the DCBOP was required, under its 1987 Regulations, to determine whether the candidate had "committed serious disciplinary infraction." 28 DCMR § 204.18(h).

48. Under the 1987 Regulations, the candidate's institutional adjustment was "an aggravating factor applicable [where] the [DCBOP] has made findings that disciplinary infractions . . .are either serious or repetitious enough to impact negatively on the parole decision." D.C. Guidelines Report at 5.

49. The Manner in which the DCBOP used the parole candidate's institutional adjustment to adjust his/her base point score at an initial parole hearing was the subject of precise guidelines adopted by the DCBOP. Specifically, the DCBOP used the "point grid" in Appendices 2-1 and 2-2 to the 1987 Regulations to reflect adjustments to a parole candidate's base point score. See DCMR apps. 2-1, 2-2. Pursuant to Appendices 2-1 and 2-2, the DCBOP could add one point to a candidate's base point score for "negative institutional behavior." See Id. The 1987 regulations, however, did not provide guidance as to how the DCBOP was to determine whether to adjust a parole candidate's point score for institutional adjustment, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to, and later did,avoid.

PROGRAM ACHIEVEMENT: THE FOURTH FACTOR CONSIDERED BY DCBOP

50. The fourth factor that the DCBOP considered was program achievement - whether the candidate had achieved sustained program achievemnet since he/she had been imprioned for the current offense.

51. After calculating a parole candidate's SFS, the corresponding base point score, and adjusting for "type of risk" and institutional infractions, the DCBOP, under its 1987 regulations, was required to determine whether a candidate had "demonstrated sustained achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense." 28 DCMR § 204.18(i).

-18-

52. Under the 1987 Regulations, a parole candidate's program participation was a "mitigating factor" applied when the DCBOP found that the candidate's program or work accomplihments were substantial enough to impact favorably on the parole decision. D.C. Guidelines Report at 5.

53. The manner in which the DCBOP used the parole candidate's program achievement to adjust the base point score at an initial parole hearing was the subject of precise guidelines adopted by the DCBOP. Specifically, the DCBOP used the "point grid" in app. 2-1 and 2-2 to the 1987 Regulations to reflect adjustments to a parole candidate's adjusted base point score. 28 DCMR apps. 2-1, 2-2. Pursuant to Appendices 2-1 and 2-2, the DCBOP could subtract one point from a candidate's base point score for substained pro-gram or work assignment achievement. See Id. The 1987 Regulations however, did not provide guidance as to how the DCBOP was to deter-mine whether to adjust a parole candidate's adjusted base point score fro program achievement, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to, and later did, avoid.

THE PAROLE DECISION

54. Once the DCBOP calculated its base point score and adjusted it based on the "Type of Risk", "Institutional Adjustment", and "Program Achievement" factors under Appendix 2-1 of the 1987 Regs.; the DCBOP "intergrated [these factors] into a calculus to produce a **point score which constrained the Board's discretion in making final parole determinations.**" Fletcher, 433 F.3d at 871 (Citing, DCMR § 204.19 & App. 2-1 (emphasis added). . . .

-19-

. . .(Appendix 2-1 is attached as exhibit #6). This total point score "determine[d] whether or not parole is granted, and if so, the level of supervision to be imposed." D.C. Guidelines Report at 6.

56. In the case of a parole rehearing, the 1987 Regulations, as amended by the DCBOP in 1994, directed the DCBOP to grant parole to an adult at an initial parole rehearing if the total point score was zero, one, two, or three.

> In determining whether to release on parole an adult or a youth offender appearing before the BOP at a Parole rehearing, **the Board shall take the total point score from the initial hearing** and adjust that score according to the institutional record of the candidate since the last hearing pursuant to App. 2-2. The Board shall then take one of the following actions:
>
> (a) IF POINTS=0-3: Parole may be granted with highest level of Supervision required; or
>
> (b) IF POINTS=4-5: Parole may be denied and a rehearing date scheduled.

28 DCMR § app. 2-2 (attached as exhibit #7)

57. When it promulgated the 1987 Regulations, the DCBOP recognized that "there occasionally will be **unique circumstances** that are not taken into account by either the SFS or type of risk assessment, but that none-the-less should impact on the release decision." D.C. Guidelines report at 22 (emphasis added). To address these unique circumstances, the 1987 Regulations permitted the DCBOP to depart from the action indicated by a parole candidate's total point score only when mitigating and/or countervailing factors applied that demonstrated "unusual circumstances", which the Board had to explain by reference to the specific aggravating or mitigating factors listed in Apps. 2-1 and 2-2. 28 DCMR § 204.22

58. In App. 2-1 of the Regulations, the DCBOP listed those pre- and post-incarceration circumstances that it determined might be deemed unusual and therefore warrant a depature from the 1987 Regulations where a parole candidate's total point score indicate that the candidate should be paroled. Id. at DCMR § app. 2-1.

59. The DCBOP believed that six pre-incarceration circumstances or factors ordinarily demonstrated that the candidate was a worse risk for parole at the candidate's initial parole hearing than indicated by his/her total point score:

a. the candidate repeatedly failed under parole super-vision - "Repeated failure under parole supervision";

b. the "Current offense involve[d] on-going criminal behavior";

c. the candidate had a "Lengthy history of criminally related alcohol abuse";

d. the candidate had a "History of repetitive sophis-ticated criminal behavior";

e. the candidate had an "Unusual extensive and serious prior record (at least five felony convictions)"; and

f. the candidate's crime involved "Unusual cruelty to victims." 28 DCMR § app. 2-1.

60. The DCBOP recognized that the six pre-incarceration circumstances were "unique" or "unusual" circumstances because they did not apply to the majority of parole candidate's, I.e., the usual parole candidate. See D.C. Guidelies Report at 22.

-21-

The DCBOP did not consider them to be "inique" or "unusual" simply because they were factors not taken into account by the SFS or type of risk assessment. See Id.

61. The 1987 regulations did not identify the criteria that the DCBOP was to apply to determine whether one or more of these six pre-incarceration factors applied in a specific case, which sometimes led to inconsistent and inequitable interpretations and applications of the regulations by the DCBOP officials.

62. Appendix 2-2 of the 1987 Regulations, which applied at parole rehearings, di not include any pre-incarceration aggrava-ting factors on which the DCBOP could rely to depart from the regu;lations and deny parole. See Mack Dep. at 26-27.

63. It was the DCBOP's policy and practice **not** to consider a parole candidate's current offense at a parole **rehearing** in deciding whether to depart from the guidelines, See Mack Dep. at 28 (testifying that there is no place in Appendix 2-2 for the D.C. Parole Board to consider the current offense behavior as a reason for departing from the action indicated by a parole candidate's total point score), and instead, to focus on the candidate's rehabilitation, community resources, and health since the candi-date's previous hearing. See Id. at 26-27.

### THE 1991 POLICY GUIDELINE: THE DCBOP'S EFFORT TO REMOVE INCONSISTENCY AND ENSURE EQUITABLE APPLICATION OF THE 1987 REGULATIONS

64. In 1991, to ensure consistent and equitable application of the 1987 Regulations, the DCBOP adopted a Policy Guideline that defined the term used in the Appendices to the 1987 Regulations. (the "1991 Policy Guidelines") (Attcahed as exhibit #8)

65. The 1991 Policy Guideline applied to all requests for parole heard by the DCBOP. See 1991 Policy Guideline at 1.

-22-

66. Following this Court's decision in Cosgrove, the USPC instructed its personel to apply the 1991 Policy Guideline when conducting parole hearings for D.C. Code offenders in federal correctional facilities. See 1992 Stover Mem. at 2. (attached as exhibit # ).

67. The purpose of the 1991 Policy Guidelines was "[t]o define criteria and parameters for determining the applicability of descriptive terminology used in the [1987 Regulations] for release decisionmaking, and to facilitate consistency in Guideline application." 1991 Policy Guideline at 1.

68. The DCBOP expressly adopted the 1991 Policy Guideline to avoid disparate decisions for similarly-situated offenders under the 1987 Regulations resulting from the subjective views and judgements of the various individuals at the Board applying those regulations to D.C. Code offenders:

> Many of the discriptive terms used in the Parole Guidelines criteria are judgemental or subjective. As such, they lend themselves to disparate interpretations and applications by Guideline users. To ensure equitable treatment of similarly-situated offenders, these terms require definitions that facilitate equitable application across affected cases, while preserving sufficient discretion to accommodate individual circumstances. See 1991 Policy Guideline at 1.

69. Tp promote consistancy in its exercise of discretion under the 1987 regulations and D.C. parole practices, the DCBOP sought to limit that discretion in the 1991 Policy Guideline by indentifying the criteria and parameters that it used to determine whether certain discretionary factors applied. See Id..

-23-

## THE DCBOP NARROWLY DEFINED
## NEGATIVE INSTITUTIONAL BEHAVIOR

70. As part of its effort to ensure consistency in its appli-
cation of the "institutional adjustment" factor in its 1987 Regu-
lations, the DCBOP promulgated section VI.A1 of the 1991 Policy
Guideline, which defined the types of institutional disciplinary
actions that the DCBOP ordinarily considered to be "negative
institutional behavior" under Appendices 2-1 and 2-2 of the 1987
Regulations. In section VI.A1 of the 1991 Policy Guideline, the
DCBOP defined "Negative Institutional Behavior" as:

> serious or repeated major disciplinary infractions as
> discribed below that are sanctioned under Department of
> Corrections (DCDOC) due process procedures.
>
> a. In INITIAL PAROLE CONSIDERATION cases, the following
>    disciplinary infractions shall ordinarily be consi-
>    dered as negative institutional behavior:
>
>    (1) One Class 1 Offense for murder, manslaughter,
>    kidnapping, armed robbery or first degree burglary
>    at any time during the minimum sentence (DCMR § 502.3
>    May 1987)
>
>    (2) One Class 1 Offense . . .during the 12 months
>    preceding the hearing OR during the last half of
>    the minimum sentence up to three years, whichever
>    is longer.; OR
>
>    (3) Two Class II offenses . . .during the 12 months
>    preceding the hearing OR during the last half of
>    the minimum sentence up to a period of three years,
>    whichever is longer.
>
> b. In PAROLE RECONSIDERATION cases, the following dis-
>    ciplinary infractions occurring since the preceding
>    release consideration on the sentence shall ordi-
>    narily be considered as negative institutional be-
>    havoir:
>
>    (1) One Class I Offense (DCMR § 502.3 through § 502.17)
>
>    (2) Two Class II Offenses (DCMR § 503.2 through § 502.12)

1991 Policy Guideline at 2 (emphasis added)

71. For purposes of determing at a parole candidate's initial hearing whether the candidate had engaged in negative institutional behavior, the 1991 Policy Guideline provided that the DCBOP's written policy was to consider only those institutional offenses committed by a candidate in the twelve months preceding the hearing or in the last half of the minimum sentence up to a period of three years, except in the cases of the offenses of murder, manslaughter, kidnapping, armed robbery, or first degree burgalary. See Id.

72. The 1991 Policy Guideline provided that at a parole rehearing, the DCBOP would consider certain types of offenses committed since the initial parole hearing as "negative institutional behavior" i.e., a Class I offense or two Class II offenses. See Id.

### THE DCBOP BROADLY DEFINED SUSTAINED PROGRAM OR WORK ASSIGNMENT ACHIEVEMENT

73. To achieve greater consistency in its application of the "program achievement" factor of the 1987 Regulations, in section VI(A)(2)(a) of the 1991 Policy Guideline, the DCBOP defined "sustained program or work assignment achievement" for purposes of appendix 2-1 as:

> In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:
>
> (1) Successful completion of one or two educational or vocational programs, or program levels, each of which enable the offender to develope an academic or job-related skill, OR enable the offender to progress to a higher level of difficulty or skill in the program area.

1991 Policy Guideline at 3.

74. For purposes of parole rehearings under Appendix 2-2 of the 1987 Regulations, section VI(A)(2)(b) of the 1991 Policy Guideline defined "sustained program or work assignment achievement as:

In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI(A)(2)(a) of this policy [i.e., those that apply in initial parole hearings] shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence. Id.

### THE DCBOP LIMITED THE SCOPE OF UNUSUAL CIRCUMSTANCES

75. In the 1991 Policy Guideline, the DCBOP clarified the scope of its authority to deny parole for "unusual circumstances" when a parole candidate's total point score indicates that parole should be granted.

76. Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," defined each of the factors listed in Appendix 2-1 of the 1987 Regulations that the DCBOP recognized as constituting "unusual circumstances" and described the objective criteria and parameters that the DCBOP required to establish the existence of those circumstances. Id. at 1991 Policy Guideline at 6-9.

77. The "unusual circumstance" of "Repeated Failure Under Parole Supervision" listed in Appendix 2-1 of the 1987 Rgulations was defined by the 1991 Policy Guideline as requiring "two (2) or more revocations of parole on any sentence within the preceding five years." Id. at 6-7

78. The "Unusual circumstances" of "Instant Offense Involved Unusual Cruelty to Victims" was defined by the 1991 Policy Guideline as requiring a finding that the offense involved" a. [p]hysical, mental or emotional abuse beyond the degree needed to sustain a . . .

. . .conviction on the instant offense; OR b. [e]specially vunerable victims, e.g., children or elderly persons were the victims of assaultive or fraudulent behavior." Id. at 7.

### THE USPC CHANGED THE DCBOP'S REGULATIONS
### AND PRACTICES AND REINSTITUTED BROAD DISCRETION

79.    Effective August 5, 1998, the Revitalization Act abolished the DCBOP. Pub. Law No. 105-33 § 11231(b). Thereafter, the USPC assumed responsibility for parole hearings for D.C. Code offenders. Id.

80. congress mandated in the Revitalization Act that the USPC conduct parole hearings for D.C. Code offenders according to the aprole statutes and regulations of the District of Columbia. Id. at § 11231(c).

81. Instead, the USPC immediately drafted interim parole regulations effective in 1998, that were significantly different from and replaced the DCBOP practices. 28 C.F.R. § 2.80(a)(5); Fletcher, 433 F.3d at 870. The USPC explained that it would apply its new regulations retroactively. See Id.

82. After promulgating several revisions to those interim rules the USPC published the 200 Guidelines in final form and announced that it would apply those guidelines to any D.C. Code offender that had not received an initial parole hearing as of August 5, 1998, 28 C.F.R. § 2.80(a)(5); Fletcher, at 870.

83. For D.C. Code offenders (such as plaintiff) who had received initial parole hearings **before** August 5, 1998, the USPC would apply the 1987 Regulations **but ignore** the DCBOP's other parole policies **and guidelines, including the 1991 Policy Guideline.**

84. The USPC justified its use of the new 1998 regulations and the 2000 Guidelines on the ground that its reasearch and analysis . . .

-27-

. . . allegedly demonstrated that "[t]he point score system used
by the DCBOP ha[d] resulted in a high rate of upward departures
from the guidelines based upon factors that should be included
in the guidelines." Id. at 63 Fed. Reg. 17771, 17772 (4/10/98).

85. As the USPC explained when it published its interim rule
on July, 21, 1998, "in a random sample of 100 cases decided by
the DCBOP in 1997, the [USPC] found departures in more than half
of the cases." See 63 Fed. Reg. 39172, (July 21, 1998). The USPC
found that the "[f]actors cited by the [DCBOP] to justify depar-
tures most often appear to involve aspects of the prisoner's
current offense or criminal history that indicate a risk of violent
recidivism." Id. The USPC's new regulations purported to "incor-
porate factors that would otherwise be expected to result in
decisions outside the guidelines." Id.

86. The USPC also undertook an analysis "to identify factors
related to current offense and criminal history that [could] be
empirically correlated with repeat violent crime." Id. For this
study, a USPC contractor drew a statistical sample of 1,000
D.C. Code offenders released in 1992 and evaluated whether those
offenders had a arrest for a violent offense within five years
after their release. Id. Despite various data and process
deficiencies noted by the USPC's contractor, the USPC determined
that this research confirmed that (a)"a violent current offense
predicts for future violence";(b) a record of prior crime is
"perdictive even if the offense did not involve violence", and
(c) that firearm possession also predicts future violent crime
even if the current offense did not involve violence. Id. at
39173.

87. Based on these two studies, the USPC replaced the DCBOP
practices with the 2000 Guidelines for D.C. Code offenders receiv-
ing an initial parole hearing after August 5, 1998. Id. It did
so despite the fact that it was concerned that its new guidelines
might increase the period of incarceration that D.C. Code offenders
would have to serve. The USPC has not analyzed whether the 2000
Guidelines in fact have increased the period of incarceration
served by D.C. Code offenders above what they likely would have
served under the D.C. Parole practices. Id.

88. The practices the USPC has followed when applying the 1987
Regulations since 1998 have increased the period of incarceration
that offenders convicted of certain crimes, including plaintiff,
must serve to establish that they are presumed suitable for parole.

89. Under the D.C. parole practices, an offender who committed
a crime of violence that resulted in the victim's death, even if
that crime was murder, has satisfied offense accountability once
the offender has served his/her "minimum sentence". Id. at D.C.
Guidelines Report.

90. Under the practices the USPC has followed when applying
the 1987 Regulations since 1998, an offender who committed **any**
crime of violence that resulted in the victim's death, whether
it be involuntary manslaughter or murder, has not satified offense
accountability once the offender has served his/her "minimum
sentence".

91. On their face, the 2000 Guidelines are significantly
different from the D.C. parole practices that applied to D.C. Code
offenders before 1998. These new guidelines have increased the
period of incarceration that offenders convicted of certain crimes
including Plaintiff, must serve to establish that they are presumed
suitable for parole.

92. Under the 2000 Guideliens, an offender who committed **any**
crime of violence that resulted in the victim's death, whether it
be involuntary manslaughter or murder, has not satisfied offense
accountability once the offender has served his/her "minimum
sentence". See 28 C.F.R. § 2.80(f).

93. Under the 2000 Guidelines, as explained in greater detail
below, 18-24 months is automatically added (more if an offender
has prior convictions and/or commitments, is under age 19, and/or
was on parole or probation when the crime was committed) to the
minimum sentence of an offender who committed **any** crime of violence
that resulted in the victim's death, whether it was involuntary
manslaughter or muder. 28 C.F.R. § 2.80(f),(h).

94. The USPC repeatedly has denied D.C. Code offenders' requests
for parole, including those of Plaintiff, on offense severity bases
or on the ground that it beleives that the parole candidates have
not served enough time for their offenses, i.e., that the inmates
have not been incarcerated long enough to satisfy the accounta-
bility for their offenses, which is the case at bar. This is true
eventhough plaintiff is under the 1987 Guidelines and the USPC
acknowledges that he should be paroled at this time.

-30-

95. In the 2000 Guidelines, the USPC has re-defined the term "unusual circumstances" that the DCBOP applied when it determined that it was appropriate to depart from the presumptive parole suitability indicated by its guidelies. (Compare 1991 Policy Guideline at 6-9, with 28 C.F.R. § 2.80(n)(2).

96. The DCBOP adopted and applied specific criteria in the 1991 Policy Guideline to determine the existence of "unusual circumstances." 1991 Policy Guideline at 6-9. The USPC ignored that policy (which applies to plaintiff) Guideline and the DCBOP's definition of "unusual circumstances." See 28 C.F.R. § 2.80(n)(2).

97. The USPC has defined an "unusual circumstances" as any factor that a USPC hearing examiner or commissioner can think of that is not accounted for already in the calculation of a parole candidate's total point score under the 1987 Regulations or Total Guideline Range under the 2000 Guidelines. See 28 C.F.R. § 2.80(n)(1).

THE USPC CONSIDER OFFENSE ACCOUNTABILITY IN
APPLYING THE 2000 GUIDELINES

98. Under the 1987 Regulations and DCBOP's practices, the DC-BOP assumed that a parole candidate had satisfied the accountability for his or her offense (the need for punishment, retribution, and general deterrence) **once the candidate became eligible for parole,** i.e., after serving the minimum sentence imposed by the court. See D.C. Guidelines Report at 2-4; 1991 Stover Mem. at 2-3; 63 Fed. Reg. at 39174.

99. The DCBOP did not address offense accountability when determining whether an inmate was suitable for parole. Mack Dep, at 46-47, 52, 53.

100. The DCBOP looked solely at the degree and type of risk of recidivism posed by a parole candidate and the candidate's institutional conduct (both positive and negative) to determine the candidate's suitability for parole. See 1998 Stover Mem. at 3; 1992 Stover Mem. at 2-3

101. In the 2000 Guidelines, the USPC recognozed that the 1987 Regulations were premised on the assumption that the "minimum term of imprisonment imposed by the court" was the "measure of basic accountability for the offense of conviction." 63 Fed.Reg. at 39174. The USPC determined that it could ignore this assumption under the 2000 Guidelines in "exceptional cases" and apply a classic **federal parole guideline** principle of considering based on the severity of a parole candidate's offense. 28 C.F.R. § 2.73(b). The USPC changed the "assumption" in the 1987 Regulations and DCBOP's practices into a "presumption" that the USPC determined it could ignore in "exceptional cases" based on "thegravity of the offense." Id.

102. The USPC has made a similar change in its practices when applying the 1987 Regulations to D.C. Code offenders who received their initial parole hearings before August 5, 1998. In that, the DCBOP assumed that all D.C. Code offenders had satisfied offense accountability when they became eligible for parole. See D.C. Guidelines Report at 2-4; 1992 Stover Mem. at 2-3; 63 Fed. Reg. at 39174. The USPC purportedly presumes this fact, but ignores the presumption whenever it decides that the Court's sentence was inadequate to satisfy the goals of punishment, retribution, and general deterrence. See Id.

-32-

103. The USPC has presented no evidence that the DCBOP ever denied a parole candidate's request for parole simply because the DCBOP believed that the candidate had not been punished enough or needed to serve longer to satisfy accountability for the offense.

### THE PRESUMPTION OF SUITABILITY UNDER THE 2000 GUIDELINES

104. Like the 1987 Regulations, the 2000 Guidelines initially use a point score system to determine whether a presumption applies that an inmate is suitable for parole.

105. This point score system, like the 1987 regulations, begins with the calculation of a Salient Factor Score for each parole applicant and is aimed at assessing the degree of risk that a parole candidate will become a recidivist. See 28 C.F.R. § § 2.80(c), 2.20.

106. This point score system then purports to look to the "Type of Risk" that the candidate will become a recidivist, and finally factors in the candidate's institutional behavior. 28 C.F.R. § 2.80(f), (j), and (k).

107. Unlike the 1987 Regulations, which use the SFS, type of risk, and institutional behavior factors to come up with a total point score that determines whether a parole candidate is presumed suitable for parole, the 2000 Guidelines use the SFS and type of risk factors to develope a "Base Point Score". which the USPC uses to determine a "Base Guideline Range". a number of months the USPC adds to a parole candidate's parole eligibility period. 28 C.F.R. § 2.80(f); See 65 Fed. Reg. at 70663; 28 C.F.R. § 2.80(l). This makes it impossible for any person with a Base point Score over three to establish a presumption of suitability for parole when . . .

-33-

. . .he or she becomes eligible for parole, i.e, after completion of his or her minimum sentence, as the 1987 Regulations permitted. The Base Guideline Range represents "[t]he time [in excess of the candidate's parole eligibility period, i.e., minimum sentence] expected for the inmate to qualify for parole (assuming no disciplinary infractions and no ordinary program achievement)." 65 Fed.Reg. at 70663.

108. The USPC adjusts the range resulting from adding the Base Guideline Range to the parole eligibility period by adding or subtracting periods of months to reflect negative institutional behavior[2] and or, superior program achievement. See 28 C.F.R. § 2.80(l). The 2000 Guidelines refer to the final range of months as the Total Guideline Range and treat it as "the amount of time [an offender] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. at 70664. Until a parole candidate has served a period of time equal to the bottom of his or her Total Guideline Range, the candidate is presumed to be unsuitable for parole.

109. Under the 1987 Regulations, depending largely on his/her SFS and institutional behavior, an offender often would have been entitled to a presumption the he/she was suitable for parole at the end of his/her minimum sentence. Under the 2000 Guidelines, the same offender is now presumed unsuitable for parole until he or she has served his/her minimum  sentence as well as any additional period of incarceration. See 28 C.F.R. § 2.80(h),(i),(l).

---

2/In the case at bar plaintiff was given three years for a dirty urine, eventhought under the 1987 guidelines he should have been given no more than "six months" added to his presumption date of which plaintiff never recieved.

110. In Plaintiff's case the hearing examiners in his last three rehearings relied on the exact same set of facts which were that;

> "Those guidelines (the 1987 guidelines of the D.C. Board of parole) indicate parole should be granted at this time. After consideration of all the factors and information presented, a departure from the departure from the guidelines at this consideration is warranted because your offense behavior involved a murder for hire. After the commission of that offense, you then committed other acts of violence in the community. In your commission the attempted robbery of a convenience store in which two individuals were shot by you to include the store owner and your codefendant." Id. at Notice of Action dated 12/14/07, attached as exhibits)

111. The examiners simply reworded the same set of facts that used to "depart outside of the 1987 Guidelines, and they focused solely on the severity of plaintiff's offense and accountability for his offense.

112. The USPC has applied a similar definition of "unusual circumstances" for D.C. Code offenders who had initial parole hearings before August 5, 1998, and to which the USPC asserts it continues to apply the 1987 Regulations. See 28 C.F.R. § 2.80(a)(4).

113. the standard applied by the hearing examiners in Plaintiff's case ("Depreciate the seriousness of the oofense behavior and pro-mote disrespect for the law") is the exact same standard applied to determine federal prisoners' suitability for parole under the federal parole guidelines. See 28 C.F.R. § 2.18 (based on the former parole statute at 18 U.S.C. § 4206, which was repealed in 1987). The DCBOP expressly rejected this standard in 1985. See Cosgrove v. Thornburgh, 703 F. Supp. 995, 1003 (D.D.C. 1988);

CONCLUSION

It is evident that "at rehearings, the DCBOP regulations plainly evidence a rehabilitative focus in making parole and reparole determinations. Post-incarceration factors were form- ally intergrated into release determinations. This is the dif- ference from the DCBOP's regulations, and the federal regulations." Id. at Fletcher v. Reilly, 433 F.3d 867 (D.C. Cir. 2006).

Furthermore, "parole/reparole regulations, even if they act as mere guides to parole board's excercise of its discretion, can constitute "law" subject to the ex post facto analysis, if difference between Board's excercise of its discretion under former and later regulation actually creates significant risk of prolong- ing inmate's incarceration." Id. at 868.

In the case at bar, the USPC has created a "liberty interest" by stating on paper that it was applying D.C.'s 1987 Guidelines while just underneath the surface they apply their new guidelines (the 2000 Guidelines) and in the process violate plaintiff's Constitutional right to due process.

PRAYER

Wherefore, these reasons stated in the aforementioned plain- tiff prays this most Honorable Court make him whole and requests this Court to Order the following:

1. Issue a declaratory judgement that the USPC has violated the Ex Post Facto Clause of the United States Constitution, as well as, create[d] a "liberty Interest" in the process.

2. Issue a declaratory judgement, declaring that the actions of plaintiff with respect to his filing of this civil action are "protected" by the U.S. Constitution under the 1st, 3rd, 4th, 5th, and 14th Amendments to the U.S. Constitution.

-36-

3. Issue pending a hearing on plaintiff's request for permanent relief, a temporary restraining order and a preliminary injunction restraining defendants and their agents, employees, and all persons acting in concert or cooperation with the defendants or at their direction or under their control from:

a. Further and future enforcement, operation, or execution of 28 C.F.R. § 2.80, § 2.81, § 2.20 (2001), and anyother statute that denys plaintiff parole and violates the Ex Post Facto Clause of the U.S. Constitution.

b. Detaining, retaliating, punishing, harassing, deterring, discouraging, or otherwise interfering with plaintiff in his excercise of his Constitutional Right to seek redress of his grevences.

4. Permantly enjoin defendants, their agents, employees, and all persons acting in concert or cooperation with them at their direction or under their control from:

a. Further and Future enforcement, operation, or execution of its procedures it follows to deny plaintiff parole and to Order that the defendants Order parole consistent with the way the DCBOP interpreted its parole practices in 1987, and 1991.

5. Award plaintiff money damages, and reasonable attorney fees.

6. Grant plaintiff all other relief that is equitable, fair, and just.

Respectfully Submitted,

Romes Austin
Fed.Reg.#00070-000
F.C.I. - Gilmer
P.O.Box-6000
Glenville, WV 26351

## CERTIFICATE OF SERVICE

I, hereby certify declare, and state, that a true and accurate copy of the foregoing Civil Action was placed into this institution's mail receptacle on this 11th day of March , 2008, to make service on the United States Attorney's Office for the District of Columbia, 555 - 4th Street, N.W., Washington, D.C. 20530.


Romes Austin
Fed.Reg.#00070-000
F.C.I. - Gilmer
P.O.Box-6000
Glenville, WV 26351

# Exhibit

# 1

DC
23-101

_ins[et_                                          180934

## Superior Court of the District of Columbia

### CRIMINAL DIVISION

_Corrected Copy_

### JUDGMENT AND COMMITMENT ORDER

UNITED STATES OF AMERICA

vs

Ramos Austin, Jr. aka Jerome Walker

Case Number F-2391-81D

PDID Number 259 689

WHEREAS the above-named defendant having entered a plea of   ☐ Not Guilty   ☐ Guilty

to the charge(s) of _Assault with intent to rob while armed_

and having been found guilty by   ☐ Jury   ☑ the Court

and a pre-sentence investigation and report having been   ☑ prepared and considered   ☐ not requested

IT IS HEREBY ADJUDGED that the defendant has been convicted of and is guilty of the offense(s) charged.

The defendant having been given an opportunity to make a statement in his own behalf, and the government having had the opportunity to reply thereto, it is hereby

ORDERED that the defendant be committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of

_Not less than fourteen years, Nor more than fifty years._

IT IS FURTHER ORDERED that the Clerk or his Deputy deliver a true copy of this order to the United States Marshal and that the copy shall serve as the commitment of the defendant.

July 6, 1982
_____
Date

_____
Judge

A TRUE COPY OF THIS ORDER DELIVERED TO THE U.S. MARSHAL OR HIS DEPUTY:

SUPERIOR COURT FOR THE ___ RICT OF COLUMBIA

United States of America
District of Columbia:

Case No: F 6044-83

vs.

PDID No. 259-689

ROMES HUSTIN

R

## JUDGMENT AND COMMITMENT/PROBATION ORDER

The above-named defendant having entered a plea of ___ ☐ Not Guilty ☑ Guilty to the Charge(s) of ___

(C) Murder II

and having been found guilty by ☐ Jury ☑ Court, it is hereby ORDERED that the defendant has been convicted of and is guilty of the offense(s) charged, and is hereby SENTENCED to

NLT (7) Seven years to NMT (25) Twenty
Five years. The Court recommends that
Deft. Maintain present place of Incarcerate
Federal System.

☑ ORDERED that the defendant is committed to the custody of the Attorney General for imprisonment for the period imposed above.

☐ ORDERED that the defendant be placed on probation in charge of the Director, Social Services Division, and it is further ORDERED that while on probation the defendant observe the following marked conditions of probation:

  ☐ Observe the general conditions of probation listed on the back of this order.

  ☐ Obtain a job as soon as possible or continue your present employment.

  ☐ Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with written notice from your Probation Officer.

  ☐ Treatment for ☐ alcohol problems, ☐ drug dependency or abuse as follows:

  ☐ Restitution of $___ in monthly installments of $___ beginning ___ (see reverse side for payment instructions. The Court will distribute monies to ___

  ☐ ___

Costs in the aggregate amount of $___ have been assessed under the Victims of Violent Crime Compensation Act of 1981, and ☐ have ☐ have not been paid.

ORDERED that the Clerk deliver a true copy of this order to appropriate authorized officials and that the copy shall serve as the commitment/order for the defendant.

10-18-84
Date

Judge

Certification by Clerk pursuant to Criminal Rule 32(d).

10-18-84
Date

Nardette Taylor
Deputy Clerk




# The Board of Parole
### *of the*
## District of Columbia

## NOTICE OF BOARD ORDER

Order # 1 of 1

In reference to:

**DCDC** 180-934

**DOB** 12/17/1954

**DOCKET** H9710-0069

**NAME** ROMES  AUSTIN

**SSN** - -          **LOCATION** OCCOQUAN FACILT

**CONSIDERATION TYPE** H:INITIAL

The District of Columbia Board of Parole issues the following **ORDER:**

DENY PAROLE; RECONSIDER FOR PAROLE BY 11/14/2000

*POSTED*

Implementation of this Order shall include the following:
Special Instructions for Reconsideration

PROGRAM PARTICIPATION
WORK DETAIL
NO NEW DISCP. REPORTS
PSYCHOLOGICAL COUNSELING

PSYCHOLOGICAL EVALUATION
COMPLETE SUBS. ABUSE PROGRAM
COMMUNIC/CONFLICT RESOLU

Remarks:

Decision and set-off based upon subject's prior failure under community supervision; ongoing or repetitive criminal behavior; and need for programming to remain crime-free in the community.

11/07/1997
_____
Date

_____
Chairman
on behalf of the Board of Parole

Seal

[ Institution ]

RE: _Ramos Austin_ DCDC# _180-934_ Board Order Date: _11/09/97_

Code #     **Reasons for the Board's Decision are Circled Below:**

20  As Recommended by Point Assignment Grid Score of: _____

(30) Set-off is Outside Parole Guidelines Recommendation Due to Countervailing Factors

21  Exceptional Program or Work Assignment Achievement
    Successful completion of appropriate educational or vocational programs or program levels which increased the
    likelihood the offender will remain crime-free in the community, OR exceptional and sustained performance in one or
    more work details which increased the likelihood the offender will remain crime-free in the community, OR maximum
    effort to participate in appropriate programs, but opportunities for programming were not available, and offender's
    programming needs can be met in the community.

22  Record of Nonviolent Offenses
    criminal convictions have not involved injury or threat of injury to others

23  Substantial Crime-Free Period
    in the 5 years prior to committing instant offense, subject was not committed for more than 30 days on any offense,
    AND     offender has otherwise demonstrated an ability to remain crime-free in the future

24  Substantial Previous Period in Custody on Other Sentences or Additional Committed Sentences
    offender has demonstrated during this continuous period in custody, which included or will include other sentences, that
    he or she is ready to be paroled to the community or to his or her consecutive sentence

25  Substantial Cooperation with the Government
    documented special or unusual assistance to DCDC or another government agency which made an exceptional
    contribution to the health, welfare, or safety of persons or property

29  Availability of Community Resources Leading to Better Parole Prognosis
    an opening or opportunity for offender to participate in a program, service or other accommodation in the community,
    AND     that will meet the offender's identified needs and lead to reduced risk to the community or another person

28  Poor Medical Prognosis
    terminally ill or sufficiently debilitated so that the likelihood of repeated criminal involvement or risk to the community
    or other person is minimal

26  Other Changes in Circumstances
    capabilities or characteristics of offender have changed in ways that minimize the likelihood of repeated criminal
    involvement, or risk to the community or other person

(61) Prior Failure Under Community Supervision
    offender's prior negative conduct while under community supervision is likely to be repeated if again released to the
    community

(69) Ongoing or Repetitive Criminal Behavior
    failure to remain free of criminal activity over sustained periods of time, OR instant offense is similar to a prior offense
    and is likely to be repeated

62  Prior Record of Violent Behavior
    prior record of violent behavior that creates an unacceptable risk to public safety

63  Instant Offense Involved Unusual Cruelty to Victims
    physical, mental, or emotional abuse beyond the degree needed to sustain a conviction on the instant offense, OR
    especially vulnerable victims (for example, children or elderly persons victimized by assaultive, exploitive, or fraudulent
    behavior)

64  Serious Negative Institutional Behavior
    documented criminal conduct or breach of institutional rules, the severity, frequency, or recent occurrence of which
    indicates that subject is not ready to remain crime-free in the community

65  Opportunity but Little Effort to Engage in Productive Programming or Work
    an opportunity for productive programming or work was made available by the Department of Corrections, parole
    officer, or other agency or employer, AND offender was able but failed to make appropriate use of that opportunity

66  Absence of Community Resources Which Ensure Safety of the Community
    unavailability of necessary services to support offender's personal or community adjustment, and minimize risk to the
    community, offender, or other person

(67) Needs Programming to Remain Crime-Free in the Community
    offender requires appropriate programming to address the underlying cause of his or her criminal conduct and reduce
    the risk to the community

70  Other:_____

# HEARING SUMMARY

**Name:  Austin, Romes**

**Reg No:  00070-000**

## Hearing Parameters

Hearing Type ................................: **Rehearing (Initial Hearing Before 8/5/98)**

Hearing Date ................................: 12/7/04

Examiner......................................: Rob Haworth

Institution ....................................: Atlanta USP

## Sentence Parameters

Sentence Type..............................: **DC Parole Eligible**

MR/Statutory Release .................: 5/29/2032

Full Term Date.............................: 1/18/2057

Months in Custody.......................: 276 as of 12/18/04

Fines/Restitution/Assessment ......: None

Detainer.......................................: None

**Additional text regarding the above parameters:**  None

---

## Prior Action & Institutional Factors

**Prior Action:**  See the Prehearing Review dated 11/10/04. This prisoner is serving a 75-year sentence. He has previously been denied parole by the DC Board and the USPC. His last NOA ordered a Rehearing after 36 months during December 2004.

**Codefendants:**  No information.

**Representative & Representative's Statement:**  Counselor Craig attended the hearing and made a statement on subject's behalf. Counselor Craig runs a Program titled Cage your Rage. The subject participates in that program and is doing very well. Counsel Craig considers him one of the best inmates he's ever worked with. The subject has good attitude and is a good participant in the program.

**Prisoner's Statement:**  The prisoner stated he has participated in some programs and has worked hard on his job assignment. He is hopeful of parole.

## Disciplinary Infractions

**No. 1 - BOP Incident Report No. 123345**
   **Description of Behavior:**  Use of Drugs: On 5/27/04 the subject tested positive for use of marijuana. He was found guilty by the DHO on 6/29/04 and received 60 days segregation, 60 days loss of commissary and 120 days loss of visiting privileges.
   **Prisoner's Response:**  The subject admitted guilt.

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.
**Basis:** DHO finding of 6/29/04 and your admission.
**Rescission Guideline: 1-point.**

**Program Achievement:** As indicated above, the subject participates in the Cage your Rage Program and is considered a good participant. He is in the GED Preparation Program and has good reports from the Education Department. He works as Orderly in the Unit and receives good reports.

During the hearing Case Manager Carpenter stated that she feels subject is sincere in his education work and he strives to get along with other prisoners and staff. Ms. Carpenter stated that subject has been no problem for prison staff. She believes that the positive drug incident is very uncharacteristic of this prisoner and not likely to happen again.

**Release Plans:** The subject wants to live in Maryland with his daughter. She lives in the Metropolitan DC area. He can find employment.

## Guideline Parameters, Evaluation & Recommendation

Prior Grid Score:...................1
Discipline:........................ +1
Program Achievement:...... -1
Current Grid Score:..............1

**Evaluation:** This prisoner has done very well in prison. The difficulty in making a parole decision is the serious nature of the current offenses and the risk he may pose to the community. He has served 23 years as of next month. As pointed out in the Prehearing Assessment, subject is serving for a robbery during which two people were shot and murdered that was a separate offense he committed. This examiner would not likely be willing to recommend parole before 30 years of prison time had been accomplished. The prisoner is viewed as a more serious risk for the same reasons provided on the last NOA.

**Recommendation:** Deny Parole. Continue for a Rehearing in December 2007, after the service of 36 months from your last hearing. Reasons for going outside the guidelines taken from NOA dated 1/18/02 – you were involved in a robbery in which you shot two people and you were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money. The commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time.

**Conditions:** None.

**Statutory Interim Hearing:** None.

**Guideline Use:** A decision above the guidelines are warranted because see Recommendation Section above.
**Additional Text:** The decision to go outside the guidelines, that is, justified above relates to the rehearing guidelines and the point score guidelines. The normal rehearing range for a DC Case like this would be 12-months. The subject previously received the 36 months setoff so maintaining the 36-month setoff is the appropriate action at this time since parole is being denied.

**Austin, Romes, Reg. No. 00070-000**                    **Page 2 of 3**

**Executive Reviewer's Comments:**

JRH/PAH
December 14, 2004

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**Notice of Action**

D-2

| | |
|---|---|
| Name: AUSTIN, Romes | Institution: Atlanta USP |
| Register Number: 00070-000 | |
| DCDC No: 180-934 | Date: January 18, 2002 |

In the case of the above-named, the following parole action was ordered:

Deny parole. Continue for a rehearing in December 2004, after the service of 36 months from your hearing date of December 17, 2001.

**REASONS**:

Your Grid Score at your last hearing was 2 point(s). You continue to be scored under the 1987 guidelines of the D.C. Board of Parole.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes -1 point for ordinary program achievement since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 1. You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. Those guidelines indicate that parole should be granted at this time. After consideration of all factors and information presented, a departure from the guidelines at this consideration is warranted because your offense was particularly aggravated in that you were involved in a robbery in which you shot not only your co-defendant but also an innocent victim and were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money. Your commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time.

After consideration of all factors and information presented, a departure above the rehearing guidelines at this consideration is warranted because you have not yet attained your GED or completed a vocational training. The aggravated nature of your crimes, which involved the shooting of two persons and the murder of a third and two separate unrelated behaviors, warrants continued programming and counseling.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:     Sharon Barnes-Durbin, SCSA
        CSS Data Management Group
        D.C. Court Services & Offender Supervision Agency
        300 Indiana Avenue, N.W., Suite 2149
        Washington, D.C. 20001

**D.C. Rehearing/Rescission Prehearing Assessment**
**Adult and Youth**
**(Initial Hearing Before 8/5/98 ; For Summary use RHO-S)**

**Offense of Conviction :** Assault With Intent to Rob While Armed; Murder II

| | | | |
|---|---|---|---|
| DCDC Number.............: | 180-934 | PDID Number...............: | 259-689 |
| Name.........................: | Austin Romes | Sentence Type..............: | Adult |
| Reg. No......................: | 00180-934 | Short Term Date............: | 10/26/2031 |
| Birthdate.....................: | 12/17/1955 | Full Term Date.............: | 01/18/2057 |
| Pre-Assessment Examiner.: | Poteat Adrienne R. | Fines/Restitution/ | |
| Rehearing Date.............: | 10/02/2001 | Court Assessment..........: | $0 |
| Institution...................: | "In Transit" | | |

Detainer:  None

**Previous Parole Action :**
The offense of AWIT Robbery involved the robbery of a High Store by the subject and co-defendant, resulting in the subject shooting an employee and second victim.

There is no official version of the Murder offense. In addition, a Police Report was requested, but to no avail. However, information contained in a Psychological Evaluation states that the subject indicated he was hired to kill someone's husband and accomplished the task.

The subject appeared before the D.C. Board for an Initial hearing, during which time parole was denied with reconsideration for parole by November 14, 2000.

The subject is current "In Transit".

**Previous Grid Score = 2**

**Institutional Adjustment and Release Plans:**
The subject's overall institutional adjustment has been satisfactory with program involvement and no disciplinary reports.

Release plans include residing with his family in the District of Columbia.

**Negative Institutional Behavior**
Category IV Points:  0
Misconduct Details:
The subject has not incurred any disciplinary infractions.

**Program Achievement**

U.S. Department of Justice                        **Notice of Action**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

---

Name: AUSTIN, Romes                      Institution  : Atlanta USP
Register Number: 00070-000
DCDC No: 180-934                          Date          : December 23, 2004

---

As a result of the hearing conducted on December 7, 2004, the following action was ordered:

Deny parole. Continue to a Three-Year Reconsideration Hearing in December 2007.

REASONS:

Your Grid Score at your last hearing was 1 point(s). You continue to be scored under the 1987 guidelines
of the D.C. Board of Parole.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes 1 point for negative
institutional behavior since your last hearing.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes 1 point for ordinary
program achievement since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 1.
You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. Those guidelines
indicate that parole should be granted at this time. After consideration of all factors and information
presented, a departure from the guidelines is found warranted because: multiple armed offenses were involved
in a robbery in which you were also implicated as a violent offender consequently you were in a scheme for hire in
which you were paid in cash for the robbery and the commission of money and the commission of these multiple
violent acts makes you a more serious risk to commit further violent behavior in the community if
released at this time.

The decision to go outside the guidelines, that is, justified above relates to the rehearing guidelines and
the point score guidelines. The normal rehearing range for a DC Case like this would be 12-months. The
subject previously received the 36 months set off so maintaining the 36-month setoff is the appropriate
action at this time since parole is being denied.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies
may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:     CSS Data Management Group
        D.C. Court Services & Offender Supervision Agency
        300 Indiana Avenue, N.W., Suite 2070
        Washington, D.C. 20001

---

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland  20815-7201

**Notice of Action**

Name:  AUSTIN, Romes
Register Number: 00070-000
DCDC No:  180-934

Institution:   Gilmer FCI

Date:    December 14, 2007

As a result of the hearing conducted on November 21, 2007, the following action was
ordered:

Deny parole.  Continue for a rehearing in November 2010, after the service of 36 months
from your last hearing.

**REASONS**:

Your Grid Score at your last hearing was 1 point(s).  You continue to be scored under the
1987 guidelines of the D.C. Board of Parole.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes +1
point for negative institutional behavior since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current
Grid Score is 2.  You continue to be scored under the 1987 guidelines of the D.C. Board
of Parole.  Those guidelines indicate that parole should be granted at this time.  After
consideration of all factors and information presented, a departure from the guidelines at
this consideration is warranted because your offense behavior involved the following
aggravating circumstances in that you engaged in an offense involving a murder for hire.
After the commission of that offense, you then committed other acts of violence in the
community.  In your commission the attempted robbery of a convenience store in which
tow individuals were shot by you to include the store owner and your codefendant.

After consideration of all factors and information presented, a departure above the
rehearing guidelines at this consideration is warranted for the same reasons provided
above for denying parole.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer.  In
certain cases, copies may also be sent to the sentencing court.  You are responsible for
advising any others you wish to notify.

cc:    CSS Data Management Group
        D.C. Court Services & Offender Supervision Agency
        300 Indiana Avenue, N.W., Suite 2070
        Washington, D.C. 20001

# REPORT ON THE DEVELOPMENT OF PAROLING POLICY GUIDELINES

## FOR THE DISTRICT OF COLUMBIA

## BOARD OF PAROLE

FILED

MAY ██ 1980

CLERK, US ████████████
DISTRICT OF COLUMBIA

Exhibt "A"
Civil Action No. 80-0516

## STATEMENT OF POLICY AND PROCEDURES

The District of Columbia Board of Parole represents but one link, albeit a crucial one, in the overall administration of criminal justice in the District. As such, the Board of Parole, after examining a variety of approaches for structuring its decision-making process, is adopting a set of formal parole guidelines. In so doing, the District of Columbia Board of Parole joins paroling authorities in a number of other jurisdictions, such as the United States Parole Commission, the Pennsylvania Board of Probation and Parole, and the New Jersey Board of Parole that have sought to structure the exercise of the paroling authority's discretion.

The decision to employ formal parole guidelines has been made with the benefit of prior research in this area done by the Board of Parole as well as by parole entities in other jurisdictions. Based on the results of these studies and the experiences of other jurisdictions, the Board of Parole is confident that its guidelines are a significant step toward a more coherent parole decision-making process that will lead both to increased consistency in parole release decisions and enhanced accountability of the Board. It should be noted further that the adoption of these guidelines will enable the Board of Parole to function more productively within a sentencing guidelines structure, such as that which might be promulgated by the D.C. Superior Court's Sentencing Guidelines Study Committee.

The decision to utilize parole guidelines should not be viewed as a decision to abandon the aim of making parole release decisions on the merits of the individual case. Instead, the use of guidelines should be seen as an effort to make explicit those factors that will be considered in each individual case.

We, however, do not consider the guidelines promulgated here to be a finished or static product. The model used is a dynamic one, requiring an ongoing data collection and feedback mechanism to provide the information necessary to modify either the content or the structure of the guidelines if, based on experience, it appears that the objectives of the guideline system could be better served by such modification. The point that these guidelines represent only the initial effort in the process cannot be over-emphasized.

## Major objectives

In promulgating formal parole guidelines, the District of Columbia Board of Parole expects to achieve the following objectives:

1.  Promoting consistent parole decision-making by the Board of Parole;

2.  Making more explicit the paroling policies of the Board of Parole;

3.  Incorporating a concern for fairness by ensuring that the time served by an offender is proportionate to the sentence imposed by the court and the risk posed by the offender.

4.  Achieving the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilitation;

5.  Penalizing institutional misconduct; and

6.  Developing an evolutionary model of management control,

wherein the policies, procedures, and decisions of the Board
of Parole are modified or adjusted as a result of an ongoing
data collection and feedback mechanism.

While there are clearly a range of secondary objectives that the
Board of Parole wishes to achieve, the above represent the
primary goals of the new guidelines.


## Principles behind the D.C. Board of Parole Guidelines

Sound operating policies must never be created in a vacuum.
In adopting its guidelines, the Board of Parole has been guided
by its mandates (as set out in Title 24 of the District of
Columbia Code and Title 28, section 204, of the District of
Columbia Municipal Regulations) and by a number of operating
principles. The principles all derive from the Board's goals of
achieving fairness and consistency in its decisions.

The first principle is that the touchstone of the parole
decision-making process should be based on offender
characteristics that have a statistically determined bearing on
the offender's risk of future involvement in criminal behavior.
This focus should enable the Board to most reliably meet its
statutorily imposed duty to protect the public. The structured
consideration of other offense and institutional factors within
this empirically based framework will ensure that the Board
utilizes the full range of information at its disposal to
determine that parole release in an individual case would not be
incompatible with the welfare of society.

The second principle behind the guidelines is that the court
addresses the purposes of retribution and general deterrence
through the sentence it imposes in adult cases. As a matter of

policy, the Board of Parole does not act in any manner that might be viewed as a usurpation of the functions of the sentencing judge. Similarly, the Board assumes that the sentencing goals of retribution and general deterrence do not apply in the case of youthful offenders sentenced under the Youth Corrections Act (18 U.S.C. § 5010). The YCA statute provides general guidance to both the court and the paroling authority by requiring that the focus of the sentencing and release decisions be on whether a youth offender will derive further benefit from treatment. Guidelines oriented to the assessment of risk and institutional performance, therefore touching on the need for and progress towards rehabilitation, will be consistent with the intent of this Act.

A third principle is that in determining the factors to be used in assessing the guidelines, consideration should be given to their fairness as well as to their statistical reliability. Unless predictibility would be seriously compromised, social items, such as employment, living arrangements, and education should be excluded from consideration. Additionally, attempts should be made to ensure that the information used to assess the guidelines is of a type that can be reliably collected in that it is objective, generally available and easy to score.

In short, the overriding principle of the guidelines is that they should enable the Board of Parole to exercise its release discretion when, and only when, reliable information indicates that there is a reasonable probability that an individual will live and remain at liberty without violating the laws and in the

4

opinion of the ~~~~~ such that it is not comprised of the

welfare of society.

## Overview of the Guidelines

The D.C. Board of Parole's guidelines are comprised of four factors, two of which utilize information known at the time of incarceration, the other two based on post-incarceration factors.

PRE-INCARCERATION FACTORS:

1. **Degree of Risk:** This is the primary factor of the guidelines, applicable in all cases, and is based on calculation of the Salient Factor Score, an actuarial risk assessment device that relies exclusively on information known at the time of incarceration. All other factors are considered within the context of this general risk classification.

2. **Type of Risk:** This is an aggravating factor applicable to those cases in which the Board has made findings that the current offense, or the offender's pattern of past offenses, involved violence, weapons, or drug trafficking.

POST-INCARCERATION FACTORS:

3. **Institutional adjustment:** This is an aggravating factor applicable to those cases in which the Board has made findings that disciplinary infractions, adjudicated by the Department of Corrections under due process procedures, are either serious or repetitious enough to impact negatively on the parole decision.

4. **Program participation:** This is a mitigating factor applicable to those cases in which the Board has made findings that the program or work accomplishments of the prisoner during this period of incarceration are substantial enough to impact favorably on the parole decision.

The guidelines are determined by first calculating the Salient Factor Score. This score places the offender into one of four categories of risk. A baseline number of points is assigned to each risk category. For each of the other factors for which an affirmative finding is made, points to be added to or

Case 1:08-cv-0100         Document 46-2     Filed 12/14/2007     Page 9 of 100

subtracted from base print are set for within each
category. The resulting point total determines whether or not
parole is granted, and if so, the level of supervision to be
imposed. Decisions outside the guidelines may be rendered for
good cause when accompanied by written reasons that include a
summary of the information upon which the determination is based.

Attachments to this document provide the following specific
information. Annex A presents the guidelines for initial
hearings, including the Salient Factor Score, the guideline point
assignment grid, and guideline worksheets that provide
definitions and illustrate the guideline calculation process.
Similar information for rehearings is contained in Annex B.
Annex C presents a detailed background report explaining the
purpose and supporting rationale of each guideline factor. Annex
D contains the Board's proposed research agenda, followed by the
instruction manual for calculating each item of the Salient
Factor Score in Annex E.

ANNEX A

DISTRICT OF COLUMBIA PAROLE DECISION-MAKING GUIDELINES

**Item A: PRIOR CONVICTIONS/ADJUDICATIONS (ADULT OR JUVENILE)** ...... ☐

    None ................. = 3
    One .................. = 2
    Two or Three ........ = 1
    Four or more ........ = 0

**Item B: PRIOR COMMITMENT(S) OF MORE THAN THIRTY DAYS** .............. ☐
    **(ADULT OR JUVENILE)**

    None ................. = 2
    One or two .......... = 1
    Three or more ....... = 0

**Item C: AGE AT CURRENT OFFENSE/PRIOR COMMITMENTS** .................. ☐

  Age at commencement of current offense
    26 years of age or more .......... = 2
    20-25 years of age .............. = 1
    19 years of age or less .......... = 0

  **\*\*\*Exception:** If five or more prior commitments of more
    than thirty days (adult or juvenile), place an "X" here _____
    and score this item ................... = 0

**Item D: RECENT COMMITMENT FREE PERIOD (THREE YEARS),** .............. ☐

    No prior commitment of more than thirty days (adult
    or juvenile) or released to the community from last
    such commitment at least three years prior to the
    commencement of the current offense .............. = 1

    Otherwise ........................................ = 0

**Item E: PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS** ................ ☐
    **VIOLATOR THIS TIME**

    Neither on probation, parole, confinement,/or escape
    status at the time of the current offense; nor
    commited as a probation, parole, confinement, or
    escape status violator this time ................ = 1

    Otherwise ........................................ = 0

**Item F: HEROIN/OPIATE DEPENDENCE** ................................. ☐

    No history of heroin/opiate dependence ... = 1
    Otherwise ................................ = 0

  **TOTAL SCORE** ...................................................... ☐

  Note:  For purposes of the Salient Factor Score, an instance of criminal
      behavior resulting in a judicial determination of guilt or an
      admission of guilt before a judicial body shall be treated as a
      conviction, even if a conviction is not formally entered.

(oint Assignment Grid)

**Instructions:**

1. Circle the appropriate Salient Factor Score Category.
2. Circle any aggravating and/or mitigating factors for which a finding has been made.
3. Within each applicable cell, circle the number of points to be added or subtracted from the baseline point assignment determined by the Salient Factor Score Category.

DEGREE OF RISK
Salient Factor Score Category

|  | Low | Fair | Moderate | High |
|---|---|---|---|---|
|  | +0 | +1 | +2 | +3 |
| 1. TYPE OF RISK |  |  |  |  |
| a. Violence | +1 | +1 | +1 | +1 |
| b. Weapons |  |  |  |  |
| c. Drug Trafficking |  |  |  |  |
| 2. Negative Institutional Behavior | +1 | +1 | +1 | +1 |
| 3. Program Achievement | -1* | -1 | -1 | -1 |

* Applicable only where points have been added for aggravating factor.

TOTAL POINTS: _____

IF POINTS = 0:  Parole should be granted at initial hearing with low level of supervision required.

IF POINTS = 1:  Parole should be granted at initial hearing with high level of supervision required.

IF POINTS = 2:  Parole should be granted at initial hearing with with highest level of supervision required.

IF POINTS = 3 - 5:  Parole should be denied at initial hearing and rehearing scheduled.

**Instructions:**

1. Circle the appropriate Salient Factor Score Category.
2. Circle any aggravating and/or mitigating factors for which a finding has been made.
3. Within each applicable cell, circle the number of points to be added or subtracted from the baseline point assignment determined by the Salient Factor Score Category.

DEGREE OF RISK

Salient Factor Score Category

|  | | Low | Fair | Moderate | High |
|---|---|---|---|---|---|
|  | | +0 | +1 | +2 | +3 |
| 1. | TYPE OF RISK | | | | |
|  | a. Violence | +1 | +1 | +1 | +1 |
|  | b. Weapons | | | | |
|  | c. Drug Trafficking | | | | |
| 2. | Negative Institutional Behavior | +1 | +1 | +1 | +1 |

*As initial hearings for YCA offenders are held approximately 60 days after their incarceration, a reduction in points for sustained program achievement is not appropriate at the initial hearing.

TOTAL POINTS: _____

IF POINTS = 0:  Grant parole at initial hearing with conditions established to address treatment needs.

IF POINTS =1-5:  Deny parole at initial hearing and schedule for a rehearing based on estimated time to achieve program objectives established by the classification team and the Board of Parole.

10

A.  Salient Factor Score _____ (From SFS Worksheet)
RISK GROUP:
    Low      _____ (10-9)    Moderate _____ ( 5-4)
    Fair     _____ ( 8-6)    High     _____ ( 3-0)

B.  TYPE OF RISK ASSESSMENT:

|  | Yes | No |
|---|---|---|

1.  **Violence:**
    a.  Does the current offense involve a felony
        in which the defendant caused, attempted
        to cause, or threatened to cause death or
        serious bodily injury to another individual?     _____  _____

    b.  Does the offender have two or more
        previous convictions for such felony
        described in (1.a)?                               _____  _____

    c.  Does the offender have a history of
        committing crimes of violence while under
        the influence of PCP?                            _____  _____

2.  **Weapons:**
    a.  Does the current offense involve a felony
        in which the defendant used a dangerous
        weapon?                                          _____  _____

    b.  Does the offender have two or more
        previous convictions for such felony
        described in (2.a)?                              _____  _____

3.  **Drug Trafficking:**
    a.  Does the current offense involve a
        felony conviction under the D.C.
        Uniform Controlled Substances Act
        for distribution, or intent to
        distribute, illicit substances?                 _____  _____

    b.  Does the offender have two or more
        previous convictions for significantly
        similar offenses as those described in
        (3.a) (i.e., convictions under this
        statute or a similar one in another
        jurisdiction)?                                  _____  _____

## Post-Incarceration Factors

|  | Yes | No |
|---|---|---|

A.  INSTITUTIONAL ADJUSTMENT:
    Has this offender committed
    serious or repeated disciplinary
    infractions (adjudicated under
    Department of Corrections due
    process procedures)?                                _____  _____

B.  INSTITUTIONAL PROGRAM PARTICIPATION
    Has this offender demonstrated sustained
    achievement in the area of prison
    programs, industries or work assignment
    during this period of incarceration?               _____  _____

11

(3) Months in custody at Date of Hearing: _____

(4) Decision:  /  / Parole        Date_____
               /  / Rehearing     Date_____

(5) Decision is Within___  Below___  Above____  Guidelines

Reasons (if outside of the Guidelines):

WORSE RISK:

...Repeated Failure under parole supervision;
...Current offense involves on-going criminal behavior
...Lengthy history of criminally related alcohol abuse;
...History of repetitive sophisticated criminal behavior
...Unusually extensive and serious prior record [at least five
   felony convictions]
...Unusual cruelty to victims
Specifically:_____
_____

BETTER RISK: NOTE:  Applicable only to offenders not classified
                    as low risks by the salient factor score.

...record resulting exclusively from trivial offenses
...substantial crime-free period for which credit not already
   given on the salient factor score.
Specifically:_____
_____

OTHER PRE-INCARCERATION FACTORS:

...This YCA offender would have been exposed to a maximum
   sentence of _____ months had he been sentenced as an adult
...Substantial cooperation to the government that has not been
   otherwise rewarded
...Substantial Period in Custody on other Sentence(s) or
   Additional Committed Sentences.(NOTE:  This circumstance can
   also be used as an "other change in circumstances" below if a
   new committed sentence is imposed after incarceration on the
   current                        offense.
...Other_____
_____
Specifically:_____
_____

POST-INCARCERATION FACTORS:

...Change in the availability of community resources leading to
   better parole prognosis
...Poor medical prognosis
...Other Change in Circumstances _____
_____
Specifically:_____
_____

12

ANNEX B

REHEARING GUIDELINES

## POINT GRID FOR PAROLE REHEARINGS

|  | | POINTS |
|---|---|---|
| 1. | Points From Previous Hearing | |
| 2. | Negative Institutional Behavior Since Last Consideration | +1 |
| 3. | Program Achievement Since Last Consideration | -1 |

TOTAL POINTS: _____

IF POINTS = 0-3, Parole should be granted at this rehearing with highest level of supervision required.

IF POINTS = 4-5, Parole should be denied and a rehearing date scheduled.

## Findings

| | | Yes | No |
|---|---|---|---|
| A. | INSTITUTIONAL ADJUSTMENT: Has this offender committed serious or repeated disciplinary infractions (adjudicated under Department of Corrections due process procedures)? | _____ | _____ |
| B. | INSTITUTIONAL PROGRAM PARTICIPATION Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignment during this period of incarceration? | _____ | _____ |

14

(1) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(3) Months in custody at Date of Hearing: _____

(4) Decision:  /  / Parole          Date_____
              /  / Rehearing       Date_____

(5) Decision is Within____  Below____  Above_____  Guidelines


Reasons (if outside of the Guidelines):


...Change in the availability of community resources leading to
   better parole prognosis
...Poor medical prognosis
...Other Change in Circumstances _____
   _____

Specifically:_____
_____

15

ANNEX C

BACKGROUND REPORT

## RATIONALE OF THE PAROLE GUIDELINES

### The Experience of Other Jurisdictions

The parole decision-making guideline system for the District of Columbia has been built on ideas and tools derived in part from the United States Parole Commission and in part from those of the state of Pennsylvania. Both of these models provide a decision-making framework that is specific enough to control the exercise of the Board's discretion while still allowing the flexibility to deviate from the guidelines when the circumstances of a particular case so warrant.

The Board incorporates the risk assessment component of the federal model, the Salient Factor Score, into its guidelines, thereby benefitting from the results of extensive research carried out over the last fourteen years to construct and validate this actuarial device. The Board, however, did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale. It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant. That of Pennsylvania, which considers more subjective parole factors within the context of an actuarial risk assessment, seemed a good model for accomplishing these objectives.

### Choice of Salient Factor Score

The District of Columbia, in 1984, engaged in a research project, funded by the Bureau of Justice Statistics, to test the applicability of the Iowa Risk Assessment Scale. This device had

appeal because it contains a "risk of violence" classification in
addition to a general risk classification scheme. Our research,
based on followup of a retrospective sample of 581 District of
Columbia parolees released during CY 1980, however, did not
indicate that this device would be a satisfactory one for our
population.[1]

With the seeming inapplicability of the Iowa Risk Assessment
to D.C. parolees, we turned to the Salient Factor Score, the
risk assessment device that has been used in connection with
federal parole decision-making, in one form or another, for the
last ten years. There were a number of reasons for turning to
the federal device:

1. It was developed and validated on samples of prison releasees
that included some D.C. offenders (i.e., those incarcerated in
federal facilities). This led us to believe it might apply to the
D.C. population better than the Iowa scale.

2. A recent annual D.C. Board of Parole performance study[2]
showed that many of the factors that seem to predict success or
failure of D.C. offenders under parole supervision are included
in the Salient Factor Score.

3. It does not contain social items such as employment or living
arrangements, and relies on adjudicated guilt (rather than
arrest) for determining its prior record items. It therefore fit
with our principles of guideline construction.

---

[1] District of Columbia Office of Criminal Justice Plans and
Analysis, D.C. Department of Corrections, "The Iowa Assessment
Tool: A Partial Replication", Report to the Bureau of Justice
Statistics, Washington, D.C., August, 1984.

[2] D.C. Department of Corrections, "Annual Parole Performance
Monitoring Report", Washington, D.C., August, 1984.

4.  Also consistent with our principles of guideline construction, the salient factor score (a) is relatively straightforward to score, using a simple additive scale of 0's, 1's, and 2's, and (b) has been subjected to two separate reliability exercises which resulted in the refinement of its items and the instructions for scoring items to enhance its reliability (e.g., its items now focus on recent information which is more readily available and therefore more likely to be scored correctly).[3]

The Salient Factor Score has been used as the risk assessment component of the federal parole guidelines nationwide since 1974 and has a strong empirical foundation.  It was developed as part of a three-year federal guideline development project, funded by the Law Enforcement Assistance Administration, being initially constructed and validated on random samples of offenders released from federal prisons during 1970.[4]  Since that time the device has been re-validated on other samples of federal prison releasees.[5]  The device has also been modified through the years so as to eliminate reliance on social items without a loss of predictive power, and to remove items that, though predictive when coded for a retrospective sample, turn out to be less

---

[3]Hoffman, P., Fife, J., and Stone-Meierhoefer, B., "Reliability in Guideline Application:  A Preliminary Assessment", United States Parole Commission Research Report 25, May, 1980; Hoffman, P., Stone-Meierhoefer, B., and Fife, J, "Reliability in Guideline Application:  Initial Hearings 1980", United States Parole Commission Research Report 27, July, 1981.

[4]See, Hoffman, P. and Beck, J., "Parole Decision-Making:  A Salient Factor Score", Journal of Criminal Justice, V. 2, 1974, pp. 195-206.

[5]See, Hoffman, P., Stone-Meierhoefer, B. and Beck, J., "Salient Factor Score and Releasee Behavior:  Three Validation Samples", Law and Human Behavior, V. 2, No. 1, 1978, pp. 47-63.

effective in practice either because their basis is easily manipulated or because it is difficult to score the item reliably.

To ascertain whether this device differentiated adequately for D.C. offenders, we calculated salient factor scores as best we could from available data for 402 of the cases in the retrospective sample that had been used for the research on the Iowa device.[6]  On the whole, outcome by score distributes as would be expected, with those scoring in the low risk range having the lowest revocation rate and those parolees scoring in the high risk range having the highest revocation rate.  It is critical to note that due to serious limitations of our database, these analyses are strictly preliminary.[7]  Therefore, the Board will adopt the Salient Factor Score as a part of its guidelines on an experimental basis.  This necessitates the development of a data feedback system that will allow us to validate more rigorously the applicability of this device to our population.

---

[6] Supra, Note 2.

[7] First, the sample for which calculation of the Salient Factor Score was attempted was but a subsample of the original 581 1980 releasees.  In addition, the sample included only those who were release by parole during 1980.  Secondly, the outcome measures refer to a parolee's behavior while under supervision.  There is, therefore, not a uniform follow-up period for all sample members and the data are not specific enough to allow for a survival analysis to account for sample "drop-outs".  Further, the scoring of the salient factor score items for our sample cases was not refined to include all of the restrictions that are applicable in actual scoring practice.  For example, the item that refers to prior commitments counts only commitments of more
(Footnote Continued)

Choice of Additional Pre-Incarcerative Factors to be Considered

**TYPE OF RISK**

The Salient Factor Score does not profess to predict the type of criminal behavior in which an offender is likely to become involved. Attempts to predict specific behavior such as dangerousness with any reasonable degree of accuracy have repeatedly failed. For example, our research in connection with the Iowa device failed to replicate its claim to predict violence for our population.

The concept of type of risk, however, is an important one in the parole release decision. It cannot be ignored that if an offender has already indicated through past behavior that he or she is capable of committing a _type_ of crime that is considered particularly serious (e.g. use of violence or weapons), we should be willing to tolerate a lesser _degree_ of risk.

The two systems that we have used as patterns for our guideline development both take this type of information into account. The U.S. Parole Commission lists "a history of repetitive assaultive (violent) behavior" as a risk related reason for going above the guidelines. Pennsylvania lists as reasons for parole refusal: aggressive behavior, victim injury, and weapon involved in the commission of the offense.

The D.C. Board of Parole has chosen to incorporate this consideration into our guidelines in a manner similar to that

--------------------------------

(Footnote Continued)
than thirty days (see _infra_, The Salient Factor Scoring Manual, Annex E); our data, however, did not include information on the length of prior commitments.

used in Pennsylvania, modified to reflect the District's particular crime problems. The Board has chosen three types of offense behaviors to be counted as negative parole indicants: violence (including violence involving PCP use), use of a weapon and drug trafficking. Our guidelines will consider as an adverse parole factor the situation where either the current offense, or two prior felony convictions, involve any or all of the above listed behaviors.

PRE-INCARCERATIVE REASONS FOR GOING OUTSIDE THE GUIDELINES

The Board of Parole recognizes that, when applying guidelines to individual cases, there occasionally will be unique circumstances that are not taken into account by either the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on the release decision. Following the procedures of the U.S. Parole Commission, the Board sets forth examples of circumstances that, when supported by specific documentating information, could constitute reason for going outside of the guidelines. These are listed on the Decision Worksheet for Initial Hearings (see Annex 1).


Selection of Post-Incarcerative Factors to be Considered

INSTITUTIONAL FACTORS:

Adjustment: The relationship between institutional adjustment and release adjustment is essentially curvilenear. A lack of disciplinary infractions may mean one of two things: one is that the offender is a generally good citizen and can be expected to continue to do well upon release; the other that the offender can function successfully only within an institutional setting.

serious adjustment problems while incarcerated, however, do not bode well for post-release adjustment. In addition to this risk-related rationale for including institutional adjustment in our guidelines, we also believe that the Board has a role to play in imposing sanctions for misconduct to contribute to the orderly running of the facility.

For these reasons, the Board's guidelines call for imposing sanctions on offenders who have serious or repeated disciplinary infractions. To ensure the rights of the prisoner, however, the Board will consider only those infractions that form the basis of findings from a Department of Corrections due process hearing.

The inclusion of prison misconduct as a negative parole factor is consistent with the practices of both the U.S. Parole Commission (which penalizes adjudicated misconducts through its recission guidelines) and the Pennsylvania Board of Probation and Parole which lists specified serious or repetitious prison misconduct as its most heavily weighted "reason for parole refusal".

Program Participation: Though studies have been unable to establish an empirical link between participation in programs and post-release outcome, the Board still believes that some offenders will benefit from their prison experiences. Though we can not establish a priori groups of offenders for whom this will be the case, the Board will reward sustained achievement on a case-by-case basis where it seems apparent that the offender has substantially improved his or her situation regarding future criminal behavior. It is hoped that this will encourage

prisoners to avail themselves of the rehabilitative opportunities offered at the institution.

This factor is similarly considered in the parole release decision-making of the U.S. Parole Commission (through its schedule of reductions for superior program achievement) and of the Pennsylvania Board of Probation and Parole which lists positive response to prison programs as a factor countervailing a guideline recommendation to refuse parole.

As part of its research program, the D.C. Board of Parole plans to assess what this approach to participation in prison programming adds to our understanding of rehabilitation and its proper role in the parole process.

## POST-INCARCERATION REASONS FOR DECISIONS OUTSIDE THE GUIDELINES

The D.C. Board of Parole is aware that offenders may experience a change in circumstances other than those delineated by the specific institutional factors that form a part of our guidelines. Where these changes are significant and can be expected to relate to the criteria for parole release, decisions outside the guidelines, supported by specific written reasons, are allowed. Examples of permissible post-incarcerative reasons for going outside the guidelines are listed on the Decision Worksheets for both initial hearings (Annex A) and rehearings (Annex B).

24

ANNEX D

PROPOSED RESEARCH AGENDA

RESEARCH AGENDA

Throughout this report, mention has been made of the feedback system and research tasks that the Board will undertake in support of its guideline system. The major points of our research/data analysis program will be as follows:

(1)  Monitoring guideline usage:  For each case having a parole hearing, data will be kept on each guideline factor and each decision, including the reasons for departure from the guidelines where relevant.  These will be analyzed on an ongoing basis to:

　　a.　Exercise quality control on decision-making in individual cases;

　　b.　Gather material for training purposes; and

　　c.　Assess whether decisions outside the guidelines for particular reasons or in particular types of cases are so frequent as to raise the possibility of incorporating the underlying factor for such decisions into the guideline scheme.

(2)  Releasee Followup:  Additional background and post-release followup data will be collected for each case in order to:

　　a.　Assess the validity of applying the salient factor score to the D.C. population.

　　b.　Assess whether a better risk prediction device can be developed for the D.C. population.

　　c.　Assess whether those cases in which the Board of Parole gave credit for program achievement do better than would be expected given their baseline risk categorization.

(3)  Impact Analysis:  By relating the specific case information to time-served data, the Board will be in a position to assess the impact of any proposed changes in the guidelines on the prison and parole population.

ANNEX E

SALIENT FACTOR SCORING MANUAL

# SALIENT FACTOR SCORING MANUAL[1]

The following instructions serve as a guide in computing the salient factor score. Obviously, no guide can include all possible situations - good judgement always must be used. When in doubt about a classification, follow as closely as possible the examples listed below. Remember, however, that the salient factor score is designed as an actuarial parole prognosis aid. You may override this actuarial predictive aid, where warranted, provided you adequately explain your reasons.

## Item A.   PRIOR CONVICTIONS/ADJUDICATIONS (ADULT OR JUVENILE)

None.......... = 3
One.......... = 2
Two or three.. = 1
Four or more.. = 0

## Scoring Instructions

A.1   In General.   The purpose of this item is to consider previous verified instances of criminal conduct. Except as specifically noted, count all convictions/adjudications (adult or juvenile) for criminal offenses other than the current offense. Count convictions for offenses committed while on bail or probation for the current offense. Do not count the current offense behavior, or any other convictions in the District of Columbia or elsewhere resulting from the offense behavior. These more properly relate to evaluation of current offense factors.

---

[1]Adapted from U.S. Parole Commission Procedures Manual, "Salient Factor Scoring Manual" (January 31, 1983), pp. 55-57.

A.2   **Minor Offenses.**   Do not count convictions for minor offenses such as disorderly conduct, vagrancy, loitering, public intoxication, hitchhiking, possession of alcohol by a minor, or minor traffic offenses. Serious vehicular offenses (e.g., driving while intoxicated, hit and run) are to be counted.

A.3   **Juvenile Conduct.**   Count juvenile convictions/adjudications except as follows:

    (a) Do not count any status offense (e.g., runaway, truancy, habitual disobedience) unless the behavior included a criminal offense which would otherwise be counted;

    (b) Do not count any criminal offense committed at age 15 or less unless it resulted in a commitment of more than 30 days or involved an offense that would be classified as a "High" Type of Risk.

A.4   **Military Conduct:**   Count military convictions/adjudications for acts that are generally prohibited by civilian criminal law (e.g., assault, theft). Do not count convictions for strictly military offenses. NOTE: This does not preclude consideration of serious or repeated military misconduct as a negative indicant of parole prognosis (i.e., a possible reason for overriding the salient factor score in relation to this item).

A.5   **Diversion.**   Conduct resulting in diversion from the judicial process without a specific finding of guilt (e.g., deferred prosecution, probation without plea) is not be be counted in scoring this item. However, behavior resulting in a judicial determination of guilt or an admission of guilt before a judicial body shall be counted as a conviction even if no formal conviction results.

2

**A.6  Setting Aside of Convictions/Restoration of Civil Rights.**
Setting aside or removal of juvenile convictions/
adjudications is normally for civil purposes (to remove
civil penalties and stigma).  Such convictions/adjudications
are to be counted for purposes of assessing parole
prognosis.  This also applies to adult convictions/
adjudications which may be set aside by various methods
(including pardon).  However, convictions/adjudications that
were set aside or pardoned on grounds of innocence are not
to be counted.

**A.7.  Convictions Reversed or Vacated on Grounds of
Constitutional or Procedural Error:**  Exclude any conviction
reversed or vacated for constitutional or procedural
grounds, unless the prisoner has been retried and
reconvicted.  It will be presumed that a conviction/
adjudication is valid.  If a prisoner challenges
such conviction he/she should be advised to petition for a
reversal of such conviction in the court in which he/she was
originally tried, and then to provide the Board with
evidence of such reversal.  NOTE:  Occasionally the file
documents facts clearly indicating that a conviction was
unconstitutional for deprivation of counsel [This occurs
only when the conviction was for a felony, or for a lesser
offense for which imprisonment was actually imposed; and the
record is clear that the defendant (1) was indigent, and (2)
was not provided with counsel and (3) did not waive
counsel].  In such case, do not count the conviction.
Similarly, if the offender has applied to have a conviction
vacated and provides evidence (e.g., a letter from the court
clerk) that the required records are unavailable, do not
count the conviction.  NOTE:  If a conviction found to be
invalid is nonetheless supported by persuasive information
that the offender committed the criminal act, this may be
considered as a negative indicant of parole prognosis (i.e.,
a possible reason for overriding the salient factor score).

**A.8  Ancient Prior Record:**  Do not count convictions occurring
prior to a conviction free record of ten years in the
community immediately prior to the current offense behavior
(including time on probation or parole).  The ten year
period is counted between the date of the last countable
conviction or release from the last countable commitment
(whichever is last) and the date of commencement of the
current offense behavior.  NOTE:  This does not preclude
consideration of earlier behavior (e.g., repetition of
particularly serious conduct) as a negative indicant of
parole prognosis (i.e., a possible reason for overriding the
salient factor score).  Similarly, a substantial crime free
period in the community, not amounting to ten years, may, in
light of other factors, indicate that the offender belongs
in a better risk category than the salient factor score
indicates.

**A.9  Foreign Convictions:**  Foreign convictions for behaviors that
are criminal in the United States are counted.

**A.10  Forfeiture of Collateral.**  If the only known disposition is
'forfeiture of collateral', count as a conviction (if the
offense would otherwise be counted).

## Item B.   PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS (ADULT OR JUVENILE)

None............ = 2
One or two...... = 1
Three or more... = 0

### Scoring Instructions

B.1  Count all prior commitments of more than thirty days (adult or juvenile) resulting from a conviction/adjudication listed under Item A, except as noted below.  Do not count any commitment of thirty (30) days or less. Also count commitments of more than thirty days imposed upon revocation of probation or parole where the probation or parole resulted from a conviction/adjudication counted under Item A.

B.2  Count only commitments that were imposed prior to the commission of the current offense behavior.  Commitments imposed after the current offense are not counted for purposes of this item.  Concurrent or consecutive sentences (whether imposed at the same time or at different times) that result in a continuous period of confinement count as a single commitment.  However, a new court commitment of more than thirty days imposed for an escape/attempted escape or for criminal behavior committed while in confinement/escape status counts as a separate commitment.

B.3  Definitions

(a)  This item only includes commitments that were actually imposed.  Do not count a suspended sentence as a commitment.  Do not count confinement pending trial or sentencing or for study and observation as a commitment unless the sentence is specifically to 'time served'.  If a

sentence imposed is subsequently reconsidered and reduced, do not count as a commitment if it is determined that the total time served, including jail time, was 30 days or less.

(b) This item includes confinement in adult or juvenile institutions, and residential treatment centers. It also includes confinement in a community treatment center. It does not include foster home placement.

(c) If a committed sentence of more than thirty days is imposed prior to the current offense but the offender avoids or delays service of the sentence (e.g., by absconding, escaping, on bail pending appeal), count as a prior commitment.

## Item C. AGE AT COMMENCEMENT OF THE CURRENT OFFENSE/PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS (ADULT OR JUVENILE

Age at commencement of the current offense:
   26 years of age or more.................... = 2***
   20-25 years of age........................ = 1***
   19 years of age or less................... = 0

***EXCEPTION: If five or more prior commitments of more than thirty days, (adult or juvenile), place an 'x' here _____ and score this item.............................. = 0.

### Scoring Instructions

C.1 Score 2 if the subject was 26 years of age or more at the commencement of the current offense and has fewer than five prior commitments.

C.2 Score 1 if the subject was 20-25 years of age at the commencement of the current offense and has fewer than five

6

prior commitments.

C.3   Score 0 if the subject was 19 years of age or less at the commencement of the current offense, or if the subject has five or more prior commitments.

C.4   Definitions

(a)   Use the age at the commencement of the subject's current offense behavior, or in the case of probation violators, the age at commencement of the behavior leading to violation.

(b)   Prior commitment is defined under Item B.

Item D.   RECENT COMMITMENT FREE PERIOD (THREE YEARS)

No prior commitment of more than thirty days (adult or juvenile), or released to the community from last such commitment at least three years prior to the commencement of the current offense.......................................= 1

Otherwise...............................................= 0

Scoring Instructions

D.1   Score 1 if the subject has no prior commitments; or if the subject was released to the community from his/her last prior commitment at least three years prior to commencement of his/her current offense behavior.

D.2   Score 0 if the subject's last release to the community from a prior commitment occurred less than three years prior to the current offense behavior; of if the subject was in confinement/escape status at the time of the current

**offense.**

## D.3  Definitions

(a)  Prior commitment is defined under Item B.

(b)  Confinement/escape status is defined under Item E.

(c)  Release to the community means release from confinement status (e.g., a person paroled through a Halfway House is released to the community upon release from the Halfway House, not the institution.)

## Item E.    PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS VIOLATOR THIS TIME

Neither on probation, parole, confinement, or escape status at the time of the current offense; nor committed as a probation, parole, confinement or escape status violator this time.....= 1

Otherwise.................................................= 0

### Scoring Instructions

E.1  Score 1 if the subject was not on probation or parole, nor in confinement or escape status at the time of the current offense behavior; and was not committed as a probation, parole, confinement, or escape status violator this time.

E.2  Score 0 if the subject was on probation or parole or in confinement or escape status at the time of the current offense behavior; of if the subject was committed as a probation, parole, confinement, or escape status violator this time.

## E.3  Definitions

(a)  The term probation/parole refers to a period of
federal, state, or local probation or parole supervision.
Occasionally, a court disposition such as 'summary
probation' or 'unsupervised probation' will be encountered.
If it is clear that this disposition involved no attempt at
supervision, it will not be counted for purposes of this
item.

(b)  The term 'parole' includes parole, mandatory parole,
conditional release, or mandatory release supervision (i.e.,
any form of supervised release).

(c)  The term 'confinement/escape status' includes
institutional custody, work or study release, pass or
furlough, halfway house (community treatment center)
confinement or escape from any of the above.

## Item F.  HISTORY OF HEROIN/OPIATE DEPENDENCE

No history of heroin or opiate dependence....... = 1

Otherwise...................................... = 0

### Scoring Instructions

F.1   Score 1 if the subject has no history of heroin or opiate
dependence.

F.2   Score 0 if the subject has any record of heroin or opiate
dependence.



**F.3    Ancient Heroin/Opiate Record.**  If the subject has no record
of heroin/opiate dependence for the <u>ten year period</u>
preceeding the current offense (not counting any time spent
in confinement), do not count a previous heroin/opiate
record in scoring this item.


**F.4    <u>Definition</u>**


Heroin/opiate dependence refers to physical or phychological
dependence, or regular or habitual usage.  Drug abuse other
than heroin/opiate dependence is not counted in scoring this
item.  However, this does not preclude consideration of
serious abuse of a drug not listed above as a negative
indicant of parole prognosis (i.e., a possible reason for
overriding the salient factor score in relation to this
item).

Government of the District of Columbia
DEPARTMENT OF CORRECTIONS
Community Services Division
Parole Supervision
1923 Vermont Avenue, N.W.
Suite N-102
Washington, D.C. 20001

September 17, 1985

Memorandum

To      :   Supervisory Parole Officers

From    :   Elias E. Kibler
            Chief Parole Officer

Subject:    Case Transfer

Re      :   Unit VI Intensive Supervision
            Controlled Substance Unit


        Your attention is directed to Service Order 8021, Intensive
Supervision Controlled Substance Unit, Section 6, Eligibility
Criteria.

        Active cases experience drug related problems as indicated
under Section 6, should be screened and referred through the
Office of the Chief Parole Officer for transfer to Unit VI.
A narrative of the client's drug related problems, home and
employment adjustment, status of pending charges, if any, ongoing
treatment or related case materials are to be a part of all
referrals for transfer.

        Those cases approved for transfer must be scheduled and
coordinated with the Supervisor of Unit VI.


EEK/sl

# Exhibit

# 2

DISTRICT OF COLUMBIA MUNICIPAL REGULATIONS

TITLE 28

CORRECTIONS, COURTS, AND CRIMINAL JUSTICE

Certified and Published

by the

D.C. OFFICE OF DOCUMENTS

MAY 1987

Copyright © 1987

Office of Documents
Room 523 - District Bldg.
Washington, D.C. 20004

**204     PROCEDURES FOR GRANTING PAROLE**

204.1     As its criteria for determining whether an incarcerated individual shall be paroled or reparoled, the Board shall use the criteria set forth in this section and Appendices 2-1 and 2-2 to this chapter. These criteria consist of pre and post-incarceration factors which enable the Board to exercise its discretion when, and only when, release is not incompatible with the safety of the community. Any parole release decision falling outside the numerically determined guideline shall be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-2.

204.2   ·  The Board shall assign each candidate for parole a salient factor score (SFS) which shall be one of the factors used in calculating parole eligibility pursuant to the provisions of this section.

204.3     The Board shall utilize the SFS as an actuarial parole prognosis aid to assess the degree of risk posed by a parolee.

204.4     For the purposes of calculating the SFS, the Board shall assign a numerical value to each of the following categories:

(a)  Prior convictions and adjudications;

(b)  Prior commitments of more than thirty (30) days;

(c)  Age at commission of current offense;

(d)  Recent commitment-free period;

(e)  Status of prisoner at time current offense; and

(f)  History of heroin or opiate dependence.

204.5     In assigning a SFS numerical value for the factor of prior convictions and adjudications pursuant to §204.4(a), the Board shall count the following:

(a)  All convictions and adjudications for criminal offenses (except as excluded by §204.6), other than the current offense;

(b)  Convictions for offenses committed while on bail or probation for the current offense;

(c)  Juvenile delinquency adjudications except the following:

(1)  Status offenses (e.g., runaway, truancy, habitual disobedience); and

204    PROCEDURES FOR GRANTING PAROLE    (Continued)

204.5    (Continued)

        (2)  Criminal offenses committed at age fifteen (15) or younger unless it resulted in a commitment of more than thirty (30) days or involved violence (as defined in §23-1331(a), D.C. Code (1981 ed.)), use of weapons (as defined by §22-3202(a), D.C. Code (1981 ed.)), or drug trafficking.

    (d)  Military convictions for acts that are generally prohibited by civilian criminal law;

    (e)  Criminal conduct resulting in a judicial determination of guilt or an admission of guilt before a judicial body, even if no formal conviction results;

    (f)  Convictions and adjudications even though later set aside for civil purposes;

    (g)  Foreign convictions and adjudications for conduct that is criminal in the United States; and

    (h)  Forfeitures of collateral if the offense would otherwise be counted.

204.6    In assigning a SFS numerical value for the factor of prior convictions and adjudications, the Board shall not count the following:

    (a)  Convictions and adjudications for misdemeanors for which the maximum punishment is not more than ninety (90) days in prison;

    (b)  Convictions and adjudications reversed or vacated unless the prisoner has been retried and reconvicted; and

    (c)  Convictions and adjudications occurring prior to a conviction and adjudication-free period of ten (10) years in the community immediately prior to the commission of the current offense.

204.7    In assigning a SFS numerical value for the factor of prior commitments of more than thirty (30) days pursuant to §204.4(b), the Board shall count the following:

    (a)  All prior commitments actually imposed of more than thirty (30) days resulting from convictions and adjudications counted pursuant to §204.5; and

204     PROCEDURES FOR GRANTING PAROLE     (Continued)

204.7     (Continued)

> (b)  Prior commitments of more than thirty (30) days imposed
> upon revocation of probation or parole where the probation
> or parole resulted from a conviction or adjudication
> counted pursuant to §204.5.

204.8     Concurrent or consecutive sentences, whether imposed at the same
time or at different times, that result in a continuous period
of confinement shall be counted as a single commitment.

204.9     Commitments of more than thirty (30) days imposed for an escape,
an attempted escape, or for criminal conduct committed while in
confinement or escape status shall be counted as a separate
commitment.

204.10    A commitment under §204.4(b) means confinement in a jail,
prison, juvenile institution, or residential or community
treatment center.

204.11    A prior commitment for more than thirty (30) days shall be
counted under §204.7(a) despite avoidance of actual confinement
through escape or bail pending appeal.

204.12    In assigning a SFS numerical value for the factor of age at
commission of the current offense pursuant to §204.4(c), the
Board shall, in the case of a parole or probation violator, use
the age at the commencement of the conduct constituting the
parole or probation violation.

204.13    In assigning a SFS numerical value for the factor of recent
commitment-free period pursuant to §204.4(d), the Board shall
regard a prisoner's commitment as terminated when he or she is
released from confinement status regardless of where confinement
occurs.

204.14    In assigning a SFS numerical value for the factor of status of
the prisoner at the time of commission of the current offense
pursuant to §204.4(e), the Board shall not consider a prisoner
to have been on parole or probation if at the time of the
commission of the current offense that parole or probation was
unsupervised.

204.15    In assigning a SFS numerical value to the factor of history of
heroin or opiate dependence under §204.4(f), the Board shall not
consider the prisoner to have had a history of dependence if the
prisoner had no dependence for the ten (10) year period
preceding the commission of the current offense, not counting
any time spent in confinement.

204    PROCEDURES FOR GRANTING PAROLE    (Continued)

204.16    For the purposes of this chapter, heroin or opiate dependence
refers to physical or psychological dependence, or regular or
habitual usage.

204.17    The Board shall use the parole candidate's SFS to determine
which risk category applies to the candidate, as follows:

(a)    10-9 = low risk

(b)    8-6 = fair risk

(c)    5-4 = moderate risk

(d)    3-0 = high risk

204.18    After determining which risk category applies to a parole
candidate, the Board shall consider the following pre and post
incarceration factors to determine whether a candidate should be
granted parole:

(a)    Whether the current offense involved a felony in which the
parole candidate caused, attempted to cause, or threatened
to cause death or serious bodily injury to another
individual;

(b)    Whether the parole candidate has two (2) or more previous
convictions for a felony of the nature described in
§204.18(a);

(c)    Whether the parole candidate has ever been convicted of a
crime of violence (as defined in §23-1331(4), D.C. Code
(1981 ed.)) while under the influence of PCP (other than
current offense);

(d)    Whether the current offense involved a felony in which the
parole candidate used a dangerous weapon (as defined by
§22-3202(a), D.C. Code (1981 ed.));

(e)    Whether the parole candidate has two (2) or more previous
convictions for a felony of the nature described in
§204.18(d);

(f)    Whether the current offense involved a felony conviction
under the D.C. Uniform Controlled Substances Act for
distribution or intent to distribute illicit substances;

(g)    Whether the parole candidate has two (2) or more previous
convictions under the D.C. Uniform Controlled Substances
Act;

204      PROCEDURES FOR GRANTING PAROLE      (Continued)

204.18      (Continued)

(h)   Whether the parole candidate has committed serious
      disciplinary infractions (adjudicated under the Department
      of Corrections' due process procedures) while under
      confinement for the current offense; and

(i)   Whether the parole candidate has demonstrated sustained
      achievement in the area of prison programs, industries, or
      work assignments while under confinement for the current
      offense.

204.19      After determining an adult parole candidate's SFS score and
            after applying the pre and post incarceration factors to arrive
            at a total point score pursuant to §204 and Appendix 2-1, the
            Board shall take one (1) of the following actions:

(a)   IF POINTS = 0:      Parole shall be granted at initial
                          hearing with low level of
                          supervision required;

(b)   IF POINTS = 1:      Parole shall be granted at initial
                          hearing with high level of
                          supervision required;

(c)   IF POINTS = 2:      Parole shall be granted at initial
                          hearing with highest level of
                          supervision required; or

(d)   IF POINTS = 3-5     Parole shall be denied at initial
                          hearing and rehearing scheduled.

204.20      After determining a youth offender parole candidate's SFS score
            and after applying the pre and post incarceration factors to
            arrive at a total point score pursuant to §204 and Appendix 2-1,
            the Board shall take one (1) of the following actions:

(a)   IF POINTS = 0:      Parole shall be granted at initial
                          hearing with conditions established to
                          address treatment needs; or

(b)   IF POINTS = 1-5:    Parole shall be denied at initial
                          hearing and a rehearing scheduled based
                          on estimated time to achieve program
                          objectives established by the
                          classification team and the Board of
                          Parole.

204         PROCEDURES FOR GRANTING PAROLE        (Continued)

204.21    In determining whether to release on parole an adult or a youth
          offender appearing before the Board at a parole rehearing, the
          Board shall take the total point score from the initial hearing
          and adjust that score according to the institutional record of
          the candidate since the last hearing pursuant to Appendix 2-2.
          The Board shall then take one of the following actions:

          (a)  IF POINTS = 0-3:        Parole shall be granted at this
                                       rehearing with highest level or
                                       supervision required; or

          (b)  IF POINTS - 4-5:        Parole shall be denied and a
                                       rehearing date scheduled.

204.22    The Board may, in unusual circumstances, waive the SFS and the
          pre and post incarceration factors set forth in this chapter to
          grant or deny parole to a parole candidate.  In that case, the
          Board shall specify in writing those factors which it used to
          depart from the strict application of the provisions of this
          chapter.

# Exhibit

# 3

# Memorandum

*Low total part score*
*0-2 at initials*
*0-3 at rehearings*
*point subtracted for sustained achievement*
*good conduct*

| **Subject** | **Date** |
|---|---|
| Special Procedures for District of Columbia Code Offenders | August 21, 1992 |

| **To** | **From** |
|---|---|
| Jasper R. Clay, Jr.<br>Acting Chairman<br>U.S. Parole Commission | Michael A. Stover *Michael Stover by RC*<br>General Counsel<br>and<br>Rockne Chickinell *Rockne Chickinell*<br>Deputy General Counsel<br>U.S. Parole Commission |

## I. INTRODUCTION

The U.S. Parole Commission is now required to apply District of Columbia parole laws and guidelines to all D.C. Code offenders in federal prisons, both male and female inmates. The following memorandum explains the D.C. guidelines and other relevant regulations and policies of the D.C. Board of Parole. It provides our legal advice for compliance with the court order in Cosgrove v. Thornburgh, Civ. No. 80-0516 (D.D.C. 1989)(which applies to federally-housed male D.C. Code inmates). Female D.C. Code inmates can continue to apply for a transfer and a hearing before the D.C. Board, but if they elect to appear before the Commission, a hearing must be held under D.C. procedures.

This memorandum also contains our policy for mixed sentence (U.S. and D.C.) cases, which is published at 28 C.F.R. §2.68. Due to the decision in Thomas v. Brennan, 961 F.2d 612 (7th Cir. 1992), which was recently adopted by the district court in the Cosgrove class action case, the Commission has passed an amendment to this regulation which requires the advancement of any D.C. guideline hearing that was scheduled for a date after the expiration of a mixed sentence prisoner's "federal time". This amended version of the mixed sentence policy should be implemented immediately, as the Commission determined at its July, 1992 business meeting, and it should be applied retroactively, as previously decided cases come before Commissioners and staff for a review or hearing.

Note: For purposes of applying D.C. parole laws and guidelines, a prisoner sentenced in a U.S. District Court for a D.C. Code offense is a "D.C. Code offender" and must be heard under the D.C. guidelines, not the guidelines of the Parole Commission.

## D.C. POLICY GUIDELINES

We have attached to this memorandum two Policy Guidelines from the D.C. Board of Parole which explain the use of various terms used by the Board in applying its guidelines. The first Policy Guideline covers decisions to override the guidelines (i.e., to grant or deny parole despite the point score). The second Policy Guideline covers rehearing dates that depart from the schedule for ordinary cases. The Policy Guidelines are more particularly described in the later sections of this memorandum.

The Policy Guidelines are not intended to cover every situation which may come before the Board. Therefore, the Board may employ, in an unusual case, a reason for overriding a favorable point score, or for setting a longer-than-ordinary rehearing date, which is not listed as one of the "countervailing factors" generally used for this purpose. The Commission has the discretion to follow the same practice.

But where the Policy Guideline does address a situation that is present in a particular case (e.g., when to add a point to the total score for "negative institutional behavior," or when to override the point score for "unusually extensive or serious prior criminal record"), we recommend that the Commission use the same criteria and terminology in its own decisionmaking.

## ELIGIBILITY, INITIAL HEARING, AND SETTING A PAROLE DATE.

Under the D.C. Good Time Credits Act of 1986 (as amended in 1991), all D.C. prisoners (wherever confined) have good time deducted from their eligibility dates at the same rate applicable to the maximum term. They are eligible on the date calculated by the Bureau of Prisons.

All D.C. Code offenders must receive an initial hearing four months in advance of their eligibility dates. After the initial hearing is held, parole may be granted up to six months after the eligibility date (or up to six months after the date of a rehearing) if pre-release CCC placement (work release) is found appropriate. Otherwise, parole must be granted for the earliest date that the release plan can be reviewed and approved by the U.S. Probation Office (but not before the eligibility date).

## GUIDELINE APPLICATION IN GENERAL

The D.C. parole guidelines (copy attached) are straightforwardly written and relatively simple to apply with the aid of the D.C. Board's worksheets. The guidelines need not be restated in full in this memorandum. However, a few words of introduction are in order.

The D.C. parole guidelines employ a salient factor score virtually identical to that contained in the federal guidelines; therefore, the federal salient factor score instructions should be used. However, the D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served. Rather, the D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of accountability for

the offense, and apply a point score system (which includes the salient factor score and other readily ascertainable items) to determine whether or not the prisoner is suitable for parole upon the completion of the minimum term. Hence, a D.C. Code prisoner has satisfied offense accountability at eligibility, unless unusual offense factors are present (discussed below). His point score will then determine his presumptive suitability for release.

A point score of 0 to 2 points indicates that parole should ordinarily be granted at the initial hearing, and a point score of 3 to 5 points indicates that parole should ordinarily be denied at the initial hearing and a rehearing scheduled. A "rehearing" is a full reconsideration hearing, unlike a federal "statutory interim hearing," and the point score may well change at that point. At a rehearing, a point may be subtracted for "sustained program achievement" or added for institutional misconduct based on the prisoner's conduct and achievements since the last consideration.

One of the "point score" factors is negative institutional behavior and refers to infractions adjudicated under due process procedures. This means a DHO type of hearing. "Negative institutional behavior" is defined in the attached Policy Guideline on "Definitions of Terms Used in Parole Guidelines." Negative institutional behavior will, of course, raise the point score at a rehearing. In the Policy Guideline the D.C. Board identifies with some specificity the type of violations that ordinarily result in a finding of negative institutional behavior. Furthermore, this Policy Guideline also states that violations committed only within a certain time period before the hearing are normally considered in adding a point for negative behavior.

At a rehearing, a point score of 0 to 3 points indicates that parole should be granted at the rehearing, and a point score of 4 to 5 points indicates that parole should continue to be denied and another rehearing scheduled. The guidelines appear to favor granting parole for many cases at the initial hearing or the first rehearing. However, departures from the guidelines are permitted based upon individual factors, including risk of recidivism, lack of programming,[1] and unusual seriousness of the offense (i.e., factors making the offense a significantly more aggravated version of its type). Examples of reasons for departures are provided in the Policy Guideline on "Definitions of Terms Used in Parole Guidelines." The reasons for deviating from a decision indicated by the total point score should be stated on the notice of action.

Since the D.C. guidelines are written in terms of a simple decision to grant or deny parole, two critical operational differences from the federal guidelines become apparent. First, presumptive parole dates are not set. No parole date can be set more than six months in the future. Second, if parole is denied at a given hearing, the timing of the next rehearing becomes critical because the inmate's total point score may be improved, and

---

[1]  In accordance with Congressional intent, the Commission has, in federal cases, avoided using parole denials to coerce participation in institutional programs. However, the D.C. Parole Board's regulations and practices permit--but do not require-- parole denials for this reason.

may call for parole to be granted at the next hearing.      *REHEARING – TIMING*

The D.C. regulations set out the following general policy on the ordinary timing of rehearings, six months in the case of a maximum sentence less than five years and one year in the case of a longer maximum sentence. However, longer (or shorter) continuances are scheduled, for the same types of reasons set forth in the Policy Guideline on factors countervailing a recommendation to grant or deny parole. See 28 DCMR § 104.11 (". . . the Board may order a parole reconsideration date it determines to be appropriate."). The Board has published a separate Policy Guideline entitled "Reconsideration Hearings -- Establishing Dates". (See attached.)

The D.C. Board does not observe any limit to the length of time an inmate may be continued for a rehearing, and continuances have been ordered for rehearing dates up to nine years in the future. Use individualized discretion in determining the actual rehearing date (e.g., a hearing after 18, 24, or 36 months may be the most appropriate disposition depending on the nature of the case). Although the D.C. Board has not adopted any limit to the permissible length of a set-off, the Commission's approved practice will be not to exceed five years except for the most serious and dangerous offenders in the prison system (e.g., aggravated first-degree murderers and offenders of like seriousness). However, no presumption in favor of parole is implied in the setting of any rehearing date. For those prisoners who are found to have unusual factors warranting a rehearing beyond the "ordinary" schedule by five years or less, the rehearing date should reflect a decision that all aggravating factors identified in the decision will have been fully accounted for at that time. The reasons for deviating from the ordinary rehearing schedule should be stated on the notice of action.

For example, a longer continuance than indicated by the D.C. regulations would be appropriate for any case involving a lengthy or serious criminal history, a case with exceptional seriousness of the instant offense, cases of particularly serious or frequent institutional misconduct, and cases of substantial drug or alcohol problems. It must be emphasized that "seriousness of the offense," under the D.C. regulations, typically concerns "unusual cruelty to the victim," a case of "vulnerable victims," or a "leadership role in an organized criminal venture." (See the Policy Guidelines.) The D.C. Board does not focus upon considerations of quantity (e.g., the amount of drugs or money involved in the crime or the number of multiple separate offenses) as the U.S. Parole Commission does. The D.C. Board appears to consider such factors as already accounted for by the minimum term or terms. "Seriousness of the offense" is a concept which, for the D.C. Board, is closely related to "seriousness of risk," and should be applied by the Commission with that limitation in mind. When considering reasons for a departure from the point score or rehearing guidelines, always consult the Policy Guidelines.

Therefore, a decision "outside the guidelines" could consist of a decision to override a point score that indicates parole at the initial or rehearing stage, or to override the normal six-month or one-year rehearing schedule, or both. It could also consist of a decision to grant parole where the point score indicates no parole at an initial hearing or rehearing. A good example of an actual case decision involving aggravating factors may be found in the attached court decision in Rookard v. District of Columbia Board of Parole,

4

C.A. No. 86-3238 (January 21, 1988). The case involves a decision above the guidelines based on "unusual cruelty to the victim."

## TRANSFER TO DISTRICT OF COLUMBIA

If a D.C. Code offender who has already received a decision from the U.S. Parole Commission is transferred to a District facility, the Commission's file is to be promptly transferred to the D.C. Board of Parole, which thereafter assumes jurisdiction and treats all USPC decisions as decisions of the D.C. Board. (A complete record must be kept of this transfer so the file can be located if needed.)

## RESCISSION HEARINGS

Once a parole date is granted on a D.C. Code sentence, the date may be rescinded for a disciplinary rule violation or new criminal conduct. A rescission hearing should be scheduled to consider the new information and determine whether a point should be added to the prisoner's previous point score for "negative institutional behavior". This point should not be added at the rescission hearing if a point for negative behavior was added at the prisoner's last parole consideration (the consideration which led to the setting of the parole date). A decision notwithstanding the point score resulting from the rescission hearing may be made for countervailing factors, as discussed in the Policy Guidelines. A short retardation of the parole date may be made for a rule violation, without a rescission hearing. Such retardation of the date on the record should not exceed sixty days.

## REVOCATION CASES

Revocation hearings are the same as under the federal system except (1) street time forfeiture is automatic under D.C. Code §24-206(a) and (2) there are no reparole guidelines, only a rehearing schedule to which the same policies described above apply. See 28 DCMR §104.4 to §104.10 and Policy Guideline on "Reconsideration Hearings." This rehearing schedule must be followed unless aggravating or mitigating factors are found to warrant otherwise. The case of the repeat parole violator is perhaps the most frequent example of a decision to override the rehearing schedule and establish a longer set-off.

Sections 104.4 to 104.10 of the D.C. Board's regulations set the following general policy for the scheduling of rehearings after the revocation decision:

| Most Serious Violation | Time Remaining on Sentence | |
|---|---|---|
| | Less than 5 years | 5 years or more |
| Technical | 0-6 months | 6 to 9 months |
| Misdemeanor | 6 to 9 months | 9 to 15 months |
| Felony | 9 to 15 months | 15 to 24 months |

Note: These categories apply whether or not the offender was convicted of the

5

misdemeanor or felony in question. <u>The rehearing date is set from the date the violator warrant is executed, not the date of the revocation hearing.</u>

Although it has been the practice of the D.C. Board to grant reparole at the rehearing if the violator has a good institutional record, and has participated in institutional programs, that practice creates no rights or obligations and does not set a rule or policy. There are no guidelines to structure the reparole decision itself. Therefore, the Commission's discretion on whether to grant reparole is unstructured. (This does not mean the Commission may refer to federal guidelines.) Reparole may be denied at the rehearing for any permissible reason (see the Policy Guidelines) and another rehearing is then scheduled.

## HEARING PROCEDURES IN GENERAL

Although the District of Columbia Parole Board's regulations provide for somewhat different hearing procedures from those used by the Commission, the Commission should, for the sake of simplicity, continue to apply its own hearing procedures, including representation, disclosure, etc. As far as we are able to determine, this will not prejudice the prisoner's opportunities for a fair parole consideration. Therefore, in any situation not covered by these special procedures, the regular federal procedures will be applicable. Revocation hearings are, of course, governed by the same due process rules.

## VOTING QUORUM AND APPEAL

### Prisoners Serving D.C. Code Offenses Only:

In order to match the D.C. Parole Board's three-member concurrence requirement, the Regional Commissioner should refer these cases to the National Commissioners under the procedure of 28 C.F.R. §2.24(a). The release determinations are not appealable, since the D.C. Parole Board does not provide an appeal procedure.

### For mixed U.S. and D.C. Code sentences:

The consideration of the federal sentence block and the setting of the D.C. initial hearing date should be handled under the Commission's normal regulations on voting quorums. The prisoner may appeal both the federal time imposed, and the Commission's determination as to the date the D.C. initial hearing should be held. But the consideration under the D.C. guidelines at the D.C. initial hearing and subsequent hearings is handled by the procedure discussed above, i.e., referral to the National Commissioners.)

## DETAINERS

If a D.C. Code parole violator is sentenced for a new crime, and incarcerated in a facility <u>not</u> operated by the District of Columbia, the Commission may place a detainer, which must be reviewed every six months until the warrant is executed. **Dispositional**

6

revocation hearings are not held. NOTE: If the offender is designated for a D.C. facility, the case is immediately transferred to the D.C. Board, using the standard transfer letter.

## II. STEP-BY-STEP PROCEDURES -- D.C. CODE SENTENCES ONLY

For purposes of applying the D.C. guidelines to offenders currently incarcerated in federal institutions, we suggest that they be divided into three groups: prisoners serving exclusively D.C. Code sentences who are just approaching eligibility for parole, prisoners serving exclusively D.C. Code sentences who are already beyond the eligibility date, and prisoners serving mixed D.C. Code and U.S. Code sentences. We recommend that the Commission proceed as outlined below.

## ONLY D.C. CODE SENTENCES--NOT YET ELIGIBLE

1. Conduct the hearing at the scheduled time (four months before the eligibility date) and consider the case using the D.C. Parole Board's guidelines.

2. If a parole date is found to be warranted on the basis of that consideration, grant that parole date, with or without CCC placement. Otherwise, issue a decision denying parole, schedule a rehearing according to the rehearing policy described above, and give reasons for the decision on the Notice of Action.[2] This includes the reason for a departure from the point score, and/or the reason for a longer continuance.

## ONLY D.C. CODE SENTENCES--ALREADY ELIGIBLE

Some prisoners (including female D.C. Code offenders) may have received decisions under the federal parole guidelines and have not yet been reheard. Such prisoners may have already passed not only their parole eligibility dates but also the dates when they would have received rehearings, by the time they appear for a hearing under the D.C. guidelines. Thus, to give them the benefit of the D.C. guidelines at this time, it may be necessary to conduct a hearing which applies the guidelines for both initial and review considerations.

1. Vacate all actions already taken and schedule the case for a D.C. initial hearing as soon as possible. [D.C. regulations do not permit parole on the record. Therefore in-person hearings are required in all cases.]

2. Conduct the hearing applying the D.C. initial guidelines.

3. If a parole effective date is warranted on the basis of that consideration, grant it.

---

[2] The D.C. Board does not supply reasons for parole denials, except when the Board is departing from the guidelines. 28 DCMR 204.22. However, the reasons for all its decisions are carefully recorded in the file.

Otherwise, determine how long a set-off is warranted.

**If that set-off time has not passed,** issue a decision denying parole, scheduling a rehearing at the appropriate time, giving reasons for the decision.

**If the set-off time has already passed,** consider the case with the D.C. Parole Board's rehearing guidelines at the present consideration i.e., with the point score recalculated for the rehearing. If a parole grant is warranted on the basis of that consideration, grant it. If a parole grant is not warranted, issue a decision denying parole, and schedule a rehearing at the appropriate time, giving reasons for the decision.

## ONLY D.C. CODE SENTENCES -- ELIGIBILITY DATE ADVANCED BY GOOD TIME

Due to the Good Time Credits Act of 1991, which authorizes the reduction of the minimum term by good time, some prisoners who have yet to be heard under the D.C. guidelines may have already passed the point when they are eligible for an initial consideration. In such cases, schedule the prisoner for an initial hearing as soon as feasible and apply steps 2 and 3 outlined in the previous section for "Exclusively D.C. Code Sentences -- Already Eligible."

If the prisoner has already been given an initial hearing under the D.C. guidelines, the case should be re-evaluated at the regularly scheduled rehearing date. At the rehearing the case should be evaluated under the initial and rehearing guidelines as if the initial hearing had been held four months prior to the parole eligibility date advanced by good time deductions.

## REVOCATION CASES ALREADY HEARD UNDER USPC GUIDELINES

1. Vacate previous reparole date (not the revocation decision).

2. Schedule for a new hearing to determine reparole, or a new combined initial/reparole hearing if the parole violation term is combined with a new sentence (D.C. or Federal).

## III. **STEP-BY-STEP PROCEDURES FOR MIXED U.S. CODE AND D.C. CODE SENTENCES -- 28 C.F.R. §2.66(c)-(f).**

## INITIAL CONSIDERATIONS

This is the most complex group of all because it calls for the application of two different sets of guidelines in relation to different components of the overall sentence. The Bureau of Prisons will continue to aggregate the sentences for purposes of establishing a single parole eligibility date and a single mandatory release date, and the Commission will continue to treat the sentences as fully aggregated. However, **for its internal decision-making analysis only,** the Commission should hypothetically de-aggregate the sentence and arrange them into two separate blocks of sentences--federal and D.C.--with the federal

8

block of sentences being the first in order.  (The actual order of imposition is irrelevant.)
Then proceed as follows:

## STEP 1 -- Setting the Federal Date

The federal sentence block will be considered first regardless of the actual chronology of sentence imposition.  Apply the federal parole guidelines to the U.S. Code offense behavior.  **The offense severity rating may not include the District of Columbia conviction.**  At this stage, if the D.C. conviction (as opposed to the D.C. offense) was sustained before the U.S. Code crime was committed, the D.C. conviction should be counted in Item A of the salient factor score.  Furthermore, if the D.C. prison sentence began before the federal crime was committed, count this period of confinement in Item B.  This consideration should result in the setting of the "federal date".  **(Note: This is not an actual parole date.)**

*whether resc gl or reg gl (yr) are used when prison misconduct leads to new [U.S Code conv'c] — Change this and be particular on*

Rescission behavior should be considered under the rescission guidelines (28 C.F.R. §2.36) in setting the "federal date" unless such behavior results in a new D.C. Code conviction.  (If rescission behavior is used to set the "federal date", this does not preclude use of the same behavior to later add a point for the post-incarceration risk factor of "negative institutional behavior" when the D.C. guidelines are subsequently applied.)

The "federal date" may exceed the guideline range, but it may be no later than the hypothetical statutory release date of the federal sentence block if it is less than five years, or the hypothetical two-thirds date if the federal sentence block is five years or more.  These limits cannot be exceeded even if the inmate has forfeited good time, or would not qualify for mandatory parole by reason of his prison misconduct or the seriousness of the risk.  However, any factor (except accountability for the D.C. crimes) can be considered in exceeding the federal guideline range up to the limits described above.  (Risk factors not adequately accounted for in the federal decision can be used to override the D.C. guidelines.)

## STEP 2 -- Setting the D.C. Hearing Date

If the "federal date" exceeds the parole eligibility date on the aggregate term, the date of the D.C. guideline hearing should be set four months prior to the "federal date".  If the "federal date" is the same or less than the parole eligibility date, the date of the D.C. guideline hearing should be set four months prior to the parole eligibility date on the aggregate sentence.

## STEP 3 -- Applying the D.C. Guidelines at the D.C. Hearing

At the D.C. guideline hearing, the examiners should consider the prisoner for parole with regard to his D.C. Code offense and apply the D.C. guidelines.  For salient factor scoring purposes, the D.C. Code offense should be considered as the "current offense".  The U.S. Code conviction should be counted as a prior conviction if the U.S. Code conviction (as opposed to the federal offense) occurred prior to the commission of the D.C. Code offense.

If the U.S. Code prison sentence began before the D.C. crime was committed, this period of confinement should be counted as a prior commitment.

**Note:** The prisoner's overall offense behavior (including U.S. and D.C. Code offenses) may be considered for the purpose of determining whether the prisoner poses an unusual risk to the public welfare. For example, the overall offense behavior may reveal a pattern of sustained, or repeatedly violent, criminality that warrants a finding of "unusually serious risk" and a decision to override a favorable D.C. point score.

## RETROACTIVE APPLICATION OF REVISED MIXED SENTENCE POLICY

If the prisoner has already had a hearing at which the former mixed sentence policy at 28 C.F.R. §2.66 was applied, the case should be re-evaluated at the next hearing or record review under the revised mixed sentence policy. If application of the new policy indicates that the D.C. guideline hearing should have already been conducted by the date of the present consideration (and such hearing has not been held), the prisoner should be promptly given a D.C. guideline hearing. **This hearing should be conducted as if it were being held on the date indicated by the new policy.** If it appears that a rehearing (or rehearings) should have also been held once the new policy is applied, the case should also be evaluated under the D.C. rehearing guidelines. If parole is denied, the timing of the rehearing should be set according to the date the initial (and subsequent hearing(s)) should have been held.

If the prisoner has already been given a D.C. guideline hearing, the case should be evaluated under the new policy to determine whether this hearing should have been held earlier. If so, the D.C. rehearing schedule and guidelines should be applied as if the D.C. guideline hearing had been held on the date indicated by the new policy.

## THE D.C. GUIDELINE HEARING AND GRANTING PAROLE

The D.C. guideline hearing on a "mixed sentence" is always scheduled four months prior to the date on which the Commission commences the application of the D.C. guidelines. Parole will not, however, be granted for a date earlier than the commencement date except that if there is superior program achievement, parole could be set for a date during the four months preceding the federal date. A D.C. guideline hearing is otherwise to be treated as a D.C. initial parole hearing, except that any grant of parole is from the aggregate sentence.

## MANDATORY PAROLE IN MIXED SENTENCE CASES

In a case where the federal sentence block is five years or more, do not grant a separate mandatory parole date on the federal sentence(s). The mandatory parole law will be satisfied by observing the procedure described above for setting the federal date.

## MIXED SENTENCE REPAROLE POLICY -- 28 C.F.R. §2.66(h)

**Note: See next section for advice on specific situations when the parolee**

10

has been convicted of a new U.S. Code or D.C. Code offense while on parole.

A violation of the conditions of parole on a mixed sentence is deemed to be a simultaneous federal and D.C. parole violation. Therefore, the warrant is always issued on the aggregate sentence, regardless of when the component terms were imposed.

With respect to reparole decisions in these mixed federal and D.C. cases, federal reparole guidelines should be applied, but the D.C. rehearing schedule should be followed.

With respect to street time forfeiture, forfeit all street time if forfeiture is required by 28 C.F.R. §2.52(c) for a new conviction. If not, then divide the street time according to the proportional relationship of the D.C. sentence block to the federal sentence block, and forfeit only the D.C. portion of that time. (By our interpretation, D.C. law continues to require forfeiture in all revocations.) For example, if the parolee is serving a 10-year D.C. sentence and a 5-year federal sentence (total aggregate term of 15 years), the D.C. sentence block is two-thirds of the aggregate term, and only two-thirds of the total street time is forfeited. (In the case of an absconder, the Commission would also forfeit the total time in absconder status from the federal portion of the parolee's street time.) Measure "street time" from date of release on parole to warrant execution, or confinement on other charges.

## IV. DETAINERS AND REPAROLE DECISIONS FOR PAROLEES WITH NEW CONVICTIONS -- STEP-BY-STEP PROCEDURES

These instructions are based on the premise that the prisoner is eligible for parole on any new U.S. Code sentence imposed by the court.

## D.C. CODE SENTENCE PAROLE VIOLATORS

**Parole Violator on a D.C. Code Sentence Serving a New D.C. Code Sentence and Returned to a D.C. Facility.**

Transfer the case to the D.C. Board of Parole, which acquires jurisdiction as soon as the prisoner is designated for service of his new D.C. Code sentence in a D.C. facility. There is a standard-form transfer letter.

**Parole Violator on a D.C. Code Sentence Serving a New D.C. Code Sentence in a BOP Facility.**

If the warrant has not yet been executed, the Commission should conduct a dispositional review on the record within six months of notice that the warrant has been lodged as a detainer. The Commission should decide whether (a) to let the detainer stand, (b) to execute the warrant and schedule a revocation hearing, or (c) to withdraw the warrant and close the case. If the decision is to let the detainer stand, conduct a record review every six months, and consider the prisoner for parole on the new D.C. sentence

11

four months prior to completion of the minimum term pursuant to the D.C. initial parole guidelines. The warrant should be executed when the prisoner is paroled or mandatorily released to the violator term on his original D.C. sentence.

Once the warrant is executed, conduct a revocation hearing, but continue to apply the D.C. initial parole guidelines and the rehearing schedule included therein (not the D.C. reparole rehearing schedule). If there are parole violations in addition to the crime for which the new D.C. sentence was imposed, those violations may warrant a denial of parole on the aggregate sentence, notwithstanding a point score indicating that parole is appropriate.

If the warrant has already been executed before the prisoner is received in a federal facility, but the prisoner has yet to reach his eligibility date on the new D.C. sentence, conduct a revocation hearing to enter a revocation and street time forfeiture order, but continue the prisoner for an initial hearing four months prior to completion of the minimum term. If he is already at that point, conduct a combined initial/revocation hearing, and employ the D.C. initial guidelines as described above.

**Parole Violator on a D.C. Code Sentence Serving a New U.S. Code Sentence in a BOP Facility.**

If the warrant has not been executed, consider the prisoner for parole only on the new U.S. Code sentence pursuant to the federal guidelines. Conduct a dispositional record review within six months of notice of the detainer to determine whether (a) to let the detainer stand, (b) to execute the warrant and schedule a revocation hearing, or (c) to withdraw the warrant and close the case.

When the warrant is executed upon parole or mandatory release from the federal sentence, conduct a revocation hearing and apply the D.C. rehearing schedule for reparole cases.

If the warrant has been executed before release from the U.S. Code sentence, conduct a combined initial/revocation hearing and apply the federal reparole guidelines and the D.C. rehearing schedule for parole violators, taking into consideration time already served on the new U.S. Code sentence that relates to the parole violation charges.

**Parole Violator on a D.C. Sentence Serving a New Mixed U.S./D.C. Code Sentence.**

If the warrant has not been executed, the prisoner should be considered for parole on the new mixed sentence under the policy at 28 C.F.R. §2.66 (c)-(f). Within six months of notice of the detainer, conduct a dispositional record review to determine whether (a) to let the detainer stand, (b) to execute the warrant and schedule a revocation hearing, or (c) to withdraw the warrant and close the case.

When the warrant is executed upon parole or mandatory release from the (new) mixed sentence, conduct a revocation hearing on the D.C. violator term using the D.C. rehearing schedule in reparole cases. Take into consideration time already served on the

12

new sentence that relates to the parole violation charges.

If the warrant is executed before consideration on the mixed sentence, the D.C. parole violator term is aggregated with the mixed sentence. Conduct a combined initial/revocation hearing, applying the policy at §2.66(c)-(f) for mixed sentence initial parole determinations. Parole violations not already accounted for in the new mixed sentence may be considered as a possible reason for denying parole notwithstanding a D.C. point score that indicates parole should be granted.

## MIXED SENTENCE PAROLE VIOLATORS

**Parole Violator on a Mixed Sentence Serving a New D.C. Sentence in a BOP Facility.**

If the warrant has not been executed, the prisoner should be considered for parole on the new D.C. sentence pursuant to D.C. initial parole guidelines. The outstanding detainer from the mixed sentence is to be reviewed pursuant to 28 C.F.R. §2.47. When the warrant is executed after parole or mandatory release from the new D.C. sentence, conduct a revocation hearing and make the reparole decision in accordance with the mixed sentence reparole policy (28 C.F.R. §2.66(h)), with credit toward the federal reparole guidelines being given for the time served on the new D.C. sentence. If a rehearing is ordered under the D.C. rehearing schedule for reparole cases, the date the rehearing is calculated from the date the warrant was executed.

If the warrant has already been executed, conduct a combined initial/revocation hearing, and consider the prisoner for parole on the aggregate sentence according to the standard D.C. initial guidelines. However, this hearing will be delayed until completion of the minimum term of the new D.C. Code sentence. The Commission may take into consideration the fact that the prisoner is a parole violator in deciding whether or not to exceed the D.C. point score.

**Parole Violator on a Mixed Sentence Serving a New U.S. Code Sentence.**

If the warrant has not been executed, conduct an initial parole hearing on the new U.S. Code sentence and apply 28 C.F.R. §2.47 to the detainer. When the warrant is executed upon release from the U.S. Code sentence, apply the mixed sentence reparole policy (§2.66(h)), with guideline credit for time served on the new U.S. Code sentence.

If the warrant has been executed, conduct a combined initial/revocation hearing, and apply the mixed sentence reparole policy.

**Parole Violator on a Mixed Sentence Serving a New Mixed Sentence.**

If the warrant has not been executed, conduct an initial hearing on the new mixed sentence using the mixed sentence initial parole policy (§2.66(c)-(f)). Review the detainer pursuant to 28 C.F.R. §2.47. When the warrant is executed upon release from the new mixed sentence, conduct a revocation hearing applying the mixed sentence reparole policy

13

(§2.66(h)), with credit for time served on the new sentence.

If the warrant has already been executed, conduct an initial/revocation hearing, using the mixed sentence reparole policy.

## U.S.CODE SENTENCE PAROLE VIOLATORS

**Parole Violator on a U.S. Code Sentence Serving a New D.C. Sentence in a D.C. Prison.**

Transfer this case to the jurisdiction of the D.C. Board of Parole.

**Parole Violator on a U.S.Code Sentence Serving a New D.C. Sentence in a BOP Facility.**

If the warrant has not been executed, apply D.C. initial release guidelines to the new D.C. sentence and use §2.47 to determine when to execute the federal warrant. When the federal warrant is executed upon parole or mandatory release from the D.C. sentence, apply federal reparole guidelines with credit for time served on the D.C. sentence.

If the violator warrant has been executed, the prisoner is serving a mixed sentence. Conduct a combined initial/revocation hearing, and apply the mixed sentence initial parole policy (§2.66(c)-(f)), with the federal violator term acting as "the federal sentence block".

**Parole Violator on a U.S. Code Sentence Serving a New Mixed Sentence.**

If the warrant has not been executed, apply the initial release mixed sentence parole policy (28 C.F.R. §2.66 (c)-(f)) to the new mixed sentence. Review the warrant pursuant to 28 C.F.R. §2.47. When the warrant is executed upon release from the new mixed sentence, conduct a revocation hearing and apply the federal reparole guidelines, with credit for time served on the new mixed sentence.

If the warrant has already been executed, the prisoner is now serving an aggregate mixed sentence, based on the combination of the new mixed sentence and the violator term. Conduct an initial/revocation hearing and apply the mixed sentence initial parole policy (§2.66(c)-(f)), with the federal violator term aggregated with the new U.S. Code sentence to form the "federal sentence block".

## V. SAMPLE WORDING FOR ORDERS AND NOTICES OF ACTION

1.    Cancellation of prior actions [one vote]:

ORDER:    Reopen and vacate previous decision(s) of the U.S. Parole Commission on the establishment of the parole release date. [Schedule new initial hearing for _____.]

NOTICE OF ACTION: Reopen and vacate previous decision(s) of the U.S. Parole

14

Commission on the establishment of the parole release date. [Schedule new initial hearing for _____.]

2.    Exclusively D.C. Code Sentence [three concurring votes]:

a. Denial of parole:

ORDER: Continue for a review hearing in _____.

NOTICE OF ACTION: Continue for a review hearing in _____.

REASONS: You have a score of _____ points under the District of Columbia parole guidelines. See attached point assignment grid. Those guidelines indicate that parole should be denied at this time. After consideration of all factors and information presented, a departure from the guidelines is not found to be warranted.

[Above D.C. guidelines]: You have a score of _____ points under the Those guidelines indicate that parole should be granted at this time. However, a decision notwithstanding the favorable point score is warranted because: [give conclusion and facts in support]. [Add, if applicable: Your case warrants a longer rehearing date than the ordianry case for the same unusual factors noted for the decision to deny parole nothwithstanding your favorable point score.

[The statement of reasons for a D.C. parole denial should be accompanied by a completed point assignment grid for initial hearing (PB 48) or review hearings (PB51), as appropriate.]

b. Grant of parole [three concurring votes]:

ORDER    AND    NOTICE    OF    ACTION:    Parole    effective _____19_____.

[Reasons need not be given for parole grants.]

3.    Mixed U.S. and D.C. sentences.  [One vote for setting the federal date and date for commencing D.C. guidelines; three votes to grant or deny parole under the D.C. guidelines]:

a. Parole on both.

ORDER: Commence application of the District of Columbia parole guidelines on _____ after service of ___ months for your federal offense(s) and an additional _____ months for your D.C. Code offenses. Parole effective

15

_____ 19_____.

NOTICE OF ACTION: Commence application of the District of Columbia parole guidelines on _____ 19_____, after service of ___months for your federal offense(s) and an additional _____ months for your D.C. Code offenses. Parole effective _____ 19____. [Give the customary guideline reasons to explain the federal guideline date. Reasons for the District of Columbia guideline calculation and decision are not required when parole is granted.]

b. Parole denied -- D.C. guidelines commenced after "federal date" or parole eligibility date, whichever comes later.

ORDER: Commence application of the District of Columbia parole guidelines on _____ 19__, [insert either: "after service of _____ months for your federal offense(s)" or "upon your eligibility for parole".] Your D.C. guideline hearing will be held in _____, 19__ [four months prior to the federal date, or parole eligibility date, whichever comes later].

NOTICE OF ACTION: Commence application of the District of Columbia parole guidelines on _____ 19__, [insert either: "after service of ___ months for your federal offense(s)" or "upon your eligibility for parole".] Your D.C. guideline hearing will be held in _____ , 19__. [Give the customary federal guideline reasons, then add the following:]

The above federal guideline decision was made strictly on the basis of your federal crimes and sentences. A D.C. guideline hearing will be conducted for you four months before the date determined appropriate to satisfy your U.S. Code offenses, or upon your parole eligibility, whichever is later. At that time, the U.S. Parole Commission will determine, pursuant to District of Columbia parole guidelines, whether you should be released to the community.

## VI.    MAKING RECOMMENDATIONS TO SENTENCING COURT FOR REDUCTION IN MINIMUM TERMS.

The Parole Commission also has the responsibility to consider the requests of D.C. offenders in BOP prisons for recommendations to the D.C. Superior Court regarding the reduction of minimum terms. We have included as an appendix a memorandum from Mr. Chickinell to Commissioner Lopez dated October 6, 1988 which outlines the proposed procedures for making such recommendations.

## CONCLUSION

Compliance with the court decisions will doubtless present more problems that we have covered here. As questions arise please call the Legal Office for further assistance, where Mr. Chickinell (301-492-5959) will take the lead in providing advice on these matters. Recommendations to improve these procedures are invited from Commissioners and staff.

17

WORKSHEET FOR DETERMINING WHEN TO COMENCE APPLICATION OF D.C.
GUIDELINES ON A MIXED U.S./D.C. CODE SENTENCE

Inmate's Name: _____    Date: _____

Reg. No.: _____    Institution: _____

Note:  Use this worksheet after the federal date has been
established in accordance with Commission procedures.

[Federal Sentence Block]

1.    Your federal sentence block is _____ months.  The
hypothetical statutory release/two-thirds date is after _____
months.

2.    Your basic federal guideline range has been established
at _____ to _____ months.

3.    Your federal time has been set at _____ months.  This
time will be satisfied on _____, 19___ (your
federal date).*

[D.C. Sentence Block]

4.    Your D.C. sentence block is _____ to _____ months.

5.    Your D.C. minimum time is therefore _____ months.  The
highest guideline range for a prisoner (with your salient factor
score) that would be satisfied by service of your D.C. minimum
time is _____ to _____ months.

[Decision on Commencement of D.C. Time and When D.C. Guidelines
Should be Used.]

6.    Accordingly, your D.C. equivalent offense severity
rating is Category _____.  Applying the Multiple Separate

_____

*  This decision will have been made by reference to the
aggregate, not the basic, federal guideline range if there are
escapes, rescission behavior, etc., that resulted in additional
guideline ranges added to the basic federal guideline range.
These additional behaviors are accounted for in setting the
federal date; they are not considered in this determination.

Offenses Table to your basic federal offense (or to each of your basic federal offenses if there were multiple separate federal offenses), combined with your D.C. equivalent offense severity rating, the resulting guideline range is _____ to _____ months.

7.  The difference between the minimum of the above guideline range and the minimum of your basic federal guideline range is _____ months. [Enter zero if, under the Multiple Separate Offenses Table, the basic federal guideline range would not be increased by the addition of the D.C. equivalent offense severity rating.]

8.  Adding this difference to your federal time requires you to serve a total of _____ months before application of the D.C. guidelines. [Add the result in no. 7 to no. 3.] This period of time will be satisfied on _____, 19____.

9.  Schedule a D.C. guideline hearing for _____, 19____. The instructions for setting this hearing date are as follows:

A.  Set a hearing date four months in advance of the federal date in no. 3 if there is no increase in the guideline ranges and the prisoner is eligible for parole on the aggregate sentence. [Parole will not be granted for a date prior to the federal date, unless the Superior Program Achievement criteria at 28 C.F.R. § 2.60 are satisfied.]

B.  Set a hearing date four months before the date entered in no. 8, if that date is beyond the federal date and the prisoner is eligible for parole on the aggregate sentence. [Parole will not be granted for a date prior to the date entered in no. 8, because of minimum accountability for the D.C. offense(s).]

C.  Set a hearing date four months before eligibility on the aggregate sentence if the prisoner is not eligible for parole until after the federal time and any additional time for the D.C. offense(s) has expired. [Parole will not be granted for a date before eligibility.]

ATTACH THIS WORKSHEET TO THE NOTICE OF ACTION, AFTER MAKING ANY CORRECTIONS FOUND NECESSARY AFTER COMPLETION OF THE INITIAL PAROLE HEARING.

32.



GOVERNMENT OF THE DISTRICT OF COLUMBIA
B O A R D   O F   P A R O L E
717-14TH STREET, N.W., SUITE 300
WASHINGTON, D.C. 20005

May 7, 1992

Carol Pavileck Getty, Chair
U.S. Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

Dear Mrs. Getty:

Enclosed is an amended Policy Guideline on establishing dates for
reconsideration hearings that was adopted by the Board at its
monthly public meeting on April 27, 1992.  This Guideline replaces
the policy on the same subject that was adopted by the Board last
December.

The Guideline was amended to eliminate any interpretation that the
Board is restricted to using the specific aggravating and
mitigating factors listed in the document.  Specifically, the
amendments stipulate that the "factors considered by the Board
include but are not limited to..." those listed in the Guideline.
The amended language is found in section VI, paragraphs A-2 and A-
3, and paragraphs B-2 and B-3.

Please contact me, if you have any questions or need additional
information.  Thank you for your continuing cooperation and
support.

Sincerely,

Erias A. Hyman
Chairman

Enclosure

JR/jr



GOVERNMENT OF THE DISTRICT OF COLUMBIA

B O A R D   O F   P A R O L E

717-14TH STREET, N.W., SUITE 300
WASHINGTON, D.C. 20005

---

**POLICY GUIDELINE**

SUBJECT:  Reconsideration Hearings --- Establishing Dates
AS AMENDED BY THE BOARD ON APRIL 27, 1992

I.   **AUTHORITY:**  D.C. Code Section 24-201.2 and 28 DCMR Section 104, May 1987.

II.  **PURPOSE:**   To ensure consistency and equity in the establishment of parole reconsideration dates.

III. **APPLICABILITY:**  An offender who has been denied parole or an offender whose parole has been revoked.

IV.  **REFERENCES:**  Board of Parole Policy Guideline, adopted on December 16, 1991, regarding definitions of terms used in Parole Guidelines

V.   **DEFINITIONS:**

A.  RECONSIDERATION HEARING:  a hearing conducted by the Board to consider whether an offender should be released on parole after the offender was denied parole, or after the offender was reincarcerated when parole was revoked.

B.  SET-OFF:  a period of time ordered by the Board that an offender must remain incarcerated before being reconsidered for parole by the Board.

C.  PRESCRIBED SET-OFFS:  a period of time specified in the rules that an offender may remain incarcerated before being considered for parole.

D.  AGGRAVATING FACTOR:  factor(s) considered by the Board for guidance in determining whether to establish a reconsideration hearing date later than the prescribed set-off.

E.  MITIGATING FACTOR:  factor(s) considered by the Board for guidance in determining whether to establish a reconsideration hearing date earlier than the prescribed set-off.

2

**F.** TECHNICAL VIOLATION: a violation of parole that is noncriminal in nature, *i.e.*, that does not consist of new criminal activity or involvement.

## V. RATIONALE:

The rules provide prescribed set-offs for the purpose of establishing reconsideration hearing dates when parole is denied or revoked. The Board, in its discretion, may establish a reconsideration date outside of the prescribed set-offs where certain factors exist.

## VI. POLICY:

### A. Set-offs When Parole is Denied:

1. When the Board denies parole for any offender, it shall ordinarily schedule a reconsideration date within the prescribed set-offs unless certain factors support imposition of an alternative set-off. The length of a set-off is based on the term of the sentence imposed by the courts, and may not exceed the date on which release from incarceration becomes mandatory.

2. The Board, in its discretion, may schedule a reconsideration date later than the prescribed set-off if one or more aggravating factors are present. The aggravating factors considered by the Board include but are not limited to the following:

   a. There has been repeated failure under any form of community supervision (probation, parole, bail, diversion programs).

   b. The instant offense involved ongoing criminal behavior or leadership role in an organized, criminal venture (e.g., an organized drug distribution operation).

   c. There is a lengthy history of criminally-related alcohol and/or substance abuse.

   d. There is a history of repetitive sophisticated, assaultive, or fraudulent criminal behavior (including the current offense).

   e. There is an unusually extensive or serious prior record (at least five felony convictions).

3

f. The instant offense involved unusual cruelty to victim(s) or involved especially vulnerable victims (e.g., children or elderly victims of assaultive or fraudulent behavior).

g. There has been repeated or extremely serious negative institutional behavior.

h. There has been opportunity but little/no effort made toward rehabilitation/preparation for remaining crime-free if returned to the community.

i. The offender poses a serious threat to self or others and adequate resources are not available in the community.

3. The Board, in its discretion, may schedule a reconsideration hearing date prior to the prescribed set-off if one or more mitigating factors are present. The mitigating factors considered by the Board include but are not limited to the following:

a. There has been exceptional program achievement.

b. There is a record of exclusively trivial offenses.

c. There has been a substantial crime-free period since the last offense.

d. There has been a substantial previous period in custody on other sentence(s) or the prisoner faces a substantial period of time on additional committed sentences.

e. There has been substantial cooperation with the Government that has not been otherwise rewarded.

f. There has been a change in the availability of community resources leading to better parole prognosis or the prisoner has exceptional community resources available.

g. There is a poor medical prognosis.

h. There have been other changes in circumstances.

i. The offender has put forth maximum effort to participate in assigned programs, but opportunities for programming were not available.

4

**B.    Set-offs When Parole is Revoked**

1. When the Board revokes parole for any offender due to a noncriminal parole violation, or a new misdemeanor charge or conviction, or a new felony charge or conviction, a reconsideration hearing date shall ordinarily be set within the prescribed set-offs unless certain factors support imposition of an alternative set-off. The set-off is based on the nature of the violation(s) (noncriminal parole violation, new misdemeanor charge or conviction, or new felony charge or conviction), and the number of years remaining on the maximum sentence for the offense(s) on which parole was granted, provided the set-off does not exceed the date on which release from incarceration becomes mandatory.

2. The Board, in its discretion, may schedule a reconsideration date later than the prescribed set-off for a violation of parole if one or more aggravating factors are present. The aggravating factors considered by the Board include but are not limited to the following:

**a.** There has been repeated failure under parole supervision on this sentence, or a past history of failure under community supervision (probation, parole, bond, diversion programs).

**b.** The violation involved ongoing criminal behavior while on parole supervision.

**c.** The violation involved unusual cruelty to the victim(s) or involved especially vulnerable victims (e.g., children or elderly victims of assaultive or fraudulent behavior)

**d.** The violation involves a history of repetitive sophisticated criminal behavior.

**e.** There is an unusually extensive or serious prior record (at least five felony convictions).

**f.** The offender poses a serious threat to self or others and adequate resources are not available in the community.

**g.** The violation involved serious new felony behavior committed soon after release.

**h.** The parolee absconded from supervision for an extended period of time or otherwise frustrated all attempts at meaningful parole supervision.

5

**3.** The Board, in its discretion, may schedule a reconsideration date prior to the prescribed set-off for violation of parole if one or more mitigating factors are present. The mitigating factors considered by the Board include but are not limited to the following:

**a.** There is ongoing and exceptional program participation and/or achievement in the community.

**b.** There has been a substantial violation-free period on parole.

**c.** Community resources leading to a better prognosis are or will be available prior to the end of the prescribed set-off.

**d.** There is a poor medical prognosis.

**e.** The prescribed set-off for noncriminal violation, or a new misdemeanor charge or conviction would terminate otherwise consistently stable community adjustment.

## VII. PROCEDURES

**A.    Establishing Reconsideration Dates**

**1.** Where the Board denies parole and establishes a date for reconsideration that is outside of the prescribed set-offs, each aggravating or mitigating factor applicable to the decision shall be specified in writing.

**2.** Where the Board revokes parole and establishes a date for reconsideration that is outside of the prescribed set-offs, each aggravating or mitigating factor applicable to the decision shall be specified in writing.

Adopted by the D.C. Board of Parole on April 27, 1992.

_____
Erias A. Hyman
Chairman

# Exhibit

# 4

# Memorandum

| Subject | Date |
|---|---|
| Proposed interim rules for D.C. prisoners | June 26, 1998 |

| To | From |
|---|---|
| Michael J. Gaines<br>Chairman<br>U.S. Parole Commission | Michael A. Stover<br>General Counsel<br>U.S. Parole Commission |

Enclosed are (1) the proposed rules for D.C. prisoners published in the Federal Register on April 10, 1998; (2) the public comment in response to the Federal Register publication; and (3) the draft revision of the proposed rules that is presented to the Commission for adoption (as interim rules) effective August 5, 1998. The revised rules cover both issues of procedure and paroling policy guidelines for D.C. prisoners, and feature an improved "Point Assignment Table." A revision to the Salient Factor Score at 28 C.F.R. § 2.20 is also necessary for the SFS to retain its predictive validity for the D.C. offender population. The continuance ranges for rehearings are intended to avoid increasing the total prison time served by D.C. offenders, but the Commission should continue to study (and improve) the data so that a reasonably good prediction can be made. (It may be necessary to publish revisions prior to August 5, 1998, to achieve this purpose.)

## The Public Comment

The public comment can be summarized as follows.

The D.C. Public Defender's Service and the D.C. Prisoners' Legal Services Project argue that the proposed regulations will "increase the measure of punishment" for D.C. offenders, and will therefore violate the ex post facto clause. However, it was also acknowledged that the D.C. Board of Parole does not always follow its own rules. This is the point that defeats the ex post facto argument. Parole guideline changes, especially those that incorporate factors that are used to exceed the guidelines on a discretionary basis, do not offend the ex post facto clause. See, e.g., Warren v. U.S. Parole Commission, 659 F.2d 183 (D.C. Cir. 1981), Inglese v. U.S. Parole Commission, 768 F.2d 932 (7th Cir. 1985), and Yamamoto v. U.S. Parole Commission, 794 F.2d 1294 (8th Cir. 1986).

Other contentions are that the Commission has no authority to administer the Youth Rehabilitation Act (based on the dubious proposition that YRA prisoners are not "imprisoned felons"), that the salient factor score has no demonstrated validity as a predictor of recidivism for D.C. offenders (although the revised version we propose actually predicts quite well for D.C. offenders), that the United States Attorney should not be permitted to object when the Commission proposes to petition the sentencing court for reduction of a D.C. prisoner's minimum sentence, that prisoners should not be required to undergo the "needless formality" of a parole application, and that there should be representatives at parole hearings in D.C. facilities. The comment about representatives is understandable, but it appears that the D.C. Department of Corrections would be hard-pressed to handle the security problems posed by an influx of outside representatives (most of whom would not be licensed attorneys).

Much of the other comment was devoted to pointing out discrepancies between the proposed rules at §§ 2.77 and 2.78, and the Medical and Geriatric Parole statute. (These comments were very helpful, and I have made revisions accordingly.) There was at least some praise for the Commission's proposal to conduct initial parole hearings within 180 days of eligibility. The most surprising comment came from the General Counsel of the Public Defender Service, who objected to the possibility that a crime victim might be allowed to testify at a parole hearing. That victims would be prohibited from testifying seems to me the unacceptable proposition.

There were a few comments from individual prisoners, whose concerns chiefly appear to be to receive the same opportunities as federal prisoners, and not to be subjected to anything required by the Revitalization Act that would make them serve more time in prison. This is a serious point, and we will continue to study the recommended continuance guidelines in § 2.80 in order to ensure that application of the revised D.C. guidelines by the Parole Commission will not produce unanticipated prison overcrowding.

### The Draft Revised Rules

The following revisions are recommended for adoption by the Commission at this meeting. It is also recommended that the Commission put these rules into effect on August 5, 1998, as a set of interim regulations with request for further public comment. The public comment period should extend at least to December 31, 1998, so that the interim rules can be reconsidered next year in the light of the Commission's experience and further public comment.

### 1.    Proposed Procedural Revisions

Section 2.70 **(Authority and functions)** omits the Commission's authority to submit Youth Rehabilitation Act studies to the Superior Court. It appears that this is no longer a statutory requirement, and there is no reason why the Commission should review correctional staff reports on committed youth offenders. (I am grateful to the Offender Supervision Agency's General Counsel for pointing this out.)

2

Section 2.72 (**Hearing procedure**) has a new provision allowing hearing examiners to order the postponement of a parole hearing if the Commission needs to obtain more information. It also specifies that prehearing disclosure will be available only for inmates in BOP institutions. (It cannot be expected that D.C.D.C. staff could be trained to perform this disclosure function.) In addition, the right of a victim to present not only a written statement, but to testify at a hearing (which the D.C. Board of Parole prohibits), is clarified. I have added, however, the 30-day requirement for victims who wish to appear for an office visit, because the Public Defender Service is correct that the same considerations apply to both victims and supporters (i.e., the need to make a proper record in advance of the parole hearing itself.)

Finally, I have added the provision from § 2.13 requiring examiners to provide the inmate with a recommendation at the conclusion of each hearing, except in complex cases. (It appears that security will be adequate for examiners to conform to standard federal practice in this regard.)

Section 2.73 (**Parole criteria**) has been revised to state that, in unusual cases, parole may be denied based upon the seriousness of the offense. Although the case law is sparse on this subject, and the guidelines of the D.C. Board of Parole clearly focus exclusively on the issue of risk, I am convinced that the D.C. Board of Parole occasionally exercises discretion to deny parole based upon an extremely serious offense. There is no question that this is consistent with D.C. Code § 24-204. Adding express authority to consider the seriousness of the offense in extraordinary cases will not change the basic emphasis of the D.C. parole function on determining the degree of risk, i.e., whether the prisoner would be "a responsible citizen if he is returned to the community" and whether "release on parole is consistent with the public safety." White v Hyman, 647 A.2d 1175 (D.C. App. 1994).

Section 2.74 (**Decision of the Commission**) has no change.

Section 2.75 (**Reconsideration hearings**) is changed so as to set a prisoner's first continuance from the eligibility date rather than the date of the initial hearing. Although this is a change from the current practice of the D.C. Board of Parole, it would avoid disparity in actual prison time caused solely by delays in conducting the initial hearing. The only drawback is that, in the case of a significantly delayed initial hearing, the time to the first rehearing will be correspondingly shortened. (However, total hearings conducted for each prisoner will not be increased.) A further change to Section 2.75 recognizes the authority of the D.C. Board of Parole to revoke and grant an immediate reparole, so that the U.S. Parole Commission's authority begins only when revocation results in the violator becoming an "imprisoned felon" under the Revitalization Act. The General Counsel for the Offender Supervision Agency agrees with this proposed division of authority.

Section 2.76 (**Reduction in minimum sentence**) has no change. It is important to give the U.S. Attorney's Office the opportunity to object to a petition before it is filed, in order to make sure that no significant new information comes to light after the petition

3

has already been filed with the court. The Commission may, in any event, file the petition notwithstanding an objection from the U.S. Attorney.

Section 2.77 and Section 2.78 (**Medical and geriatric parole**) reflect the public comment concerning the Medical and Geriatric Parole Act. The changes permit prisoners to apply for both types of parole, incorporate the 15-day deadlines for medical parole consideration that are imposed by statute, and repeat the statutory language with regard to cases of terminal illness. Although I think that the statutory requirement for "a reasonable medical judgment that the prisoner is within six months of death" is a very difficult standard to apply, any attempt to explain how this standard should be interpreted merely increases the controversy. The legislative history suggests that the City Council simply intended to establish a very restrictive standard, so the Commission might as well repeat the statutory language in the rule. In regard to comment opposing the strict standard established for cases of "permanently incapacitated" prisoners, I think that a strict standard was intended by the City Council. The law does not explain exactly what a prisoner is supposed to be incapacitated from doing, but the logical assumption is that his physical condition should be severe enough to make him incapable of continuing his criminal career.

Section 2.79 (**Good time forfeiture**) has no change.

Section 2.81 (**Effective date of parole**) has no change.

Section 2.82 (**Release planning**) is changed to refer to the CSOSA "supervision staff," and sets a 30-day deadline for submission of release plan reports for approval by the Commission. The rule gives the CSOSA staff the opportunity to report that release planning efforts are unsatisfactory, or that CSOSA lacks the resources to provide effective supervision to a particular individual. It also is changed to reflect USPC practice with regard to employment plans. (Actual employment is not required but there must be a realistic plan to pursue employment.) The Offender Supervision Agency has agreed to the 30-day deadline and will investigate the plans of both parolees and mandatory releasees.

Section 2.83 (**Release to other jurisdictions**) has been pared down to side step the issue of the Commission's authority to parole federally-housed D.C. Code prisoners to supervision outside the District of Columbia by U.S. Probation Officers. That issue should be resolved in another context.

Section 2.84 (**Conditions of release**) qualifies the prohibition on parolees serving as informants by recognizing that this can be done with the Commission's approval, (i.e., if the law enforcement agency makes the proposal). (The Department of Justice (OPD) took severe exception to the appearance of an outright ban on informant agreements.)

Section 2.85 (**Release on parole**) includes a provision authorizing the Commission to retard a parole effective date by 120 days so as to permit the use of graduated sanctions for behavior that is not serious enough to warrant a parole rescission hearing. "Drug treatment program infractions" is changed to "substance abuse treatment program infractions."

Section 2.86 **(Mandatory release)** is revised to eliminate the 180-day reduction for mandatory release supervision in the case of offenses committed after the passage of the D.C. Good Time Credits Act of 1986. This Act appears to have removed the 180-day provision of 18 U.S.C. § 4164, that formerly applied to D.C. mandatory releasees. (The Offender Supervision Agency's General Counsel pointed this out.)

Section 2.87 **(Reparole)** is a new provision that would place reparole decisions under the federal reparole guidelines at § 2.21, unless the parole violation term is aggregated with a new D.C. Code sentence to which the D.C. parole guidelines at § 2.80 would have to be applied. The result would be that for parole violations that do not result in a new D.C. Code sentence of imprisonment (especially administration violations), the reparole guidelines at § 2.21 would provide the decisionmaking policy that the rules of the D.C. Board of Parole fail to supply. (The D.C. Board's rules specify a schedule for rehearing dates, but do not specify when reparole should be granted.) However, if the parole violation is a serious new crime that has resulted in a new D.C. Code sentence, the guidelines at § 2.80 will have to apply to the single aggregate term that the parole violator will be serving. The two guideline systems cannot be harmonized, and the Revitalization Act requires that the D.C. parole rules be applied to the new sentence in any event.

Section 2.88 **(Confidentiality of records)** has no change.

Section 2.89 **(Miscellaneous provisions)**, which incorporates by reference various existing procedural rules of the Commission, adds the rescission procedures at § 2.34 and the FOIA procedures at § 2.56. The rescission guidelines at § 2.36 would not apply. At a rescission hearing, the inmate would have the appropriate number of points added to his Total Point Score under § 2.80, just as if the misconduct had occurred prior to any other hearing. However, because this would yield higher guidelines than § 2.36 requires for less serious infractions, I propose that examiners be given discretion to refer to § 2.36 if the applicable range calls for less prison time. Such a change is included under the continuance ranges in § 2.80.

Section 2.90 **(Prior orders of the D.C. Board of Parole)** is unchanged.

2.    **The Guidelines at § 2.80**

The guidelines at § 2.80 have been revised to meet three goals.

First, the revised Point Assignment Table predicts violent recidivism more accurately than the current D.C. point score or the Federal Register version. However, this requires a revision of the Salient Factor Score at § 2.20 for the guidelines to predict accurately for an important offender group: prisoners who were age 19 or less at the time of the current offense.

Second, the revised Point Assignment Table incorporates most of the factors that the Commission (and the D.C. Board of Parole) have historically relied upon to go outside the guidelines based on "seriousness of the risk." We left out, however, factors that would degrade the predictive power of the score if they were included. (The revised score retains

the basic presumption that the more violent the current offense, and the more prior violent offenses there are on the prisoner's criminal record, the more serious the risk. This basic approach was validated by the research results.)

Third, the rehearing continuance ranges at § 2.80(j) have been revised to avoid increasing or decreasing total prison time served by this offender population.

The following discussion summarizes the proposed changes to (A) the Point Assignment Table, (B) the Salient Factor Score, and (C) the rehearing time ranges.

### A.    The Point Assignment Table

The revised point score excludes several traditional "outside the guidelines" factors that turned out not to be predictive. One of these factors was the assumption that "multiple current violent offenses" make the prisoner a more serious risk than if he committed only a single crime of violence. Drug trafficking without a firearm should also be dropped as adding nothing to the prediction already made by the prisoner's Salient Factor Score, but firearm possession by itself should be given an additional point (as compared with the Federal Register version), because it has more predictive power for future violence than was foreseen. Having one or more prior convictions for crimes of violence, even with no violence in the current offense, also turns out to be more predictive than we thought, and this factor is included in the revised score.

The distinction between "high level" and "other violence" in the current offense is retained primarily because it incorporates a traditional reason for departing from the guidelines (frequently used by the D.C. Board of Parole under the heading of "unusual cruelty to victims"), and it is the factor that best assures the public that parole decisions are addressing the true seriousness of each prisoner's individual criminal potential. But retaining this distinction does not make the revised point score appreciably less valid than other possible versions, in terms of predictive power for violent recidivism. (The research confirmed that it is violence in the current offense that is the best predictor of future violence.) The primary effect will be to prevent the Commission from making decisions outside the guidelines based on aggravating current offense factors, when the factor relied upon does not make the prisoner a more serious risk than the guidelines indicate. The valid factors are already included.[1]

However, we could not continue to make a distinction between "high level" and "ordinary violence" in a prisoner's prior record (as the Federal Register version did), and still produce a point score that predicts as well as the best versions we studied. Hence, we have abandoned the attempt to measure "seriousness of the risk" according to the type of violence on a prisoner's prior record. (It is violence of any sort that predicts future violence.) A decision outside the guidelines based on the prior record including one or more

---

[1]We could have proposed a valid score that was based on "any violence," but examiners would be hard-pressed not to recommend departures whenever they saw especially serious crimes.

6

episodes of "high level violence" would not, therefore, be valid, unless the case was really extreme (e.g., repeated armed rapes and evidence of severe mental illness).

Finally, a two point enhancement for death resulting from a crime of "high level violence" was retained from the Federal Register version, even though the research results did not justify the conclusion that current homicides statistically predict for future homicides[2]. Nonetheless, incorporation of this factor will structure discretion that would otherwise be used in decisions outside the guidelines based on the fact that a victim was done to death. So these offenders will at least get consistent treatment. Adding this enhancement did not undermine the predictive validity of the score.

The result is a ten-point score that is still fairly similar to the eleven point score published in the Federal Register.

## B.    The Salient Factor Score

The research also indicated that the Salient Factor Score needs to be adjusted to reflect the high degree of risk associated with offenders who were 19 years of age or less when they committed the "current offense". Failing to account for this important group of offenders in the basic SFS parole prognosis category would significantly detract from the predictive validity of the Point Assignment Table (which relies upon the Salient Factor Score). It is proposed that Item C be adjusted to become a three-point, instead of a two-point item, so that age nineteen or less "at commencement of current offense" loses three points. To accomplish this, Item F (Heroin/Opiate Dependence) would have to be dropped, because it is the existing predictive item with the least predictive power (and the most difficult to get adequate information to score). The SFS would continue to be a ten-point score and it would give better overall predictive performance.

Another benefit would be that offenders with four prior commitments would be required to forfeit a point, an adjustment that would appropriately penalize repeat parole violators, who presently come in for a deduction of two points only after accumulating five prior commitments. (Each successive revocation of parole is counted as a new conviction under Item A and a new commitment under Item B.) This would counterbalance the SFS improvement that some older prisoners would gain through elimination of Item F. The Commission should not underestimate the difficulty of securing adequate information to score the heroin/opiate item in D.C. cases, and should welcome the opportunity to avoid the apparent disparity between heroin and cocaine/crack cocaine users.[3]

---

[2] In the 1992 sample studied, there were relatively few homicide cases to begin with.

[3] The research has shown that cocaine use does not have the predictive power that heroin/opiate use does, which has been a source of repeated frustration for parole decisionmakers.

## C.   The "Time to Rehearing" guideline ranges

The guidelines published in the Federal Register also included time ranges, keyed to the prisoner's Base Point Score, to guide discretion in establishing the length of each continuance.   Based on these ranges, it can be estimated how long D.C. prisoners, categorized by Base Point Score, will serve in prison before their Total Point Score calls for a grant of parole. (We assume that the average prisoner who is denied parole will earn a one-point deduction at each subsequent rehearing until his Total Point Score is brought down to a 3, indicating that parole should be granted.)   As noted above, these time ranges may need further revision to ensure that total prison time for D.C. offenders is not increased.   The principal effect should be that violent offenders who are not indicated for parole at eligibility (some 27% of all parole candidates) serve somewhat longer than they now do, whereas offenders who are indicated for parole at eligibility serve somewhat less time, assuming that the Commission will succeed in eliminating unnecessary delays in initial parole hearings.   Due to the shortness of time available to our research staff, and difficulties with the coded data that still need to be corrected, it will probably be necessary for the Commission to publish a last-minute revision to the continuance ranges prior to August 5, 1998.

MAS/ame
Enclosures

# Exhibit

# 6

**APPENDIX 2-1**

SALIENT FACTOR SCORE

(Used to determine numerical values for parole eligibility criteria
pursuant to §204).

Item A:  PRIOR CONVICTIONS/ADJUDICATIONS (ADULT OR JUVENILE)......... ☐

       None ................. = 3
       One .................. = 2
       Two or Three ........ = 1
       Four or more ........ = 0

Item B:  PRIOR COMMITMENT(S) OR MORE THAN THIRTY DAYS............... ☐
       (ADULT OR JUVENILE)

       None ................. = 2
       One or Two .......... = 1
       Three or more ....... = 0

Item C:  AGE AT CURRENT OFFENSE/PRIOR COMMITMENTS.................... ☐

    Age at commencement of current offense
       26 years of age or more ............. = 2
       20-25 years of age ................. = 1
       19 years of age or less ............. = 0

    ***Exception:  If five or more prior commitments of more than
       thirty days (adult or juvenile), place an "X" here _____
       and score this item .................. = 0

Item D:  RECENT COMMITMENT-FREE PERIOD (THREE YEARS), .............. ☐

       No prior commitment of more than thirty days (adult or
       juvenile) or released to the community from last such
       commitment at least three years prior to the commencement
       of the current offense ............. = 1

       Otherwise .......................... = 0

Item E:  PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS ................ ☐
       VIOLATOR THIS TIME

       Neither on probation, confinement, or escape status at
       the time of the current offense; nor committed as a
       probation, parole confinement, or escape status violator
       this time .......................... = 1

       Otherwise .......................... = 0

**APPENDIX 2-1**   (Continued)

Item F:   HEROIN/OPIATE DEPENDENCE ................................. □

          No history of heroin/opiate dependence ....... = 1

          Otherwise ................................. = 0

TOTAL SCORE ......................................................... □

## Pre-Incarceration Factors

A.   Salient Factor Score _____ (From SFS Worksheet)
     Risk Group:

     Low      _____ (10-9)      Moderate    _____ (5-4)
     Fair     _____ (8-6)       High        _____ (3-0)

B.   TYPE OF RISK ASSESSMENT:

                                                      Yes    No
     1.   Violence:

          a.   Does the current offense involve a felony in    ____   ____
               which the defendant caused, attempted to cause
               or threatened to cause death or serious bodily
               injury to another individual?

          b.   Does the offender have two or more previous
               convictions for a felony described in (1.a)?    ____   ____

     2.   Weapons:

          a.   Does the current offense involve a felony in
               which the defendant used a dangerous weapon?    ____   ____

          b.   Does the offender have two or more previous
               convictions for a felony described in (2.a)?    ____   ____

     3.   Drug Trafficking:

          a.   Does the current offense involve a felony
               conviction under the D.C. Uniform Controlled
               Substances Act for distribution, or intent to
               distribute, illicit substances?                 ____   ____

2-32

**APPENDIX 2-1**    (Continued)

Drug Trafficking:  (Continued)

        b.   Does the offender have two or more previous
            convictions for significantly similar offenses
            as those described in (3.a) (i.e., convictions
            under this statute or a similar one in another
            jurisdiction)?          ___  ___


### Post-Incarceration Factors


A.   INSTITUTIONAL ADJUSTMENT:

   Has this offender committed serious disciplinary
   infractions (adjudicated under Department of Corrections
   due process procedures)?         ___  ___

B.   INSTITUTIONAL PROGRAM PARTICIPATION:

   Has this offender demonstrated sustained achievement in
   the area of prison programs, industries, or work
   assignments during this period of incarceration?   ___  ___


### POINT ASSIGNMENT GRID
### ADULT OFFENDERS


Instructions:

1.   Circle the appropriate Salient Factor Score category.

2.   Circle any aggravating or mitigating factors for which a finding has
   been made.

3.   Within each applicable cell, circle the number of points to be added
   or subtracted from the baseline point assignment determined by the
   Salient Factor Score Category.

**APPENDIX 2-1**    (Continued)

POINT ASSIGNMENT GRID ADULT OFFENDERS  (Continued_

|  |  | DEGREE OF RISK | | | |
| --- | --- | --- | --- | --- | --- |
|  |  | Salient Factor Score Category | | | |
|  |  | Low | Fair | Moderate | High |
|  |  | +0 | +1 | +2 | +3 |
| TYPE OF RISK |  |  |  |  |  |
|  | a. Violence | +1 | +1 | +1 | +1 |
|  | b. Weapons |  |  |  |  |
|  | c. Drug Trafficking |  |  |  |  |
| 2. | Negative Institutional Behavior | +1 | +1 | +1 | +1 |
| 3. | Program Achievement | -1* | -1 | -1 | -1 |

\* Applicable only where points have been added for aggravating factor.

TOTAL POINTS: _____

IF POINTS = 0:      Parole shall be granted at initial hearing with low
                    level of supervision required.

IF POINTS = 1:      Parole shall be granted at initial hearing with high
                    level of supervision required.

IF POINTS = 2:      Parole shall be granted at initial hearing with
                    highest level of supervision required.

IF POINTS = 3-5:    Parole shall be denied at initial hearing and
                    rehearing scheduled.

DECISION WORKSHEET:  INITIAL HEARINGS

(1)  Minimum Term: _____  (2)  Maximum Term: _____
(3)  Months in custody at Date of Hearing: _____
(4)  Decision:  / / Parole                     Date _____
               / / Rehearing                   Date _____
(5)  Decision is Within _____ Below _____ Above _____ Guidelines

Reasons (if outside of the Guidelines):

WORSE RISK:

...Repeated failure under parole supervision;
...Current offense involves on-going criminal behavior;
...Lengthy history of criminally related alcohol abuse;

APPENDIX 2-1   (Continued)


WORSE RISK:   (Continued)


...History of repetitive sophisticated criminal behavior;
...Unusually extensive and serious prior record (at least five felony
convictions);
...Unusual cruelty to victims.
Specifically: _____

BETTER RISK:  NOTE:      Applicable only to offenders not classified as
                        low risks by the Salient Factor Score.

...record resulting exclusively from trivial offenses;
...substantial crime-free period for which credit not already given on the
   Salient Factor Score.
Specifically: _____

OTHER PRE-INCARCERATION FACTORS: _____

...This YCA offender would have been exposed to a maximum sentence of _____
   months had he/she been sentenced as an adult;
...Substantial cooperation with the government that has not been otherwise
   rewarded;
...Substantial period in custody on other sentence(s) or additional
   committed sentences.  (NOTE:  This circumstance can also be used as an
   "other change in circumstances" below if a new committed sentence is
   imposed after incarceration on the current offense).
...Other _____
Specifically: _____
_____

POST-INCARCERATION FACTORS: _____

...Exceptional achievement in educational or vocational programs during
   period of incarceration;
...Change in the availability of community resources leading to better
   parole prognosis;
...Poor medical prognosis;
...Other change in circumstances _____

Specifically: _____
_____

APPENDIX 2-1    (Continued)

POINT ASSIGNMENT GRID:    INITIAL PAROLE CONSIDERATION
YCA OFFENDERS

Instructions:

1.   Circle the appropriate Salient Factor Score category.

2.   Circle any aggravating or mitigating factors for which a finding has
     been made.

3.   Within each applicable cell, circle the number of points to be added
     or subtracted from the baseline point assignment determined by the
     Salient Factor Score category.

|  |  | DEGREE OF RISK | | | |
|  |  | Salient Factor Score Category | | | |
|  |  | Low | Fair | Moderate | High |
|  |  | +0 | +1 | +2 | +3 |
| 1. | TYPE OF RISK | | | | |
|  | a.   Violence | +1 | +1 | +1 | +1 |
|  | b.   Weapons | | | | |
|  | c.   Drug Trafficking | | | | |
| 2. | Negative Institutional Behavior | +1 | +1 | +1 | +1 |

*    As initial hearings for YCA offenders are held approximately 60 days
     after their incarceration, a reduction in points for sustained
     program achievement is not appropriate at the initial hearing.

TOTAL POINTS:_____

IF POINTS = 0:      Parole shall be granted at initial hearing with
                    conditions established to address treatment needs.

IF POINTS = 1-5:    Parole shall be denied at initial hearing and a
                    rehearing scheduled based on estimated time to achieve
                    program objectives established by the classification
                    team and the Board of Parole.

# Exhibit

# 7

## APPENDIX 2-2

REHEARING GUIDELINES
POINT ASSIGNMENT GRID AND FINDINGS WORKSHEET FOR REHEARINGS
ADULT AND YCA OFFENDERS

POINT GRID FOR PAROLE REHEARINGS

|  |  | POINTS |
|---|---|---|
| 1. | Points From Previous Hearing | _____ |
| 2. | Negative Institutional Behavior Since Last Consideration | +1 |
| 3. | Program Achievement Since Last Consideration | -1 |

TOTAL POINTS: _____

IF POINTS = 0-3:   Parole shall be granted at this rehearing with highest
                   level of supervision required.

IF POINTS = 4-5:   Parole shall be denied and a rehearing date scheduled.

Findings

|  |  | Yes | No |
|---|---|---|---|
| A. | INSTITUTIONAL ADJUSTMENT: Has this offender committed serious infractions (adjudicated under Department of Corrections due process procedures)? | ____ | ____ |
| B. | INSTITUTIONAL PROGRAM PARTICIPATION: Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignments during this period of incarceration? | ____ | ____ |

APPENDIX 2-2

### DECISION WORKSHEET:  REHEARINGS

(1)  Minimum Term: _____  (2)  Maximum Term: _____
(3)  Months in custody at Date of Hearing: _____
(4)  Decision:  / /  Parole                    Date _____
                / /  Rehearing                 Date _____
(5)  Decision is Within _____ Below _____ Above _____ Guidelines


Reasons (if outside of the Guidelines):


...Change in the availability of community resources leading to better
   parole prognosis
...Poor medical prognosis
...Other change in circumstances _____
_____
_____
Specifically: _____
_____

# Exhibit

# 8



GOVERNMENT OF THE DISTRICT OF COLUMBIA

B O A R D   O F   P A R O L E

717-14TH STREET N W  SUITE 300
WASHINGTON D C  20005

---

## POLICY GUIDELINE

**SUBJECT:**  Definitions of Terms Used in Parole Guidelines

I.   **AUTHORITY:**  DCMR Title 28, Section 204 and Appendices 2-1 and
2-2, May 1987

II.  **PURPOSE:**  To define criteria and parameters for determining
the applicability of descriptive terminology used in the
Parole Guidelines for release decisionmaking, and to
facilitate consistency in Guideline application.

III. **APPLICABILITY:**  All cases requiring Board action in which the
Parole Guidelines are applied.

IV.  **REFERENCES:**  D.C. Department of Corrections Rules published at
28 DCMR Sections 502 and 503, May 1987 (copy attached); Board
of Parole Policy Guideline regarding the establishment of
dates for parole reconsideration, adopted on December 16,
1991.

V.   **RATIONALE:**

Many of the descriptive terms used in the Parole Guidelines
criteria are judgmental and subjective.  As such, they lend
themselves to disparate interpretations and applications by
Guideline users.  To ensure equitable treatment of similarly-
situated offenders, these terms require definitions that
facilitate equitable application across affected cases, while
preserving sufficient discretion to accommodate individual
circumstances.

VI.  **POLICY:**

The following definitions shall apply to Parole Guidelines
terminology in the release decisionmaking process; however,
the weight accorded to any applicable countervailing factor
shall be at the discretion of the Board.

2

**A.  POST-INCARCERATION FACTORS:**

**1.  Negative Institutional Behavior** consists of serious or repeated major disciplinary infractions as described below that are sanctioned under Department of Corrections due process procedures.

**a.** In INITIAL PAROLE CONSIDERATION cases, the following disciplinary infractions shall ordinarily be considered as negative institutional behavior:

**(1)** One Class I Offense for murder, manslaughter, kidnapping, armed robbery or first degree burglary at any time during the minimum sentence (see DCMR 28-502.3, May 1987); OR

**(2)** One Class I Offense as defined at DCMR 28-502.4 through 502.17 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; OR

**(3)** Two Class II Offenses as defined at DCMR 28-503.2 through 503.12 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer.

**b.** In PAROLE RECONSIDERATION cases, the following disciplinary infractions occurring since the preceding release consideration on the sentence shall ordinarily be considered as negative institutional behavior:

**(1)** One Class I Offense (see DCMR 28-502.3 through 502.17, May 1987); OR

**(2)** Two Class II Offenses (see DCMR 28-503.2 through 503.12, May 1987).

**c.** In RESCISSION CONSIDERATION cases, the following disciplinary infraction shall ordinarily considered as negative institutional behavior:

**(1)** Removal from Work Release for one or more rule violations without subsequent reinstatement, EXCEPT WHERE REMOVAL WAS AT THE EXPRESS REQUEST OF THE OFFENDER; AND

**(2)** No point for negative institutional behavior was assessed in the most recent Parole Guideline computation.

3

2.  **Sustained Program or Work Assignment Achievement** consists of completion of a program or work assignment as described below that shall ordinarily be documented by a certificate, a diploma, a report from an institutional teacher, counselor or work supervisor, OR other documentary evidence.

    **a.** In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:

    **(1)** Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area; <u>OR</u>

    **(2)** Award of a GED where the offender possessed the prerequisite skills for participation in the GED program at the time of incarceration on the sentence; <u>OR</u>

    **(3)** Successful completion of the requirements and award of an Associate's or Bachelor's degree; <u>OR</u>

    **(4)** Successful completion of one or more short-term special needs programs, such as drug treatment or psychological counseling, to address the offender's identified problems;

    NOTE:  Completion of the 2-day DAAP program alone does NOT qualify as sustained program achievement.

    <u>OR</u>

    **(5)** Satisfactory participation in one or more work details for at least one-third of the period of incarceration.

    **b.** In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence.

4

**B.  FACTORS COUNTERVAILING A RECOMMENDATION TO DENY PAROLE:**

  **1.  Exceptional Program or Work Assignment Achievement**
  consists of completion of a program or work assignment as
  described below that shall ordinarily be documented by a
  certificate, a diploma, a report from an institutional
  teacher, counselor or work supervisor, OR other
  documentary evidence.

    **a.** In INITIAL PAROLE CONSIDERATION cases, the following
    accomplishments shall ordinarily be considered as
    exceptional program or work assignment achievement during
    the period of incarceration on the sentence:

      **(1)** Successful completion of three or more
      educational or vocational programs, or program
      levels, each of which enabled the offender to
      develop an academic or job-related skill, OR
      enabled the offender to progress to a higher level
      of difficulty or skill in the program area; <u>OR</u>

      **(2)** Award of a GED where more than six (6) months
      of study were necessary to meet the requirements,
      <u>i.e.</u>, the offender began academic courses of study
      without the prerequisite skills for participation
      in the GED program and successfully completed the
      coursework necessary to earn a GED while
      incarcerated; <u>OR</u>

      **(3)** Award of an Associate's or Bachelor's degree
      where the offender needed 18 or more credits to
      fulfill the requirements for the degree; <u>OR</u>

      **(4)** Participation at a better than satisfactory
      level in one or more work details as evidenced by
      three or more promotions or formal increases in
      levels of responsibility.

    **b.** In PAROLE RECONSIDERATION cases, the accomplishments
    set forth in Section VI-B-1(a) of this policy shall
    ordinarily be considered as exceptional program or work
    assignment achievement where completion occurred since
    the preceding consideration for release on the sentence.

  **2.  Record of Exclusively Trivial Offenses** consists of
  misdemeanor offenses, ordinarily <u>excluding</u> offenses involving:

    **a.** Possession, use, sale, attempted sale, distribution
    or attempted distribution of narcotics, controlled
    dangerous substances, or related paraphernalia;

Case 1:08-cv-00553-RCL   Document 1-4   Filed 03/31/2008   Page 32 of 36
Case ▮▮▮▮▮▮▮▮▮▮   Document 46-3   Filed 12/14/2007   Page 16 of 95

5

    **b.** Possession, use, sale or control of dangerous or deadly weapons;

    **c.** Infliction or attempted infliction of bodily injury or harm; or

    **d.** Destruction of public or private property.

**3.** **Substantial Crime-Free Period** is a period of at least five (5) years prior to commission of the instant offense(s) during which the offender was in the community, was not on escape, active parole or probation, and was not committed for more than thirty (30) days on any offense.

**4.** **Substantial Previous Period in Custody on Other Sentence(s) or Additional Committed Sentences** consists of:

    **a.** A continuous period of at least five (5) years in custody on other sentence(s) immediately preceding the date the sentence for the instant offense(s) began; OR

    **b.** A continuous period of at least five (5) years to be served on one or more additional sentences to incarceration which are consecutive to the instant sentence.

**5.** **Substantial Cooperation with the Government that Has Not Been Otherwise Rewarded** consists of documented special or unusual assistance to the Department of Corrections or another governmental agency during the period of incarceration which made an exceptional contribution to the health, welfare or safety of persons or property.

**6.** **Change in Availability of Community Resources Leading to Better Parole Prognosis** may apply when there is an opening or opportunity for an offender to participate in a program, service or other accommodation in the community that will meet the offender's identified need(s) and lead to reduced risk to the community and/or any other person. For example, a drug-dependent offender is accepted into an in-patient, residential or other highly structured program of drug treatment or rehabilitation.

**7.** **Poor Medical Prognosis** may occur when an offender has been diagnosed as terminally ill and/or is sufficiently debilitated that the likelihood of repeated criminal involvement, or risk to the community and/or any other person is minimal.

**8.** **Other Change in Circumstances** may occur when the capabilities or characteristics of an offender are altered or modified in ways that minimize the likelihood of repeated

6

criminal involvement, or risk to the community and/or any
other person.

C.  **FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE:**

1.  **Repeated Failure Under Parole Supervision** consists of two
(2) or more revocations of parole on the current sentence, OR
three (3) or more revocations of parole on any sentence within
the preceding five years.  The term "parole supervision" as
used in the Parole Guidelines is inclusive of other forms of
conditional release including probation, bail, diversion
programs or other community supervision.

2.  **Ongoing Criminal Behavior** consists of:

    a.  Poor community adjustment as evidenced by failure to
    remain free of criminal activity over sustained periods
    of time; or

    b.  Acting in a leadership role in an organized, criminal
    venture, such as an organized drug distribution
    operation; or

    c.  A criminal record where the current conviction is at
    least the third (3rd) conviction for substantially
    similar offenses, OR at least the fourth (4th) conviction
    for dissimilar offenses.

3.  **Lengthy History of Criminally-Related Alcohol Abuse**
consists of at least five (5) convictions, including the
current conviction, for criminal activity committed while
under the influence of alcohol.

4.  **History of Repetitive Sophisticated Criminal Behavior**
consists of three (3) or more convictions, including the
current conviction, for:

    a.  Serious crimes involving premeditation or methodical
    planning; or

    b.  Assaultive or fraudulent criminal behavior.

5.  **Unusually Extensive or Serious Prior Record** consists of at
least five (5) felony convictions for commission, or attempted
commission, of any one or any combination of the following
"crimes of violence ... notwithstanding that the offender
lacked the capacity to commit the crime by reason of infancy,
insanity, intoxication, or otherwise" (D.C. Code 3-401(3)):

    a.  Arson;

7

   **b.** Assault, OR maliciously disfiguring another person,
OR mayhem, OR manslaughter, OR murder;

   **c.** Forcible sodomy, OR sodomy of a child less than 16
years of age, OR rape;

   **d.** Kidnapping;

   **e.** Riot;

   **f.** Robbery;

   **g.** Unlawful use of explosives.

**6. Instant Offense Involved Unusual Cruelty to Victims** may
apply where the offense involved:

   **a.** Physical, mental or emotional abuse beyond the degree
needed to sustain a conviction on the instant offense; OR

   **b.** Especially vulnerable victims, _e.g._, children or
elderly persons were the victims of assaultive or
fraudulent behavior.

**7. Repeated or Extremely Serious Negative Institutional
Behavior** consists of one or more extremely serious
disciplinary infractions, or multiple disciplinary infractions
as described below that are sanctioned under Department of
Corrections due process procedures.

   **a.** In INITIAL PAROLE CONSIDERATION CASES, the following
offenses shall ordinarily be considered as repeated or
extremely serious negative institutional behavior:

      **(1)** One or more Class I Offenses for murder,
manslaughter, kidnapping, armed robbery, or first
degree burglary at any time during the minimum
sentence (see DCMR 28-502.3, May 1987); OR

      **(2)** Two or more Class I Offenses as defined at
DCMR 28-502.4 through 502.17 (May 1987) during the
12 months preceding the hearing OR during the last
half of the minimum sentence up to a period of
three years, whichever is longer; OR

      **(3)** One Class I Offense plus two Class II Offenses
as defined respectively at DCMR 28-502.4 through
502.17, and 503.2 through 503.12 (May 1987) during
the 12 months preceding the hearing OR during the
last half of the minimum sentence up to a period of
three years, whichever is longer; OR

8

> **(4)** Three or more Class II Offenses as defined at DCMR 28-503.2 through 503.12 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; <u>OR</u>
>
> **(5)** Open charge(s) for new crime(s) committed during this sentence; <u>OR</u>
>
> **(6)** New conviction(s) for crime(s) committed during this sentence.

**b.** In PAROLE RECONSIDERATION cases, the following offenses <u>occurring since the preceding release consideration on the sentence</u> shall ordinarily be considered as repeated or extremely serious negative institutional behavior:

> **(1)** One Class I Offense for murder, manslaughter, kidnapping, armed robbery, or first degree burglary (see DCMR 28-502.3, May 1987); <u>OR</u>
>
> **(2)** Two or more Class I Offenses as defined at DCMR 28-502.4 through 502.17 (May 1987); <u>OR</u>
>
> **(3)** One Class I Offense <u>plus</u> two Class II Offenses as defined respectively at DCMR 28-502.4 through 502.17, and 503.2 through 503.12 (May 1987); <u>OR</u>
>
> **(4)** Three or more Class II Offenses as defined at DCMR 28-503.2 through 503.12 (May 1987); <u>OR</u>
>
> **(5)** Open charge(s) for new crime(s) committed during this sentence; <u>OR</u>
>
> **(6)** New conviction(s) for crime(s) committed during this sentence.

**c.** In RESCISSION CONSIDERATION cases, a recommendation to grant parole may be countervailed for repeated or extremely serious negative institutional behavior where a point for negative institutional behavior was assessed in the most recent Parole Guideline computation.

**8. Lengthy History of Criminally-Related Substance Abuse** consists of at least five (5) convictions, including the current conviction, for criminal activity committed:

> **a.** While under the influence of illegal substances, or illegal use of controlled substances; <u>OR</u>

9

      **b.** Involving the illegal sale, distribution, purchase or possession of any narcotic drug, controlled dangerous substance or related paraphernalia.

9. **Absence of Community Resources Which Ensure Safety of the Community** consists of the unavailability of services necessary to support an offender's personal or community adjustment, and to minimize the risk to the community, any other person or the offender, _e.g.,_ the opportunity is not currently available to participate in an appropriate program to treat the offender's diagnosed emotional, mental or physiological disability or dependency.

Adopted by the Board of Parole on December 16, 1991.

_____
Erias A. Hyman
Chairman

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

F
08-553
UNA

**I (a) PLAINTIFFS**

Romes Austin 88888

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
**(EXCEPT IN U.S. PLAINTIFF CASES)**

Pro Se (PR)

**DEFENDANTS**

Edward F. Reilly, JR, et al.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Reg # 00070-000

Case: 1:08-cv-00553
Assigned To : Unassigned
Assign. Date : 3/31/2008
Description: Pro Se Gen. C

JURY
ACTION
CASE REASSIGNED
TO: LAMBERTH J. RCL
APR 2 2 2008

**II. BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☑ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

☐ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other) OR** ☑ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Immigration**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus- Alien
Detainee
☐ 465 Other Immigration Actions

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☑ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant

☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.

☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt
Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if not
Administrative Agency Review
or Privacy Act)

| □ G. *Habeas Corpus/ 2255* | □ H. *Employment Discrimination* | □ I. *FOIA/PRIVACY ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ K. *Labor/ERISA (non-employment)* | □ L. *Other Civil Rights (non-employment)* | □ M. *Contract* | □ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

| ☑ 1 Original Proceeding | □ 2 Removed from State Court | □ 3 Remanded from Appellate Court | □ 4 Reinstated or Reopened | □ 5 Transferred from another district (specify) | □ Multi district Litigation | □ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

---

**VII. REQUESTED IN COMPLAINT** □ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** 5 million    Check YES only if demanded in complaint    **JURY DEMAND:** ☑ YES    □ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) □ YES □ NO    If yes, please complete related case form.

**DATE**    **SIGNATURE OF ATTORNEY OF RECORD** UCD

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd