## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROMES AUSTIN** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| | ) **Civil Action No. 08-0553 (RCL)** |
| **v.** | ) **(ECF)** |
| | ) |
| **EDWARD F. REILLY, JR.** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Edward F. Reilly, Jr., in his official capacity as the Chairman of the United States Parole Commission ("Defendant"), by and through the undersigned, respectfully files this Motion to Dismiss the complaint filed by Romes Austin ("Plaintiff") under Fed. R. Civ. P. 12(b)(1) and (6).

In support of this motion, Federal Defendants respectfully refer the Court to the accompanying Memorandum of Points and Authorities with attachments, and to the entire record in this case.

Pro se Plaintiff will take note that if he fails to respond to this motion to dismiss, the Court may grant this motion and dismiss his case because of his failure to respond. See Fox v. Strickland, 837 F.2d 507 (D.C. Cir. 1988).

A proposed Order consistent with the relief sought herein is attached.

July 24, 2008                                   Respectfully submitted,

                                                _/s/_____
                                                JEFFREY A. TAYLOR, D.C. BAR # 498610
                                                United States Attorney

___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

___/s/_____
KENNETH ADEBONOJO
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W. – Civil Division
Washington, D.C.  20530
(202) 514-7157
(202) 514-8780 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| **ROMES AUSTIN** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| | ) **Civil Action No. 08-0553 (RCL)** |
| **v.** | ) **(ECF)** |
| | ) |
| **EDWARD F. REILLY, JR.** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Romes Austin, a.k.a. Jerome Walker, Reg. No. 00070-000 ("Plaintiff") brings this action

under 42 U.S.C. §1983 against Edward F. Reilly ("Defendant"), in his official capacity as Chair

of the United States Parole Commission ("Commission"), alleging that Defendant violated the ex

post facto clause of the Constitution by denying him parole at his parole rehearings in 2001,

2004, and 2007.  Plaintiff contends that, instead of using the defunct District of Columbia Board

of Parole ("Parole Board") regulations to determine his parole suitability, the Commission

applied its own parole regulations at each rehearing, thereby creating a significant risk of

increasing his punishment.  Plaintiff's Complaint, at 5, ¶13 ("Pl's Compl.").  Plaintiff requests

injunctive and declaratory relief as well as $5,000,000 in damages.  Id. at 36-37.  Plaintiff's

claims are without merit.  The Court should grant Defendant's Motion to Dismiss or in the

Alternative for Summary Judgment for the reasons set forth below.

**I. FACTUAL BACKGROUND**

Plaintiff Austin is currently serving an aggregate 21-75 year sentence for a D.C. Code

violation at Gilmer FCI in Glennville, WV.  In Case Number F2391-81D, the Superior Court of

the District of Columbia sentenced Plaintiff on July 6, 1982 to a prison term of 14-50 years for assault with intent to rob while armed.  See Judgment and Commitment Order, Ex. A.  Plaintiff committed the offense on March 3, 1981, when he shot both the victim employee and his co-offender as they struggled during the course of a store robbery.  See Presentence Report, Ex. B, 2 at ¶2.  On October 18, 1984, in Case Number F6049-83, the Superior Court sentenced Plaintiff to a 7-25 year prison term for murder II.  See Judgment and Commitment Order, Ex. C at ¶3.  In the latter case, Plaintiff was involved in a murder for hire.  See Rehearing/Rescission Hearing Summary, Ex. G at 3.

The District of Columbia Department of Corrections determined that Plaintiff was eligible for parole as of November 14, 1997.  See Face Sheet, No. 2, Ex. D.  Plaintiff received his initial parole hearing by a Parole Board official on October 24, 1997.  See Parole Determination Record, Ex. E, ¶5.  At this hearing, the official considered Plaintiff's case under the Parole Board's point assignment grid, which give Plaintiff a score of 2, indicating that he should be paroled at his initial hearing.  Id.  Two Board members subsequently voted to deny Plaintiff parole and scheduled him for a reconsideration hearing in three years.  Id.  The Board members agreed that countervailing factors warranted a departure from its parole suitability regulations because Plaintiff had admitted to the hearing official that he was paid to kill someone.  Id.

On November 17, 1997, the Parole Board informed Plaintiff of its decision to deny parole and reconsider him for parole by November 14, 2000.  See Notice of Board Order, Ex. F, ¶7.  In addition to the murder-for-hire, the Parole Board explained that its decision was "based upon subject's prior failure under community supervision; ongoing or repetitive criminal behavior; and need for programming to remain crime-free in the community."  Id.

On December 17, 2001, the Commission conducted Plaintiff's rehearing at the U.S.

Penitentiary, Atlanta, Georgia.  See Hearing Summary, Ex. G.  The hearing examiner evaluated

the case under the same Parole Board's point assignment grid regulations for rehearings.  Id.  The

examiner recommended reduction of the point score from 2 to 1 based on Plaintiff's record of

conduct and program performance indicating that parole should be granted.  Id.  But the

examiner recommended that the Commission deny Plaintiff parole and continue him for a

rehearing in three years.  Id.

The Commission concurred with the examiner's recommendation and issued a notice of

action dated January 18, 2002, denying parole and continuing him for a rehearing in December

2004.  See Notice of Action, Ex. H ¶9.  The notice provided the following reason for a departure

from the favorable outcome indicated by the point score:   "your offense was particularly

aggravated in that you were involved in a robbery in which you shot not only your codefendant

but also an innocent victim and were subsequently involved in a murder for hire in which you

were paid to murder the husband of a woman for money.  Your commission of these multiple

violent acts makes you a more serious risk to commit further violent behavior in the community

if released at this time."  Id.  The Commission then gave the following reason for departing from

the normal rehearing schedule (i.e., a rehearing every twelve months): "you have not yet attained

your GED [grade equivalency diploma] or completed a vocational training.  The aggravated

nature of your crimes, which involved the shooting of two persons and the murder of a third and

two separate unrelated behaviors, warrants continued programming and counseling."  Id.

Plaintiff was given another rehearing by a Commission examiner on December 7, 2004,

at the U.S. Penitentiary, Atlanta, Georgia.  See Hearing Summary, Ex. I, ¶10.  The hearing

examiner found that Plaintiff's point score should remain at 1, after adding a point to the previous score for institutional misconduct because Plaintiff tested positive for marijuana use in May 2004 and subtracting a point for good program performance.  Id.  The examiner recommended that the Commission deny Plaintiff parole and set him off for a rehearing in three years.  Id.

The Commission concurred with the hearing examiner's recommendation and issued the following decision in a notice of action dated December 23, 2004, denying parole and continuing to a three-year reconsideration hearing in December 2007.  See Notice of Action, Ex. J, ¶11.  The Commission gave the following reason for departing from the point score: "you were involved in a robbery, which [sic] you shot two people, and you were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money.  The commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time."  Id.  The Commission indicated in the notice of action that this reason also applied to the decision to depart from the normal rehearing schedule.  Id.

A Commission hearing examiner conducted Plaintiff's most recent rehearing on November 21, 2007.  See Hearing Summary, Ex. K, ¶12 .  The hearing examiner conducted the rehearing by video conference between the Commission's office in Maryland and the Federal Correctional Institution in Gilmer, West Virginia.  Id.  The hearing examiner considered Plaintiff's record of conduct and program performance since his last hearing, including a misconduct report for using alcohol.  Id.  The hearing examiner added a point to Plaintiff's previous point score for negative institutional behavior, giving him a total point score of 2.  Id.  Though the point score indicated that parole should be granted at the rehearing, the examiner

4

found countervailing factors for denying parole and recommended that the prisoner should be set

off for a rehearing in three years.  Id.  The Commission agreed with this recommendation and by

Notice of Action dated December 14, 2007, informed Plaintiff of the decision denying parole and

continuing him for a rehearing in November 2010.  See Notice of Action Ex. L, ¶13.  The

Commission gave the following reasons for the departure from the outcome Parole Board's

guidelines and the rehearing schedule: "your offense behavior involved the following aggravating

circumstances in that you engaged in an offense involving murder for hire.  After the commission

of that offense, you then committed other acts of violence in the community.  In your

commission [sic] the attempted robbery of a convenience store in which two individuals were

shot by you to include the store owner and your codefendant."  Id.

## II. LEGAL BACKGROUND

### i.    Parole Board and Commission Regulations

This case arises out of the transfer of paroling authority over D.C. Code offenders from

the defunct Parole Board to the Commission.  See National Capital Revitalization and Self-

Government Improvement Act ("Revitalization Act"), enacted on August 5, 1997.  The

Revitalization Act directed the Commission to "assume the jurisdiction and authority of the

Parole Board of the District of Columbia to grant and deny parole . . . in the case of any

imprisoned felon who is eligible for parole or reparole under the District of Columbia Code."

Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745.   According to the Act, the Commission "shall

have exclusive authority to amend or supplement any regulation interpreting or implementing the

parole laws of the District of Columbia."  Id.   The Commission exercised its authority "pursuant

to the parole laws and regulations of the District of Columbia."  Id.

5

The Parole Board previously conducted parole hearings in accordance with a loose set of policies in place when Plaintiff committed his crimes. The governing statute under which the Board issued regulations emphasized the discretionary nature of the Board's decisions:

> Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board *may* authorize his release on parole upon which terms and conditions as the Board shall from time to time prescribe.

D.C. Code § 24-204(a) (emphasis added).[1]

Prior to 1985, the Parole Board's regulations noted that "[t]he granting of parole is neither a constitutional or statutory requirement, and release to parole supervision by the Board is not mandatory." 9 D.C.R.R. § 105. The Board weighed the following set of "factors considered" when judging whether or not to approve parole:

> (a) The offense, noting the nature of the violation, mitigating or aggravating circumstances and the activities and adjustment of the offender following arrest if on bond or in the community under any pre-sentence type arrangement.
>
> (b) Prior history of criminality noting the nature and pattern of any prior offenses as they may relate to the current circumstances.
>
> (c) Personal and social history of the offender, including such factors as his family situation, educational development, socialization, marital history, employment history, use of leisure time and

---

[1]    Because plaintiff's prospects for parole are still guided by the same statute that was in effect when he committed his crimes, he cannot argue that his punishment has been unconstitutionally increased by a change in statutory law.

prior military experience, if any.

(d) Physical and emotional health and/or problems which may have played a role in the individual's socialization process, and efforts made to overcome any such problems.

(e) Institutional experience, including information as to the offender's overall general adjustment, his ability to handle interpersonal relationships, his behavior responses, his planning for himself, setting meaningful goals in areas of academic schooling, vocational education or training, involvements in self-improvement activity and therapy and his utilization of available resources to overcome recognized problems. Achievements in accomplishing goals and efforts put forth in any involvements in established programs to overcome problems are carefully evaluated.

(f) Community resources available to assist the offender with regard to his needs and problems, which will supplement treatment and training programs begun in the institution, and be available to assist the offender to further serve in his efforts to reintegrate himself back into the community and within his family unit as a productive useful individual.

9 D.C.R.R. § 105.1; See also Glascoe v. Bezy, 421 F.3d 543, 544-45 (7th Cir. 2005) (explaining that the guidelines instructed the Board to take the "six factors" into account "in making its parole determination").

Under these implementing rules, "the Board's discretion to grant or deny parole was

*totally unfettered*." Sellmon v. Reilly, No. 06-01650(ESH), 2008 WL 2470002, at *2 (D.D.C.

June 20, 2008). It is apparent that the Parole Board sought to provide only a general description

of some of the factors it considered significant in making release decisions, without weighing

such factors or indicating whether some were more important than others in the exercise of the

Board's judgment. There was "no formalized scoring system." Davis v. Henderson, 652 A.2d

634, 635 (D.C.1995).  Rather, the regulations "simply mirrored" the governing code language

and its discretionary character.  Blair-Bey v. Quick, 151 F.3d 1036, 1048 (D.C. Cir. 1998).

The Parole Board revised these regulations in 1985, published in 1987 ("1987

Regulations").  See D.C. Mun. Regs. tit. 28, §§ 100 et seq. (1987) (repealed Aug. 5, 2000)).  The

1987 Regulations sought to advance several objectives, including the promotion of consistent

parole decision-making and assurance that the offender's incarceration was proportionate to the

sentence imposed and risk posed by the offender.  See Pl's Compl., Ex. 1, Report on the

Development of Paroling Policy Guidelines for the District of Columbia Board of Parole,

Plaintiff's Complaint pp 1-2.  The "touchstone of the parole decision-making process," the Board

explained, "should be based on offender characteristics that have a statistically determined

bearing on the offender's risk of future involvement in criminal behavior." Id. at 3.  The Board

created a numerical scoring system "to guide . . . [it] in making the decision whether to grant or

deny parole."  White v. Hyman, 647 A.2d 1175, 1179 (D.C. 1994).

The 1987 Regulations assessed the degree of risk posed by an offender through two pre-

incarceration factors and two post-incarceration factors.  In terms of pre-incarceration metrics,

the Board first assigned an offender eligible for parole a Salient Factor Score ("SFS"), based on

six criteria.[2]  The Board would take this point total and adjust it in light of a Type of Risk

Assessment ("TRA").  It considered three categories of criminal conduct—use of violence, use of

a weapon, and drug trafficking—as aggravating factors that could add one point to a candidate's

---

[2] The factors were: (1) prior convictions and adjudications; (2) prior commitments of
more than thirty days; (3) age at commission of current offense; (4) recent commitment-free
period; (5) status of prisoner at time current offense; and (6) history of heroin or opiate
dependence.  D.C. Mun. Regs. tit. 28, § 204.4; see also Fletcher v. Reilly, 433 F.3d at 867 (D.C.
Cir. 2006).

8

score.  D.C. MUN. REGS. tit.  28, § 204, app. 2-1.  Moving to post-incarceration metrics, the

Board reviewed an offender's Institutional Adjustment, namely if he or she committed serious

disciplinary infractions while incarcerated, and then Institutional Program Participation, whether

he or she demonstrated sustained achievement in prison programs, industries or work

assignments.  Id.  While the Board would add one point to a candidate's baseline score for

negative institutional behavior, it would subtract one point for program achievement.  Id.

  After the Board tallied the D.C. offender's total point score, the 1987 Regulations held

that parole, with varying levels of supervision, could be granted for those with a 0, 1 or 2.  Those

scoring between a 3 and 5 could be denied parole.  Id.  § 204.19.  But though the scoring system

was "created to guide the Board in making the decision whether to grant or deny parole, the

purpose of the system . . . [was] 'to enable the Board to exercise its discretion.'"  White, supra,

647 A.2d at 1179 (quoting D.C. MUN. REGS. tit.  28, § 204.1).  The numerical tally "is not a rigid

formula."  McRae v. Hyman, 667 A.2d 1356, 1361 (D.C. 1995).  Departures are permissible.

The scoring system did not change the extent of the Board's discretion, providing "no more than

'flexible guideposts for use in the exercise of discretion.'"[3]  McRae, 667 A.2d at 1359 (quoting

Davis v. Henderson, 652 A.2d 634, 637-38 (D.C. 1995)); see also Ellis v. Dist. of Columbia, 84

F.3d 1413, 1420 (D.C. Cir. 1996) (holding that numerical scores under the regulations "do not

give any prisoners a liberty interest in parole").

  As the D.C. Circuit has explained, the 1987 Regulations "explicitly authorize the Board

to disregard the numerical guidelines simply by referring to 'the specific aggravating or

---

[3] Indeed, the Board's regulations were amended in 1994 by changing the word "shall" to "may" in several sections, including 204.19.  See Technical Amendments Act of 1994, D.C. Act 10-302, § 52(c)-(f), 41 D.C. Reg. 5193, 5203.

mitigating factors as stated in Appendices 2-1 and 2-2." Ellis, 84 F.3d at 1419 (quoting D.C.

MUN. REGS. tit. 28, § 204.1). The Parole Board could cite "other change in circumstances"

regarding post-incarceration factors or "other" under pre-incarcerations factors to depart from the

point system. D.C. Mun. Regs. tit. 28, § 204, app. 2-1. Such flexibility, the D.C. Circuit found,

suggested the following interpretation: "under the regulations, a prisoner with a low total point

score shall be granted parole unless the Board, in the exercise of its discretion, believes there is

some other reason for not granting him parole." Ellis, 84 F.3d at 1419 (noting also that the

Parole Board "invoked the residual category of 'other' as the basis for denying parole" to lead

plaintiff Michael Ellis).

 In "unusual circumstances," moreover, the Parole Board had the authority to "waive the

SFS and the pre and post incarceration factors . . . to grant or deny parole to a parole candidate."

D.C. MUN. REGS. tit. 28, § 204.22. The Board identified several factors under which it could

find a degree of risk that rose to the level of "unusual circumstances": (1) repeated failure under

parole supervision; (2) the current offense involves ongoing criminal behavior; (3) lengthy

history of criminally related alcohol abuse; (4) history of repetitive and sophisticated criminal

behavior; (5) unusually serious prior record of at least five felony convictions; or (6) the crime

involved unusual cruelty to victims. D.C. MUN. REGS. tit. 28, § 204, app. 2-1. Each provision

gave the Parole Board additional discretion when deciding whether to grant or deny parole.

 In 1991, to ensure more consistent application of the 1987 Regulations, the Board

promulgated a policy guideline that provided more precise definitions of key terms ("1991

Guideline"). See Pl's Compl., Ex. 12 at 1. It further explained the post-incarceration factors of

"negative institutional behavior" and "sustained program or work assignment achievement," as

well as established three additional "unusual circumstances" meriting departure from the total

point score: (1) repeated or extremely serious negative institutional behavior; (2) lengthy history

of criminally-related substance abuse; and (3) absence of community resources to ensure safety

of the community.  Id. at 1-9.

  Following passage of the Revitalization Act, the Commission formulated new parole

regulations and guidelines ("2000 Regulations"), which apply to D.C. offenders.  28 C.F.R. §

2.80 et seq.  The 2000 Regulations mirror the 1987 set in calculating a Salient Factor Score and

assessing a candidate's type of risk.  These factors are weighed to arrive at a base point score

from which a base guideline range of months might be added before an offender's

reconsideration for parole.  The Commission then increases or decreases the amount of time in

accordance with superior program achievement and negative institutional behavior.  28 C.F.R. §

280(a)-(m).  Also like the 1987 Regulations, the Commission can, "in unusual circumstances,

grant or deny parole to a prisoner notwithstanding the guidelines."  28 C.F.R. § 280(n)(1).  The

Commission nevertheless uses the guidelines of the former Parole Board for prisoners who

received their initial parole hearing before August 5, 1998.  See 28 C.F.R. §2.80(a)(4) (2007);

Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under

the District of Columbia Code, 63 Fed. Reg. 39179 (July 21, 1998), attached.

  ii. Ex Post Facto Jurisprudence

  The *Ex Post Facto* Clause bars retroactive increases in punishment for crimes that have

been committed.  U.S. CONST. art. I, §10, cl. 1; Collins v. Youngblood, 497 U.S. 37, 42 (1990).

"Retroactive changes in laws governing parole of prisoners, in some instances, may be violative

of this precept."  Garner v. Jones, 529 U.S. 244, 250 (2000) (citations omitted).  Prisoners raising

11

such a claim must demonstrate that the revised parole regulations create "a significant risk" of "a longer period of incarceration than under the earlier rule." Id.

Although Garner noted that a facial showing of marked differences between the two policies—changes that "increas[e] the penalty by which a crime is punishable"—would help to establish "significant risk," see id. (quoting California Dep't of Corrections v. Morales, 514 U.S. 499, 506-07, n.3 (1995)),  the D.C. Circuit has clarified that the "controlling inquiry 'is one of practical effect.'" Fletcher v. Reilly, 433 F.3d 867, 877 (D.C. Cir. 2006) (quoting Fletcher v. District of Columbia, 391 F.3d 250, 251 (D.C. Cir. 2004)); see also Sellmon v. Reilly, No. 06-01659(ESH), 2008 WL 1933759, at *16 (D.D.C. May 5, 2008).  A court therefore, "must assess the magnitude of the risk in terms of the practical effect of the change in regulations on the length of a petitioner's incarceration." Fletcher v. Reilly, 433 F.3d at 877.  In the instant case, Plaintiff must show that, as applied to his case, the "practical effect" of application of the Commission's standards rather the Parole Board's was a "significant risk" of extended incarceration. Sellmon, 2008 WL 1933759, at *16.

### III. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court will dismiss a claim if Plaintiff's complaint fails to plead "enough facts to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (clarifying the standard from Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also In re Sealed Case, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing Twombly).  Hence, the focus is on the language in the complaint, and whether that language sets

12

forth sufficient factual allegations to support plaintiff's claims for relief.[4]  The Court  must

construe the factual allegations in the complaint in the light most favorable to Plaintiff and must

grant Plaintiff the benefit of inferences that can be derived therefrom.  Barr v. Clinton, 370 F.3d

1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Comm. Corp., 16 F.3d 1271, 1276 (D.C. Cir.

1994)).  The Court, however, need not accept any inferences or conclusory allegations that are

unsupported by the facts pled in the complaint.  Kowal, 16 F.3d at 1276.  The Court need not

"accept legal conclusions cast in the form of factual allegations."  Id.

        Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be

entered if it is shown that there is "no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the

initial responsibility of informing the district court of the basis for its motion and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any which it believes demonstrate the absence of a genuine issue

of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences

that may be drawn from the facts placed before the Court must be drawn in favor of the non-

moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The "evidence of the

---

        [4]        Generally speaking, the Court should not consider matters beyond the pleadings
without converting the motion for summary judgment.  See Fed. R. Civ. P. 12(b)(6).
Nonetheless, there are important exceptions to this general principle.  The Court may properly
take judicial notice of court records without converting a motion to dismiss into a motion for
summary judgment.  Baker v. Henderson, 150 F. Supp. 2d 17, 19 n.1 (D.D.C. 2001)("in
determining whether a complaint fails to state a claim, the court may. . . take judicial notice of
matters of a general public nature, such as court records, without converting the motion to
dismiss into one for summary judgment."); Himmelman v. MCI Comm.,104 F. Supp. 2d 1, 3
(D.D.C. 2000)("The court may consider [on a motion to dismiss] the allegations of the
complaint, documents attached to or specifically referred to in the complaint, and matters of
public record.")

non-movant is to be believed." Id.   In responding to a motion for summary judgment, the

adverse party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e)(2); see also Celotex, 477 U.S. at 324.

## IV. ARGUMENT

### a.    SOVEREIGN IMMUNITY BARS ANY CLAIMS FOR MONEY DAMAGES AGAINST DEFENDANT IN HIS OFFICIAL CAPACITY

"It is axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206,

212 (1983).  "Absent a waiver, sovereign immunity shields the Federal Government and its

agencies from suit." FDIC v. Meyer, 510 U.S. 471, 475 (1994).  Congressional consent to suit in

this Court, a waiver of the government's traditional immunity, must be explicit and strictly

construed.  Library of Congress v. Shaw, 478 U.S. 310, 318 (1986).  Absent clear congressional

consent to entertain a claim against the United States, the District Court lacks authority to grant

relief.  United States v. Testan, 424 U.S. 392, 399 (1976).  Sovereign immunity bars all suits

against the United States, its agencies, and federal employees in their official capacities, except

where there has been a statutory waiver of immunity.  Fletcher v. United States Parole Com'n,

481 F.Supp.2d 156, 160 (D.D.C. 2007) (citing Mitchell, supra).  If the United States has not

waived sovereign immunity, the court must dismiss for lack of jurisdiction. Id. (citing First Va.

Bank v. Randolph, 110 F.3d 75, 77 (D.C. Cir. 1997).  A plaintiff has the burden of proving

subject matter jurisdiction by a preponderance of the evidence. Id. (citing Felter v. Norton, 412 F.

Supp. 2d 118, 122 (D.D.C. 2006)).

14

In the instant matter, based on the method of service, it is apparent that Plaintiff is suing Defendant in his official capacity. <u>See</u> Docket Entry 10. Notably, Plaintiff has not named the Commission or any other commissioners for that matter. Based on clearly established law, it is even more apparent that Plaintiff's claims for money damages against Defendant must be dismissed because an action against Defendant in his official capacity is essentially an action against the United States since any funds Defendant might pay will come from federal coffers. <u>Fletcher</u>, <u>supra</u>. Furthermore, Plaintiff's complaint does not point to any appropriate waiver of sovereign immunity that would permit his claim for money damages against Defendant to continue. In fact, the complaint is devoid of such facts. Accordingly, Plaintiff's claim for money damages must be dismissed. <u>Abdus-Shahid M.S. Ali v. United States Parole Comm'</u>, 2007 U.S. App. Lexis 27270 (D.C. Cir. 2007) (affirming the lower court's dismissal of claims against commissioners in their official capacities).

### b.    PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM

i.    Plaintiff Cannot Demonstrate a Significant Risk of Increased Incarceration <u>Because he Committed his Crimes Prior to the Parole Board's 1987 Regulations</u>

Plaintiff does not state a claim upon which relief can be granted because the guidelines the Commission applied at his rehearings did not create a significant risk of extended incarceration when compared to the Parole Board regulations in force at the time of his offenses. Plaintiff cannot show that the outcome of his rehearings would have been any different under the old guidelines.

The appropriate guidelines under which Plaintiff should be evaluated for parole were those in effect when he committed assault with intent to rob while armed and murder II. <u>See,</u>

e.g., Sellmon, 2008 WL 1933759, at *32 ("The principles of 'fair notice and governmental restraint' which underlie the *Ex Post Facto* Clause are implicated 'when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" (quoting Weaver v. Graham, 450 U.S. 24, 30 (1981))). The Superior Court of the District of Columbia sentenced Plaintiff in 1982 and 1984, respectively. See Judgment and Commitment Order, Exs. A, C. Accordingly, Plaintiff only had the benefit of the Parole Board's pre-1987 broad statutory principles, which poses an even more difficult task of demonstrating an ex post facto violation than the 1987 guidelines that the Parole Board actually followed.

Under the Parole Board's pre-1987 policies, Plaintiff had no better prospect of being granted parole at his 2001, 2004, and 2007 rehearings. The six "factors considered" weigh against granting him parole. First, the offenses Plaintiff committed were particularly violent and harmful, with only aggravating—murder for hire and shooting both his accomplice and a store employee who was paralyzed as a result—rather than mitigating factors. See Exs. B & G.

Second, Plaintiff's prior history of criminality is extensive. He was convicted of burglary II, grand larceny, receiving stolen property, and larceny from D.C. government, as well as prison breach. See Ex. B. The disposition of other offenses is unknown. Id. According to the Presentence Report, his past "record and failure to abide by conditions of community supervision" pointed strongly toward incarceration instead of probation. "Unfortunately rehabilitation is not possible for some individuals," the Report concluded, "and we suspect that this defendant [Plaintiff] is such a person." Ex. B.

Third, Plaintiff's personal and social history suggest a lack of socialization and unstable individual circumstances. Raised by foster parents, Plaintiff's childhood was "marred by

16

depression" and he left high school after the ninth grade because he was "'tired of school.'" Ex. B. Plaintiff is single but has fathered two children, born to Ms. Carolyn Bullock, who are supported by Ms. Bullock's parents. Id. Plaintiff also suffered from alcoholism, and in 1980 was fined for drinking in public. Id. His employment history prior to incarceration is sparse, as Plaintiff provided little detail about his prior jobs, including those held under other names. Id. The Presentence Report observed that while free Plaintiff "most likely" supported himself "through illegal means." Id.

Fourth, There is no evidence that Plaintiff suffered from any physical ailments. In regards to mental health, he recalled that his junior high school counselor suggested that he see a psychiatrist because of misbehavior. Id. Plaintiff dealt with problems related to alcoholism. Id.

Fifth, Plaintiff's institutional record is mixed. Throughout his incarceration, Plaintiff successfully completed a variety of programs, such as Alcoholics Anonymous and the Communication Conflict Resolution Program, as well as worked extensively in UNICOR and in other positions. Plaintiff, however, has never completed his GED, has tested positive for use of marijuana, and was found to have drunk alcohol as an intoxicant. See Exs. E, F, G, I, K.

Sixth, it is unclear what community resources are available to help Plaintiff reintegrate himself and become a productive citizen. Plaintiff has repeatedly cited his intention of residing with his daughter upon release and seeking employment in theWashington metropolitan area. See Exs. E, G, I, K. But having no formal education beyond ninth grade and not completed his GED, Plaintiff's job prospects are limited. His use of marijuana and alcohol in prison also shows that he has not eliminated some problematic habits. And Plaintiff has provided little information about his daughter with whom he would be presumably living upon release or other persons who

17

could assist him in that Maryland neighborhood. Id.

When considering these six factors together, the Commission would have had ample grounds upon which to deny Plaintiff parole. When the Parole Board denied Plaintiff parole in 1997, it based its decision on "subject's prior failure under community supervision; ongoing or repetitive criminal behavior; and need for programming to remain crime-free in the community"—all of which were central considerations in the pre-1987 regime. Exhibit F attached. Examiners at Plaintiff's subsequent rehearings cited similar concerns about the serious nature of his offenses and "the risk he may pose to the community." See Ex. I.

The Commission, moreover, would have exercised wide discretion in weighing these metrics under the pre-1987 regulations. It had no guidelines to follow when making such a determination. Before 1985, the Parole Board "had almost unbridled discretion to grant [or deny] parole" in accordance with the underlying statutory language. Sellmon, 2008 WL 1933759, at *33 n.15. It simply had to ensure that the person under consideration would likely "live and remain at liberty without violating the law," that his release was "not incompatible with the welfare of society," and that he had "served the minimum sentence." D.C. Code § 24-204(a). The reasons that the Parole Board and Commission gave for refusing to grant Plaintiff parole illustrate their determination that he would not live and remain at liberty without violating the law and that his release would be incompatible with the welfare of society. See Exhibits F, I, K attached. Given the freedom of decision-making that the Commission would have possessed when applying the pre-1987 guidelines, Plaintiff cannot adduce any evidence showing that he would have had a significantly greater chance of being granted parole under their provisions.

18

        ii.      The Commission's Continuing Use of the 1987 Regulations Used at Plaintiff's Initial Parole Hearing Does not Create an Increased Risk of <u>Incarceration</u>

By applying the Parole Board's 1987 Regulations to each of Plaintiff's parole rehearings, the Commission did not violate the *Ex Post Facto* Clause. The Commission followed its obligation to utilize the Parole Board's guidelines for D.C. Code offenders whose initial parole hearings took place before August 5, 1998. <u>See</u> 28 C.F.R. § 2.80(a)(4). It followed the guidelines that the Parole Board employed at Plaintiff's 1997 hearing—the 1987 Regulations—ensuring the same standard was applied uniformly.

At his 2001 rehearing, the Commission examiner stated that Plaintiff "should still be considered under the old DC procedures." Exhibit G attached. Three years later the Commission continued to evaluate Plaintiff under the 1987 Regulations, and in 2007 it also assessed his suitability for parole under these guidelines. <u>See</u> <u>Ex.</u> J, L.

Just as the Parole Board in 1997 departed from Plaintiff's numerical score under the 1987 Regulations, the Commission similarly departed from the grid results in 2001, 2004, and 2007. <u>See</u> <u>Exs.</u> H, J, L attached. At each rehearing the seriousness of Plaintiff's offenses, the risk he posed to the community if released, and the need for programming to remain crime free led the Commission to deny parole and impose a three year set-off—reasons that echoed those underscored by the Parole Board. <u>Exs.</u> E, F, H, J, L attached. In 1997, the Parole Board cited Plaintiff's "violence/revocations," the fact that he "easily could have killed several people" and his admission to being "paid to kill someone" as factors supporting a departure. <u>Ex.</u> E.

The 1987 Regulations share many commonalities with the Parole Board guidelines they replaced. As <u>Davis</u> made clear, the 1987 Regulations "merely formalized the manner in which

the Board excercise[d] the discretion conferred upon it by the governing" statute.  652 A.2d at 636; see also Blair-Bey, 151 F.3d at 1050.  "The discretion conferred by the 1980 guidelines thus survived in the 1987 revisions."  Davis. at 635 (citing White, 647 A.2d at 1170).  Davis therefore rejected a claim that application of the 1987 Regulations rather then those policies previously in force constituted a violation of the ex post facto clause.  The Davis Court pointed to precedent dismissing ex post facto suits following a similar change in 1976 to the federal parole guidelines—moving from a system without explicit standards to one with salient factor scores. Id. at 636-37 (citing Warren v. U.S. Parole Comm'n, 659 F.2d 183, 195-96 (D.C. Cir. 1981), cert. denied, 455 U.S. 950 (1982)).

In order to prevail, Plaintiff would have to prove, at a minimum, that the Parole Board's "discretion under the [1987] guidelines is totally or very substantially circumscribed in law or in fact, and yields results materially harsher than those ordinarily occurring under the prior regime." Blair-Bey v. Quick, 159 F.3d 591, 592 (D.C. Cir. 1998).  Plaintiff can offer no evidence to support such a position.  He does not set forth sufficient factual allegations to buttress his claims for relief.  Instead, Plaintiff reverts to the erroneous argument that his ex post facto argument hinges on differences between the 1987 Regulations and the Commission's own federal parole guidelines.  Complaint ¶¶ 12-13 at 5.

        iii.      Even if the Commission Applied its 2000 Regulations Plaintiff Has Not and Cannot Demonstrate an Ex Post Facto violation because in 1987 there Were No Significant Limitations on the Parole Board's Discretion

Plaintiff also cannot show that the Commission utilized its own parole policies rather than those of the Parole Board when determining his suitability for release.  Even if he could, however, Plaintiff's claim still lacks merit.  The discretion the Commission would have

possessed under the pre-1987 guidelines, as demonstrated above, provided it with numerous

grounds upon which to deny Plaintiff parole and establish a three year set-off.  As shown above,

the reasons the Commission provided for declining to grant Plaintiff parole were central

considerations under the pre-1987 regime.  In short, Plaintiff cannot prove he would have fared

any better under the pre-1987 guidelines than he would have under retroactive applications of the

federal parole regulations.  See Sellmon, 2008 WL 2470002 at *2 (holding that plaintiff Phillips

"could not show that the outcome in his case would have been any different under the pre-1987

regime, given the totally unstructured character of the Board's parole decisions prior to 1987).

The Glascoe Court noted that the federal parole regulations and the pre-1987 regulations

"consider many of the same factors, . . . including the underlying offense and institutional

behavior."  421 F.3d at 547 (finding no facial *ex post facto* problem in comparing the Board's

1981 guidelines with the Commission's 1999 guidelines).  The plaintiff in Glascoe could not

demonstrate that application of federal parole regulations created a significant risk of increased

punishment because the factors the Commission relied upon in denying him parole—his

extremely violent crimes and institutional misconduct—"would have been considered under the

1981 guidelines."  Id. at 548.  In the instant case, the reasons the Commission cited for refusing

to grant Plaintiff parole would have been considered under the pre-1987 policies.  Specifically,

the Parole Board would have assessed the nature of the offense and Plaintiff's prior history of

criminality in determining whether Plaintiff's release was "incompatible with the welfare of

society" and if he could "live in society without violating his parole conditions."

Plaintiff's allegations are thus speculative at best.  He cannot show that at each parole

rehearing the Commission subjected him to a significant risk of extended incarceration.

21

Plaintiff's claim fails he never undertook a comparison between the regulations in effect at the time he committed his crimes and those applied to him in 2001, 2004, and 2007. By failing to assess the appropriate guidelines and policies implemented, Plaintiff has no viable claim. Because Plaintiff has not supplied factual allegations sufficient to support his complaint, this Court should dismiss it with prejudice.

### c.    PLAINTIFF HAS NOT DEMONSTRATED THAT HE IS ENTITLED TO DECLARATORY OR INJUNCTIVE RELIEF

Plaintiff is seeking a declaratory and injunctive relief against the Defendant. In this Circuit, a permanent injunction is appropriate when:

> . . . the Court considers a modified iteration of the factors it utilizes in assessing preliminary injunctions: (1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction. Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Applying this test to the foregoing facts, it is difficult to see how Plaintiff can demonstrate that he is likely to prevail on the merits. Plaintiff is essentially in the same situation as the plaintiff Phillips in the Sellmon case, where Judge Huvelle recently ruled that there was no ex post facto violation. Sellmon, supra. On one hand, the Parole Board had almost unfettered discretion in dealing with parole suitability when Plaintiff committed his crimes and it is more likely that the Parole Board would have denied him parole given his history if the pre 1987 regime applied. On the other hand, although the Parole Board gave Plaintiff the benefit of the 1987 regulations, the Commission also used the same regulations and departed from a finding of

suitability just as the Parole Board did and very likely would have given Plaintiff's long and

violent criminal background.  At the very least, the Commission's actions have not "significantly

increased" Plaintiff's risk of a longer incarceration.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be granted and

Plaintiff's complaint dismissed with prejudice or, in the alternative, summary judgment should

be granted in Defendant's favor.

Date: July 24, 2008

          /s/ _____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


          /s/ _____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


          /s/ _____

KENNETH ADEBONOJO
Assistant United States Attorney
United States Attorney's Office, Civil Division
555 4th Street, N.W., Room E4210
Washington, D.C. 20530
(202) 514-7157

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **ROMES AUSTIN** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) **Civil Action No. 08-0553 (RCL)** |
| **v.** | ) **(ECF)** |
| | ) |
| **EDWARD F. REILLY, JR.** | ) |
| | ) |
| **Defendant.** | ) |

_____)

## <u>ORDER</u>

**UPON CONSIDERATION** of the Defendant's Motion to Dismiss or, in the alternative,

for summary judgment, support thereof, the grounds stated therefor and the entire record in this

matter, it is by the Court this ____ day of _____, 2008, hereby

**ORDERED** that the said motion be and hereby is granted; and it is

**FURTHER ORDERED** Plaintiff's complaint is dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

Copies to:

Kenneth Adebonojo
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530

Romes Plaintiff
R# 00070-000
Gilmer FCI
Inmate Mail/Parcels
POB 6000
Glennville, WV 26351

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the foregoing Defendant's Motion to Dismiss to be served

by first class mail upon <u>pro se</u> plaintiff at:

Romes Plaintiff
R# 00070-000
Gilmer FCI
Inmate Mail/Parcels
POB 6000
Glennville, WV 26351

On this 24th day of July 2008.        _/s/_____
                                      KENNETH ADEBONOJO
                                      Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| ROMES AUSTIN | ) |
|  | ) |
|     **Plaintiff** | ) |
|  | ) |
|  | )  **Civil Action No. 08-0553 (RCL)** |
|         **v.** | )  **(ECF)** |
|  | ) |
| **EDWARD F. REILLY, JR.** | ) |
|  | ) |
|     **Defendant.** | ) |

_____)

### DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Edward F. Reilly, Jr., in his official capacity as the Chairman of the United States Parole

Commission ("Defendant"), by and through the undersigned, respectfully submits this Statement

of Material Facts in support of the attached Motion to Dismiss Plaintiff's complaint pursuant to

under Fed. R. Civ. P. 12(b)(1) and (6) or, in the alternative, for Summary Judgment.

    1.      Plaintiff Austin is currently serving an aggregate 21-75 year sentence for a D.C.

Code violation at Gilmer FCI in Glennville, WV.

    2.      In Case Number F2391-81D, the Superior Court of the District of Columbia

sentenced Plaintiff on July 6, 1982 to a prison term of 14-50 years for assault with intent to rob

while armed.  See Judgment and Commitment Order, Ex. A.

    3.      Plaintiff committed the offense on March 3, 1981, when he shot both the victim

employee and his co-offender as they struggled during the course of a store robbery.  See

Presentence Report, Ex. B, 2 at ¶2.

    4.      On October 18, 1984, in Case Number F6049-83, the Superior Court sentenced

Plaintiff to a 7-25 year prison term for murder II.  See Judgment and Commitment Order, Ex. C

at ¶3.

5.      In the latter case, Plaintiff was involved in a murder for hire.  <u>See</u> Rehearing/Rescission Hearing Summary, <u>Ex.</u> G at 3.

6.      The District of Columbia Department of Corrections determined that Plaintiff was eligible for parole as of November 14, 1997.  <u>See</u> Face Sheet, No. 2, <u>Ex.</u> D.

7.      Plaintiff received his initial parole hearing by a Parole Board official on October 24, 1997.  <u>See</u> Parole Determination Record, <u>Ex.</u> E, ¶5.

8.      At this hearing, the official considered Plaintiff's case under the Parole Board's point assignment grid, which give Plaintiff a score of 2, indicating that he should be paroled at his initial hearing.  <u>Id.</u>

9.      Two Board members subsequently voted to deny Plaintiff parole and scheduled him for a reconsideration hearing in three years.  <u>Id.</u>  The Board members agreed that countervailing factors warranted a departure from its parole suitability regulations because Plaintiff had admitted to the hearing official that he was paid to kill someone.  <u>Id.</u>

10.      On November 17, 1997, the Parole Board informed Plaintiff of its decision to deny parole and reconsider him for parole by November 14, 2000.  <u>See</u> Notice of Board Order, <u>Ex.</u> F, ¶7.

11.      In addition to the murder-for-hire, the Parole Board explained that its decision was "based upon subject's prior failure under community supervision; ongoing or repetitive criminal behavior; and need for programming to remain crime-free in the community."  <u>Id.</u>

12.      On December 17, 2001, the Commission conducted Plaintiff's rehearing at the U.S. Penitentiary, Atlanta, Georgia.  <u>See</u> Hearing Summary, <u>Ex.</u> G.

13.    The hearing examiner evaluated the case under the same Parole Board's point assignment grid regulations for rehearings.  Id.  The examiner recommended reduction of the point score from 2 to 1 based on Plaintiff's record of conduct and program performance indicating that parole should be granted.  Id.

14.    The examiner however recommended that the Commission deny Plaintiff parole and continue him for a rehearing in three years.  Id.

15.    The Commission concurred with the examiner's recommendation and issued a notice of action dated January 18, 2002, denying parole and continuing him for a rehearing in December 2004.  See Notice of Action, Ex. H ¶9.

16.    The notice provided the following reason for a departure from the favorable outcome indicated by the point score:

> your offense was particularly aggravated in that you were involved in a robbery in which you shot not only your codefendant but also an innocent victim and were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money.  Your commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time.

Id.

17.    The Commission then gave the following reason for departing from the normal rehearing schedule (i.e., a rehearing every twelve months):

"you have not yet attained your GED [grade equivalency diploma] or completed a vocational training.  The aggravated nature of your crimes, which involved the shooting of two persons and the murder of a third and two separate unrelated behaviors, warrants continued programming and

3

counseling." Id.

18.     Plaintiff was given another rehearing by a Commission examiner on December 7,

2004, at the U.S. Penitentiary, Atlanta, Georgia.  See Hearing Summary, Ex. I, ¶10.  The hearing

examiner found that Plaintiff's point score should remain at 1, after adding a point to the

previous score for institutional misconduct because Plaintiff tested positive for marijuana use in

May 2004 and subtracting a point for good program performance.  Id.

19.     The examiner recommended that the Commission deny Plaintiff parole and set

him off for a rehearing in three years.  Id.

20.     The Commission concurred with the hearing examiner's recommendation and

issued the following decision in a notice of action dated December 23, 2004, denying parole and

continuing to a three-year reconsideration hearing in December 2007.  See Notice of Action, Ex.

J, ¶11.

21.     The Commission gave the following reason for departing from the point score:

> you were involved in a robbery, which [sic] you shot two people,
> and you were subsequently involved in a murder for hire in which
> you were paid to murder the husband of a woman for money.  The
> commission of these multiple violent acts makes you a more
> serious risk to commit further violent behavior in the community if
> released at this time.

Id.

22.     The Commission indicated in the notice of action that this reason also applied to

the decision to depart from the normal rehearing schedule.  Id.

23.     A Commission hearing examiner conducted Plaintiff's most recent rehearing on

November 21, 2007.  See Hearing Summary, Ex. K, ¶12 .  The hearing examiner conducted the

4

rehearing by video conference between the Commission's office in Maryland and the Federal

Correctional Institution in Gilmer, West Virginia.  Id.

24.    The hearing examiner considered Plaintiff's record of conduct and program

performance since his last hearing, including a misconduct report for using alcohol.  Id.

25.    The hearing examiner added a point to Plaintiff's previous point score for

negative institutional behavior, giving him a total point score of 2.  Id.

26.    Though the point score indicated that parole should be granted at the rehearing,

the examiner found countervailing factors for denying parole and recommended that the prisoner

should be set off for a rehearing in three years.  Id.

27.    The Commission agreed with this recommendation and by Notice of Action dated

December 14, 2007, informed Plaintiff of the decision denying parole and continuing him for a

rehearing in November 2010.  See Notice of Action Ex. L, ¶13.

28.    The Commission gave the following reasons for the departure from the outcome

Parole Board's guidelines and the rehearing schedule:

> your offense behavior involved the following aggravating
> circumstances in that you engaged in an offense involving murder
> for hire.  After the commission of that offense, you then committed
> other acts of violence in the community.  In your commission [sic]
> the attempted robbery of a convenience store in which two
> individuals were shot by you to include the store owner and your
> codefendant.

Id.

Date: July 24, 2008

                                        /s/
                                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                                        United States Attorney

5

_/s/_
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_/s/_
KENNETH ADEBONOJO
Assistant United States Attorney
United States Attorney's Office, Civil Division
555 4th Street, N.W., Room E4210
Washington, D.C. 20530
(202) 514-7157

180934

# Superior Court of the District of Columbia

### CRIMINAL DIVISION

*Corrected Copy*

### JUDGMENT AND COMMITMENT ORDER

UNITED STATES OF AMERICA

vs

Ramos Austin, Jr AKA Jerome Walker

Case Number F8391-81D

PDID Number 259 689

WHEREAS the above-named defendant having entered a plea of ☐ Not Guilty    ☐ Guilty

to the charge(s) of Assault with intent to rob while armed

and having been found guilty by    ☐ Jury    ☑ the Court

and a pre-sentence investigation and report having been ☑ prepared and considered ☐ not requested

IT IS HEREBY ADJUDGED that the defendant has been convicted of and is guilty of the offense(s) charged.

The defendant having been given an opportunity to make a statement in his own behalf, and the government having had the opportunity to reply thereto, it is hereby

ORDERED that the defendant be committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of

Not less than fourteen years, Nor more than fifty years.    (3 A)

IT IS FURTHER ORDERED that the Clerk or his Deputy deliver a true copy of this order to the United States Marshal and that the copy shall serve as the commitment of the defendant.

July 6, 1982
Date

**Exhibit**    Judge A

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
SOCIAL SERVICES DIVISION – ADULT BRANCH

PRESENTENCE REPORT

PDID No.:    259-689
Docket No.: F-2391-81

Re: Romes Austin                                  Date Referred:    4-26-82

To: The Honorable Peter H. Wolf                   Date Due:        6-16-82

From: Prob. Officer Herb Kalin                    Sentencing Date: 6-17-82

-------------------------------------------------------------------------------

Defendant Information:
    True Name: Romes Austin, Jr.                  Address: 168 T St., N.E.
                                                           Washington, D.C.
                                                  Tel. #:  635-1598
        Aliases: Jerome Walker and others

Age/ Birthdate: 26 (12-17-55) Sex: Male           Birthplace: Washington, D.C.

Time in D.C. Area: Lifetime                       Citizenship: U.S.
                                                  Alien No.:

Marital Status: Single    Dependents: None        Education:   9th grade

Social Security No.: 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                   Permit No.:  None

DCDC No.:         180-934                          FBI No.:     580-87-K3
-------------------------------------------------------------------------------
Offense,Code and Penalty: Assault With Intent to Commit Robbery While Armed, 22-501,
    3202, Up to Life

Plea: Guilty      Judgment: Guilty                Bond Status: Committed Without
                                                  Bond
Detainers or Pending Charges: None

Co-defendants:
    John W. Bullock 300440  (Dkt No.):                (Status): Inactive
    Edward M. Hawkins 197034  (Dkt No.):               (Status): Inactive

AUSA: David Saffern                  Telephone: 724-6000

Defense Counsel: Stuart Johnson      Telephone: 457-6700   Exhibit ____B____


"In accordance with the U.S. Parole Commission and Reorganization Act, Public Law
94-233, dated March 15, 1976 this report is disclosable to inmates in federal
institutions for purposes of parole consideration."
===============================================================================
Disposition and Date: /8-54 yrs 6/17/n



2

**CONTACTS:**

| | |
|---|---|
| 6-3-82 | Defendant interviewed at D.C. Jail |
| 6-9-82 | Conference with AUSA David Saffern |

NOTE: No home visit made in this case as defendant's parents are deceased and former foster mother, Hattie Olten was not available.

NOTE: This officer was accompanied to the D.C. Jail by Defense Counsel Stuart Johnson who sat in during the presentence interview. Upon advice of counsel the defendant declined to give a defendant's version and other information regarding past names he has used, employment in which he has used other names, his financial status and possible source of income, the extent to which he may or may not use narcotics or other illegal substances, and other information generally provided by a presentence interview. No reason was given for the failure to provide such information except that reference was made to other criminal matters for investigation that may pertain to this defendant. As a result, this report will be abbreviated in those areas not addressed.

**OFFICIAL VERSION:**

According to the PD 163 for this offense, the complainant David Banks, reported for the High's store located at 3929 South Capitol St., S.W. that on March 3, 1981 two males entered the store at which time one pointed a gun at him and ordered him to open the cash register. The second subject went around the counter and started taking money from the cash register. Another employee grabbed Subject No. 2 and as he did Subject No. 1, the defendant Romes Austin, shot both the employee and the second subject.

On April 23, 1981 a witness was shown eight photographs from which he made a positive identification of Romes Austin, Jr. as the No. 1 suspect. Mr. Austin was then arrested on April 28, 1981 in the Superior Court cell block.

**DEFENDANT'S VERSION:**

Declined

**PRIOR CRIMINAL RECORD:**

Washington, D.C. - Adult

| | | | |
|---|---|---|---|
| 6-6-74 | Disorderly Conduct | EF $10 | MPDC |
| 5-6-75 | Burglary II | Unknown | MPDC |




3

PRIOR CRIMINAL RECORD: (continued)

Washington, D.C.

| | | | |
|---|---|---|---|
| 6-19-75 | Burglary II, Grand Larceny, Receiving Stolen Property, Destroying Property, & Larceny from D.C. Government | 5010(b) commitment | DCSC |
| 7-24-75 | Bail Reform Act | Unknown | MPDC |
| 12-7-75 | Destroying Property & Larceny | Unknown | DCSC |
| 5-4-79 | Prison Breach | 9 to 27 months paroled 4-13-81, parole revoked 8-20-81 | Parole Records |
| 9-12-80 | Drinking in Public | EF $10 | MPDC |
| 3-11-81 | First Degree Murder | Dismissed by Grand Jury 4-14-81 | DCSC |
| 3-19-81 | Armed Robbery | Dismissed 4-1-81 | DCSC |
| 4-28-81 | Assault With Intent to Rob While Armed | INSTANT OFFENSE | DCSC |

CURRENT PROBATION/PAROLE/PRE-DISPOSITION ADJUSTMENT:

The defendant is committed without bond at D.C. Jail. His sentence for Prison Breach and Revocation of Parole expired on 1-19-82.

EMPLOYMENT HISTORY:

From July 1980 to July 1980
National Linen Company
Alexandria, Virginia
Position: Laborer                                          Salary: Unknown
Reason for Leaving: According to defendant he quit due to a misunderstanding
Verification: Personnel records
Telephone Number: 751-5783

In addition to the above the defendant states that he has worked other jobs such as for the Brown Refrigerator Company in Washington, D.C. and Providence Hospital in the early 1970's. On advice of counsel he did not list any jobs he may have held under other names.

4

## SOCIAL HISTORY:

### Family History:

Romes Austin, Jr. is one of five children born to Lilly E. and Romes Austin, Sr. He was born on December 17, 1955 in Washington, D.C. where he has lived his entire life. According to Mr. Austin he was raised by his parents until age twelve until "welfare took us because my parents were bootlegging." Mr. Austin states that his parents were never convicted of that charge, however he and his siblings were raised in foster homes from that point on. Defendant was raised by Ms. Hattie Outen. He says that his childhood was marred by depression because he was close to his siblings and because of the separation from his parents. To his knowledge none of his brothers or his sister were ever arrested.

### Education/Training:

Defendant attended school in the Washington, D.C. area and completed the ninth grade at Langley Junior High School. He says he did not go on to the tenth grade because he was "tired of school". As to academic performance the defendant says that his grades were neither good nor bad, but "in between".

### Military:

N/A

### Marital Status and Living Arrangements:

The defendant is single and has never been married. He is however the father of two children a girl age nine and a boy age ten born to Ms. Carolyn Bullock. The children live with Ms. Bullock in her parent's home at 2119 3rd St., N.E., Washington, D.C. Ms. Bullock could not be reached, this officer spoke to her sister, Gail Bullock who informed us that the children are supported by her parents, Mr. and Mrs. Charles Harris. When questioned about his most recent address, just prior to his incarceration, again the defendant declined to answer on advice of counsel.

### Financial Status:

Declined information on advice of counsel.

### Health:

The defendant states that he has no physical problems at this time and that the only mental problems he has ever encountered has been related to alcoholism. Details of the treatment and questions regarding his narcotic use were not answered. Mr. Austin stated that when he was in junior high school his counselor suggested that he see a psychiatrist because of misbehavior. Though he has never actually been in psychotherapy or evaluated for mental illness, Mr. Austin states that he would like to see a psychiatrist at this time. He says he would like to be able to talk openly with someone he can trust about his lifestyle and behavior.

5

SOCIAL HISTORY: (continued)

Substance Use/Abuse:

Again, there was no comment on advice of counsel.

EVALUATION AND DIAGNOSIS:

The defendant Romes Austin, Jr., twenty-six, is before the Court for sentencing after entering a plea of guilty to Assault With Intent to Commit Robbery While Armed. Mr. Austin gave no defendant's version therefore, we have little insight into his rationale for committing the offense (the assumption being that he did indeed commit it as he pled guilty to the offense.) It is also difficult to form an opinion as to the degree of remorse, if any felt by this defendant. In a conference with AUSA David Saffern it was learned that the effects of the crime have been far reaching in that the store employee that was shot has been permanently disabled; the life of a law abiding, productive citizen now lay in ruins as a result of this man's actions. Also Co-defendant John Bullock is apparently in serious condition as a result of a shooting.

One can only conjecture as to the reasons for the defendant's refusal to answer the questions put to him. Perhaps to his detriment this officer is led to believe the worst, that is that if the information were known, such as how the defendant supported himself while free, that it was most likely through illegal means. In any event, based on the nature of the offense and considering this man's past extensive record and failure to abide by conditions of community supervision in the past, it is obvious that probation should not be granted in this case.

Unfortunately rehabilitation is not possible for some individuals and we suspect that this defendant is such a person. There is only one sure method of putting a stop to his criminal behavior and that is by physical restraint.

TREATMENT PLAN: Recommended Probation Supervision Level: Maximum

Since little is known of this man's needs it is difficult to recommend a specific treatment plan. However, since Mr. Austin has requested that he see a psychiatrist, it is felt that such an evaluation and/or treatment should be made part of this treatment plan.

6

**RECOMMENDATION:**

    Incarceration.

                                           Respectfully submitted,

                                         Herb Kalin
                                         Probation Officer
                                         727-1941

APPROVED BY: _____
                           Supervisory Probation Officer

HK:jes

FOR PROSECUTORS USE

The complainant, David Banks, reports for the High's store located at 3929 South Capitol St. S.W. that on 3/3/81 two black males entered the store. The #1 subject pointed a gun at the complainant and ordered him to open the cash register. The #2 subject went around the counter and started taking money from the cash register. Another employee grabbed the number 2 suspect and the employee and the #2 suspect were shot by the #1 suspect.

On April 23, 1981 Detective Jeffery Stone of the Robbery Branch showed eight photograph to a witness. The witness made a positive identification of Romes Austin Jr. as the #1 suspect.

The defendant was arrested at 1300 hrs. 4/23/81 in Superior Court Cell Block.

ROMES AUSTIN JR.
Defendant's name

case number

Subscribed and sworn before me this    18

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America
District of Columbia

vs.

Case No. _F 6044-83_

PID No. _259-689_

_Romes Austin_

R

## JUDGMENT AND COMMITMENT/PROBATION ORDER

The above-named defendant having entered a plea of ☐ Not Guilty ☑ Guilty to the Charge(s) of _____

_(C) murder II_

and having been found guilty by ☐ Jury ☑ Court, it is hereby ORDERED that the defendant has been convicted of and is guilty of the offense(s) charged and is hereby SENTENCED to ___

_NLT (7) Seven years to NMT (25) Twenty_
_five years. The Court recommends that_
_Deft. maintain present place of incarceration_
_federal system._

☑ ORDERED that the defendant is committed to the custody of the Attorney General for imprisonment for the period imposed above.

☐ ORDERED that the defendant be placed on probation in charge of the Director, Social Services Division, and it is further ORDERED that while on probation the defendant observe the following marked conditions of probation:

☐ Observe the general conditions of probation listed on the back of this order.

☐ Obtain a job as soon as possible or continue your present employment.

☐ Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with written notice from your Probation Officer.

☐ Treatment for ☐ alcohol problems, ☐ drug dependency or abuse as follows: ___

☐ Restitution of $ _____ in monthly installments of $ _____ beginning _____
(see reverse side for payment instructions. The Court will distribute monies to _____

☐ ___

Costs in the aggregate amount of $ _____ have been assessed under the Victims of Violent Crime Compensation Act of 1981, and ☐ have ☐ have not been paid.

ORDERED that the Clerk deliver a true copy of this order to appropriate authorized officials and that the copy shall serve as the commitment/order for the defendant.

_10-18-84_
Date

_10-18-84_
Date

Certification by Clerk pursuant to Criminal Rule 32(d).

_Vandette Taylor_
Deputy Clerk

GENERAL CONDITIONS ON REVERSE SIDE

Original — Court
Blue — Jail
Green — Defendant
Canary — Social Services

Pink — Clerk's Office
Goldenrod — U.S. Attorney/Corporation Counsel

EXHIBIT ___C___

FORM 19 DCDC 7-70
VF5 103 

### DISTRICT OF COLUMBIA
### DEPARTMENT OF CORRECTIONS
### FACE SHEET No. 2

Date Prepared
10-22-84
(Mo., Da., Yr.)

| DCDC Number 180934 | Name (Last, First, Middle) AUSTIN, ROMES | | Race B | Sex M |
|---|---|---|---|---|

| Height | Weight | Build | Eyes | Hair | Age | Birth Date | Place of Birth |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**TOTAL SENTENCE: 21 to 75 YEARS**

| | | | |
|---|---|---|---|
| Offense | Assault w/I/T/ROB | MURDER II | |
| Case Number | F2391-81D | F 6049-83 | |
| Sentence (Yrs., Mos., Days) | 14-50 YEARS | 7-25 YEARS | |
| Warrant Executed / Sentence Begins (Mo., Da., Yr.) | 7-6-82 | 10-18-84 | |
| Full Term Date (Mo., Da., Yr.) | | 1-18-2057 | |
| Short Term / M.R. Date (Mo., Da., Yr.) | | ✓5-29-2032 | |
| Parole Eligibility Date (Mo., Da., Yr.) | | ~~1-19-2003~~ 11-14-97 | |
| Max. Supervision Date (Mo., Da., Yr.) | | 7-25-2056 | |
| Statutory Good Time Rate / Month | 1892 days | 9000 | |
| Plea | | GUILTY | |
| Committing Judge | | | |
| Defense Attorney | | | |
| Initialed By: | | | |

| DETAINERS | | | CONDUCT CREDITS | | | | |
|---|---|---|---|---|---|---|---|
| Date Filed | For | Action | Date | Credits | Forfeit | Restore | Balance |
| | | | | | | | |
| | | | | | | | |

| JAIL CREDIT DATES | | REMARKS |
|---|---|---|
| From and Including | To and Including | Institutional Good Time awarded on 15 yrs 9 mos 8 days |
| 1-19-82 | 7-6-82 = 168 DAYS | |

YELLOW COPY TO ADP

Exhibit ___D



 Tape _A_ at ____

# DISTRICT OF COLUMBIA BOARD OF PAROLE
## PAROLE DETERMINATION RECORD
### RESCHEDULED HEARING

RE: _Austin Karnes_                        _180.934_      _257.689_
    Subject's Name                        DCDC#            PDID#

BIRTHDATE: _12·17·55_          STATUS:   �H_T Youth Act    ☒ Adult

LOCATION: _OCCg_               NEW CONSIDERATION DATE: _10·24·97_

TYPE OF CONSIDERATION:          _H9710.0069_
                             New BOP Docket #

   ☒ Initial

   ☐ Reconsideration

   ☐ Rescission

   ☐ Revocation--Warrant

   ☐ Revocation--Order to Appear

   ☐ Reparole Consideration

   ☐ Reparole Reconsideration

ANALYST:_____   DATE: _10·9·97_

HEARING OFFICIALS:_____ _Price_ _____

SUPERVISION REPRESENTATIVE:_____

ATTORNEY:_____

WITNESSES:_____

OTHERS PRESENT:_____

ᴴ_T NO DISPOSITION, REASON:_____

    ᴴ_T Reschedule        ᴴ_T Do Not Reschedule

PDS.210 11/16/94                    **Exhibit** _E_



Tape _____ at _____

## DISTRICT OF COLUMBIA BOARD OF PAROLE
## PAROLE DETERMINATION RECORD
## PAROLE HEARING
## ADULT

RE:___AUSTIN, Romes_____     __180-934__     __259-689__
     Inmate's Name                    DCDC#          PDID#

BIRTHDATE:___12/17/55___     BOP DOCKET #H9709-0012_____

LOCATION:__Occq_____     CONSIDERATION DATE:___10/3/97_____

TYPE OF CONSIDERATION: ☒ Initial    ☒ Reconsideration

LAST BOARD ACTION, DATED__N/A_____ :_____

ANALYST:_____GBG_____     PREPARATION DATE:_9/15/97_____

HEARING OFFICIALS:_____Cruces_____

OTHERS PRESENT:_____

1 NO DISPOSITION, REASON: _*No Show*_____
   1 Reschedule by _____     1 Do Not Reschedule

INSTANT OFFENSE AND SENTENCE IMPOSED:_Assault w/i/t Rob (F2391-
81D) 14-50 yrs; Murder II (F6049-83) 7-25 yrs_____

      TOTAL: 21-75 yrs_____

PRIOR OFFENSES:_Burg II; G/L; RSP; Dest Prop & Larceny from D.C.
Govt _____

_____

____

### QUALITY ASSURANCE

ANALYST:_____     DATE:_____

PDS.200 11/16/94          **1**

RE: __**AUSTIN, Rome**_____     ___180-93█___     __259-689__
    Inmate's Name     DCDC#     PDID#

DATES SENTENCES BEGAN: _7·6·82; 10·18·84_

FULL TERM DATE: _1·18·2057_

MANDATORY RELEASE DATE: _5·29·2032_

PAROLE ELIGIBILITY/RECONSIDERATION DATE: _11·14·97_

CONTINUALLY INCARCERATED SINCE: _1·19·82_

NUMBER OF PAROLE CONSIDERATIONS THIS SENTENCE: _∅_

POINT ASSIGNMENT GRID SCORE AT LAST HEARING: _∅_

DETAINERS, PENDING CASES, SPLIT OR CONSECUTIVE SENTENCES: _N/A_

INSTITUTIONAL RECOMMENDATION AT THIS CONSIDERATION: _Grant parole_

_ANY SPECIAL INSTRUCTIONS FROM PRIOR CONSIDERATION: _N/A_

_OTHER PROGRAM RECOMMENDATIONS (Note Source): _Court recommended federal system_

_DESCRIBE PROGRAMMING COMPLETED, OR OTHER COMMENTS: _AA; Unicor, Metal Finish Work Detail; Academic school. Maintained Work Detail. He has also completed a Psychological report with a good report from_

_ HO: _Henry L. Jones Jr. M.A. N.C.C. staff psychologist at the program facility._

PDS.200 11/16/94     2

RE: __AUSTIN, Romes_____    __180-93___    __259-689__
    Inmate's Name                    DCDC#          PDID#

FACTS OF INSTANT OFFENSE: _Assault w/i/HRob - On 3.3.81_
_Tyler alone w/co-defendant robbed Nicho_
_Store at gunpoint. Tyler was identified_
_as person with gun. No PSI on_
_offender 11 Pierce. During assault_
_w/HRob Tyler shot two employees &_
HO: _Co-defendant after employee grabbed_
_him. He states there was another incident_
_when he was paid to kill a person's_
_husband._

VICTIM IMPACT REMARKS: _____
_____ _He states that the Employees_
_he shot would not die or an outcome_
_of the shooting._
_____
_____
_____

FACTS OF NEW CRIMINAL OFFENSES OR DISCIPLINARY REPORTS: _None_
_Listed_
_____
_____
_____

HO: _____ _Non Same as Above._
_____ _Gone_
_____
_____

PDS.200 11/16/94                    3

RE:    AUSTIN, Romes ████        180-93██        259-689
       Inmate's Name                DCDC#          PDID#

**ANALYSIS OF CRIMINAL HISTORY, SUBSTANCE ABUSE, MENTAL HEALTH PROBLEMS, AND TREATMENT ATTEMPTS:**

*Has been known to criminal justice system since 1974 with convictions for property related offenses. Admitted to use of alcohol. No mental health problems identified.*

HO:    *Same as above*

**PERFORMANCE UNDER ANY TYPE OF COMMUNITY SUPERVISION:** *Proba-er 1981 was revoked. While on probation ID (assault w/ ...) she committed ...*

HO:    *Same as above*

RE: AUSTIN, Romes[redacted] 180-93[redacted] 259-689
Inmate's Name DCDC# PDID#

## ANALYSIS AND CONCLUSIONS

**REGARDING INMATE'S INSTITUTIONAL ADJUSTMENT AND PAROLE POTENTIAL**

During [illegible] this sentence, subj.
has attempted to program. Documentation
indicates he has completed AA; academic
[illegible]; maintained work in UNICOR
[illegible] [illegible]. Has no
disciplinary reports. Has maintained
[illegible] — There is no PSI on
murder II [illegible] However, subj
[illegible] [illegible] [illegible]
[illegible] [illegible]
[illegible] [illegible] at this

HO: [illegible]
[illegible] PSI on [illegible] II [illegible].
[illegible]
[illegible]

He would live with his daugther
~~[illegible]~~ SAITAR. Bullock. (24) at 1425
he ~~[illegible]~~ Edgewood st, N.E. Apt 5 ph#
202 635. 04. 90 Wash, D.C. 20018.
H used to work in Construction and
maintenance [illegible].

RE: __AUSTIN, Romes_____          __180-934__          __259-689__
Inmate's Name                            DCDC#                PDID#

## SALIENT FACTOR SCORE
### Initial Hearing Only

Anl   HO
_O_   ___   **Prior Convictions or Adjudications (Adult or Juvenile):**

|      | Year | Offense | Sentence |
|------|------|---------|----------|
| 1. | *1975* | *Burg II, Sto.* | *5010 B* |
| 2. | _____ | *CSP; dsol Prop* | _____ |
| 3. | _____ | *Larceny VC Stolen* | _____ |
| 4. | *1979* | *Prison Breck* | *9-27 mos.* |
| 5. | _____ | _____ | _____ |

OTHERS: _____

+___  ___   **Prior Commitments Longer than Thirty Days (Adult or Juvenile)**
            None..3    One..2    Two-three..1    Four or more..0

_O_   ___   **Prior Commitments in the Three Years Preceding Current Offense**
            None..2    One-two..1    Three-four..0    Five or more..0

_O_   ___   **Status at Time of (or Included in) Current Offense**
            Not on probation, parole, confinement or escape status..1
            On probation, parole, confinement, or escape status..0

_2_   ___   **Age at Current Offense (in Years)**
            26 or more..2    20-25..1    19 or younger..0
            Regardless of age, five or more prior commitments..0

_1_   ___   **History of Heroin/Opiate Dependence**
            No..1    Yes..0

_4_   ___   **TOTAL SCORE**

            | 10-9(Low Risk)= 0 Points   8-6(Fair Risk)= 1 Point |
            | 5-4(Moderate)= 2 Points    3-0(High Risk)= 3 Points |

[ 2 ]   [   ]   **INITIAL POINTS**

### NEGATIVE INSTITUTIONAL BEHAVIOR
#### INITIAL

☐ ☐   1 Class I murder, manslaughter, kidnapping, armed robbery
☐ ☐   1 Class offense other than above during last ½ of minimum
       sentence, except not less than 12 months or more than 3 years
       preceding hearing
☐ ☐   2 Class II offenses
#### RECONSIDERATION
☐ ☐   1 Class I offense (since last consideration)
☐ ☐   2 Class II offenses (since last consideration)

### SUSTAINED PROGRAM OR WORK ASSIGNMENT ACHIEVEMENT

☐ ☐   1 or 2 educational or vocational programs, or program levels which
       enabled offender to develop an academic or job-related skill, or
       progress to higher level of difficulty or skill in program area
☐ ☐   Received G.E.D.
☐ ☐   Received A.A. or B.A.
☐ ☐   1+ short-term special needs programs for an identified problem
       (e.g., drug treatment, psychological counseling)--not 2-day DAATP
☐ ☐   1+ work details for at least 1/3 of this period of incarceration

PDS.200 11/16/94                    6

RE: ___AUSTIN, Romes_____     ___180-93▮___     ___259-689___
    Inmate's Name                      DCDC#              PDID#

## POINT ASSIGNMENT GRID

| | INITIAL PAROLE HEARING | | | | RECONSIDERATION |
|---|---|---|---|---|---|
| Salient Factor Score | 10-9 | 8-6 | 5-4 | 3-0 | Point Assignment Grid Score Total From Previous Consideration |
| Degree of Risk | +0 Low | +1 Fair | +2 Mod. | +3 High | |

| | Anl | HO | Anl | HO | Anl | HO | Anl | HO | Anl | HO |
|---|---|---|---|---|---|---|---|---|---|---|
| Current or 2+ Prior Felony Convictions Where Offense Involved Violence, Weapons, or Drug Trafficking | +1 | +1 | +1 | +1 | (+1) | +1 | +1 | +1 | ___ | ___ |
| Negative Institutional Behavior | +1 | +1 | +1 | +1 | +1 | +1 | +1 | +1 | +1 | +1 |
| Sustained Achievement | -1 | -1 | -1 | -1 | (-1) | -1 | -1 | -1 | -1 | -1 |

TOTAL POINTS THIS CONSIDERATION: ___2___
                                  Analyst        Hearing Official

☒ Initial        Reconsideration     DECISION GUIDELINE RECOMMENDATION
   0-2            0-3                 Grant parole
☐ 3-5            4-5                 Deny parole, schedule reconsideration

                                     SETOFF GUIDELINE RECOMMENDATION
☐ Less than five years remain       reconsider within 6 mos. of hearing
☐ Five or more years remain         reconsider within 12 mos. of hearing

ANALYST'S RECOMMENDED DISPOSITION: ___but see par___
_____ PSI - Juvenile II Offense)
     Disposition Codes: _CT - 06 - 48_     ___ - ___

SPECIAL INSTRUCTIONS/CONDITIONS:

        Code:_____     _____

        Code:_____     _____

        Code:_____     _____

        Disposition is Inside Guidelines    1 Yes    1 No
        Setoff is Inside Guidelines         1 Yes    1 No

COUNTERVAILING FACTOR CODES: _____     ___    ___  ___

        SUPPORTING FACTS_____

        _____

        _____

PDS.200 11/16/94                    7

RE:____**AUSTIN, Romes**_____    __180-93_____    __259-689___
       Inmate's Name                                                    DCDC#                    PDID#

OTHER REMARKS:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

l  Subject confirms plan information in progress report

l  Changes in plan information: _____

_____

PDS.200 11/16/94                    8

RE: __**AUSTIN, Romes**_____ ████    ___180-934___    ___259-689___
     Inmate's Name                        DCDC#                    PDID#

## HEARING OFFICIAL'S RECOMMENDATION

Ⓛ ACCEPT ANALYST'S RECOMMENDATION (on Page 7)

l OTHER RECOMMENDED DISPOSITION:_____

_____

   Disposition Codes:_____-_____-_____     _____-_____

SPECIAL INSTRUCTIONS/CONDITIONS:

   Code:_____    _____

   Code:_____    _____

   Others:_____

   Disposition is Inside Guidelines  l Yes    l No
   Setoff is Inside Guidelines      l Yes    l No

COUNTERVAILING FACTOR CODES:_____ _____ _____ _____

STAFF FOLLOWUP ACTIONS:_____

_____

BY:_____    DATE: _10/24/97_
     Hearing Official

CONCURRENCE:  Based on examination of the relevant information in this
case, the Board concurs with the disposition recommended by the Hearing
Official, and hereby orders the issuance of the appropriate implementing
documents.

Board Member:_____  Date: _10/24/97_  _10/3/97_

Board Member:_____  Date: _10/29/97_

Board Member:_____  Date:_____

### NONCONCURRENCE--See Attached Form BOP.902

X l  Erias Hyman    l  Donald Streater    l  Polly Nelson

l  Margaret Quick    l  Marcelino Cruces

PDS.200 11/16/94         9

NAME: _Austin, Romes_    DCDC#: _180 - 934_

## DISPUTED CASE

### CONCURRING BOARD MEMBERS' COMMENTS

_____

_____

_____

_____

### NONCONCURRING MEMBERS' COMMENTS AND ALTERNATIVE DISPOSITIONS

#1 BOARD MEMBER: _____ _Witt_ _____    Date: _10·29·97_

S's history of violence / revocations suggest a set-off at his initial hearing — He easily could have killed several people — I would order a PSI for reconsideration.

Alternative Disposition: ~~Deny Parole~~; reconsider By 11·14·2000

Codes: ( _DE-01-61_ ) _____

Special Instructions/Conditions: _5,6,7,9, 19, 26,27_

Countervailing Factors: _61,67,69_

#2 BOARD MEMBER: _____ _____    Date: _~~10-9-97~~ 11/7/97_

☑ Agree with # _1_ _____
Subject admitted to H.O. he was paid to kill someone

_____

#3 BOARD MEMBER: _____    Date:_____

☐ Agree with #____ _____

_____

_____

BOP.902    11/16/94                    1




# The Board of Parole
### *of the*
## District of Columbia

## NOTICE OF BOARD ORDER

Order # 1 of 1

In reference to:

DCDC  180-934                    **NAME**  ROMES   AUSTIN

**DOB**   12/17/1954              **SSN** - -          **LOCATION**  OCCOQUAN FACILT

**DOCKET**  H9710-0069            **CONSIDERATION TYPE**  H:INITIAL

The District of Columbia Board of Parole issues the following  **ORDER:**

DENY PAROLE; RECONSIDER FOR PAROLE BY 11/14/2000

Implementation of this Order shall include the following:
Special Instructions for Reconsideration

PROGRAM PARTICIPATION          PSYCHOLOGICAL EVALUATION
WORK DETAIL                    COMPLETE SUBS. ABUSE PROGRAM
NO NEW DISCP. REPORTS          COMMUNIC/CONFLICT RESOLU
PSYCHOLOGICAL COUNSELING

Remarks:

Decision and set-off based upon subject's prior failure under
community supervision; ongoing or repetitive criminal behavior; and
need for programming to remain crime-free in the community.

11/07/1997
Date

Seal

NOA Date  11·17·97  by  JLP

Chairman
on behalf of the Board of Parole

[ Parole Determination File ]

**Exhibit** ___F___

RE: _Ramos Austin_ DCDC# _180-934_ Board On Date: _11/07/97_

Code #          **Reasons for the Board's Decision are Circled Below:**          _____

20  As Recommended by Point Assignment Grid Score of:          _____

(30) Set-off is Outside Parole Guidelines Recommendation Due to Countervailing Factors

21  **Exceptional Program or Work Assignment Achievement**
Successful completion of appropriate educational or vocational programs or program levels which increased the likelihood the offender will remain crime-free in the community, OR exceptional and sustained performance in one or more work details which increased the likelihood the offender will remain crime-free in the community, OR maximum effort to participate in appropriate programs, but opportunities for programming were not available, and offender's programming needs can be met in the community.

22  **Record of Nonviolent Offenses**
criminal convictions have not involved injury or threat of injury to others

23  **Substantial Crime-Free Period**
in the 5 years prior to committing instant offense, subject was not committed for more than 30 days on any offense,
AND   offender has otherwise demonstrated an ability to remain crime-free in the future

24  **Substantial Previous Period in Custody on Other Sentences or Additional Committed Sentences**
offender has demonstrated during this continuous period in custody, which included or will include other sentences, that he or she is ready to be paroled to the community or to his or her consecutive sentence

25  **Substantial Cooperation with the Government**
documented special or unusual assistance to DCDC or another government agency which made an exceptional contribution to the health, welfare, or safety of persons or property

29  **Availability of Community Resources Leading to Better Parole Prognosis**
an opening or opportunity for offender to participate in a program, service or other accommodation in the community,
AND   that will meet the offender's identified needs and lead to reduced risk to the community or another person

28  **Poor Medical Prognosis**
terminally ill or sufficiently debilitated so that the likelihood of repeated criminal involvement or risk to the community or other person is minimal

26  **Other Changes in Circumstances**
capabilities or characteristics of offender have changed in ways that minimize the likelihood of repeated criminal involvement, or risk to the community or other person

(61) **Prior Failure Under Community Supervision**
offender's prior negative conduct while under community supervision is likely to be repeated if again released to the community

(69) **Ongoing or Repetitive Criminal Behavior**
failure to remain free of criminal activity over sustained periods of time, OR instant offense is similar to a prior offense and is likely to be repeated

62  **Prior Record of Violent Behavior**
prior record of violent behavior that creates an unacceptable risk to public safety

63  **Instant Offense Involved Unusual Cruelty to Victims**
physical, mental, or emotional abuse beyond the degree needed to sustain a conviction on the instant offense, OR especially vulnerable victims (for example, children or elderly persons victimized by assaultive, exploitive, or fraudulent behavior)

64  **Serious Negative Institutional Behavior**
documented criminal conduct or breach of institutional rules, the severity, frequency, or recent occurrence of which indicates that subject is not ready to remain crime-free in the community

65  **Opportunity but Little Effort to Engage in Productive Programming or Work**
an opportunity for productive programming or work was made available by the Department of Corrections, parole officer, or other agency or employer, AND offender was able but failed to make appropriate use of that opportunity

66  **Absence of Community Resources Which Ensure Safety of the Community**
unavailability of necessary services to support offender's personal or community adjustment, and minimize risk to the community, offender, or other person

(67) **Needs Programming to Remain Crime-Free in the Community**
offender requires appropriate programming to address the underlying cause of his or her criminal conduct and reduce the risk to the community

70  Other:_____

(RHO-S)

< SUMCODE-DCRERESA_SUM >

**D.C. REHEARING/RESCISSION HEARING SUMMARY**
**ADULT AND YOUTH**
**(INITIAL HEARING PRIOR TO 8/5/98)**

**Offense of Conviction - Assault With Intent to Rob; Murder Second Degree**

| | | | |
|---|---|---|---|
| **Name** | :AUSTIN, Romes | **Institution** | :Atlanta USP |
| **D.C. No** | :00070-000 | **Short Term Date:** | 5-29-2032 |
| **Date of Birth** | :12-17-1955 | **Full Term Date:** | 1-18-2057 |
| **Date Dictated** | :12-17-2001 | **Fines/Restitution/Court Assessment:** | None |
| | | **Detainer** | :None |
| | | **Reviewer** | :Lee H. Chait |

## I.     PREVIOUS PAROLE BOARD ACTION:

See the prereview dated 10-2-2001.

The prereviewer converted the case to the presumptive parole procedures indicating a guideline range of 244-262 months. This procedure does not apply in this case in that the subject had his initial hearing under the DC Board provisions prior to 8-5-1998 and had a grid score of 2. The subject should still be considered under the old DC procedures.

## II.     INSTITUTIONAL ADJUSTMENT AND RELEASE PLANS:

See the prereview dated 10-2-2001. The subject clarified that he was at Occoquan when he had his last hearing and was then transferred to the CTF for 5 months and then Central Facility for 5 months. He then was transferred to the Northeast Ohio Correctional Center for 2 years and was returned to Lorton for 1 year before arriving at the USP Atlanta on or about June 13, 2001.

The subject has been continuously confined since 1-18-1982. This would represent service of 239 months or 19 years, 11 months.

The subject did complete the Lifeline Therapeutic Community with a certificate of graduation in the file. He also completed 90 hours of Life Skills with perfect attendance on March 31, 1999. Completion of the Lifeline program was June 6, 2000 and the program was 13 months, although subject states he served another 5 months in the aftercare portion of the program.

The subject stated he never completed his GED.

AUSTIN.700                    **Exhibit** ____*G*____                    Page 1 of 4



(RHO-S)

The subject also completed the Communication Conflict Resolution Program, Levels I through IV on August 6, 1999 and the Employment Techniques Awareness Preparation Program (ETAP) during his last stay at Lorton.

This was according to a progress report dated 11-17-2000.

He is currently enrolled in a GED program. He attributes his failure to complete the program as a result of his transfers to various locations. He currently works in UNICOR and is viewed as a "solid dependable worker".

If released to the community, subject would reside in the Hyattsville, MD area with his daughter. He states she has a job available, although he is uncertain as to what area this employment would be in. He also states he has a 10-year old grand-daughter who has cerebral palsy. The subject acknowledged the history of alcohol abuse and also admits marijuana use.

## III.   MISCONDUCT DETAILS:

Subject has maintained clear conduct since at least 1992.

## IV.   GRID SCORE:

The old grid score was 2 and a reduction of one point for programs is recommended based on the subject's adjustment since that date. It is unclear as to why this hearing is conducted 13 months past his rehearing date and the only reason I could venture is that it was due to the transfers and further unknown reasons. When questioned, the subject indicated he did not have a reason himself as to why he was not seen at Lorton previously prior to his transfer to Atlanta.

## V.   CODEFENDANTS:

There are believed to be codefendants in each of the cases, however, their status is unknown. There appears to be no codefendant who was involved in both of the cases as was the subject.

## VI.   RISK:

The subject is viewed as a more serious risk due to his offenses which involved the shooting of three persons, one of which was a murder for hire. Subject admitted he received $3500 to kill the husband of Betsy Cole in 1982.

## VII.   EVALUATION:

The application of the retroactive presumptive parole procedures does not apply in this case in that subject had his initial hearing by the DC Board prior to August 5, 1998. I have granted the subject a reduction of one point for programs. He would now have an adjusted grid score of 1. This would be a parolable grid score.

AUSTIN.700                                                    Page 2 of 4

(RHO-S)

This examiner finds that a 3-year set-off is appropriate.  The subject has been confined for 19 years, 11 months as of the date of this hearing and this examiner does not find that accountability for the behavior has been met due to the aggravated nature of the behavior which involved shooting a victim during a robbery and shooting his codefendant during the same robbery as well as the subject freely admitting a murder for hire as part of the murder second degree case.

He has programmed well and does not appear to have a significant mental health problem.  He has not completed his GED, possibly due to transfers between various institutions.  He has not completed any vocational training.  The examiner recommended to the subject that he complete both his GED and vocational training between now and the next recommended hearing in three years.

This hearing is beyond the 0-12 months commonly associated with the DC grid score procedures, however, this examiner believes that the additional time is needed for the subject to continue his programming.

## VIII.  RECOMMENDATION:

Deny parole.  Continue for a rehearing in December 2004 after the service of 36 months from your rehearing date of December 17, 2001.

## IX.   REASONS:

See the worksheet.

Rehearing guidelines - departure:  Because you have not yet attained your GED or completed a vocational training.  The aggravated nature of your crimes, which involved the shooting of two persons and the murder of a third and two separate unrelated behaviors, warrants continued programming and counseling.

Departure from decision suggested by point score:  See the worksheet.

Because:  your offense was particularly aggravated in that you were involved in a robbery in which you shot not only your codefendant but also an innocent victim and were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money.  Your commission of these multiple violent acts makes you more serious risk to commit further violent behavior in the community if released at this time.

CLW
December 25, 2001

 

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**Notice of Action**

---

Name: AUSTIN, Romes
Register Number: 00070-000
DCDC No: 180-934

Institution: Atlanta USP

Date:    January 18, 2002

---

In the case of the above-named, the following parole action was ordered:

Deny parole. Continue for a rehearing in December 2004, after the service of 36 months from your hearing date of December 17, 2001.

**REASONS:**

Your Grid Score at your last hearing was 2 point(s). You continue to be scored under the 1987 guidelines of the D.C. Board of Parole.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes 1 point for ordinary program achievement since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 1. You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. Those guidelines indicate that parole should be granted at this time. After consideration of all factors and information presented, a departure from the guidelines at this consideration is warranted because your offense was particularly aggravated in that, you were involved in a robbery in which you shot not only your codefendant but also an innocent victim and were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money. Your commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time.

After consideration of all factors and information presented, a departure above the rehearing guidelines at this consideration is warranted because you have not yet attained your GED or completed a vocational training. The aggravated nature of your crimes, which involved the shooting of two persons and the murder of a third and two separate unrelated behaviors, warrants continued programming and counseling.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:    Sharon Barnes-Durbin, SCSA
       CSS Data Management Group
       D.C. Court Services & Offender Supervision Agency
       300 Indiana Avenue, N.W., Suite 2149
       Washington, D.C. 20001

---



Exhibit    H

## HEARING SUMMARY

**Name: Austin, Romes**                                             **Reg No: 00070-000**

### Hearing Parameters

Hearing Type ...............................: **Rehearing (Initial Hearing Before 8/5/98)**

Hearing Date ................................: 12/7/04

Examiner .......................................: Rob Haworth

Institution ......................................: Atlanta USP

### Sentence Parameters

Sentence Type...............................: **DC Parole Eligible**

MR/Statutory Release .................: 5/29/2032

Full Term Date..............................: 1/18/2057

Months in Custody........................: 276 as of 12/18/04

Fines/Restitution/Assessment ......: None

Detainer.........................................: None

**Additional text regarding the above parameters:** None

---

### Prior Action & Institutional Factors

**Prior Action:** See the Prehearing Review dated 11/10/04. This prisoner is serving a 75-year sentence. He has previously been denied parole by the DC Board and the USPC. His last NOA ordered a Rehearing after 36 months during December 2004.

**Codefendants:** No information.

**Representative & Representative's Statement:** Counselor Craig attended the hearing and made a statement on subject's behalf. Counselor Craig runs a Program titled Cage your Rage. The subject participates in that program and is doing very well. Counsel Craig considers him one of the best inmates he's ever worked with. The subject has good attitude and is a good participant in the program.

**Prisoner's Statement:** The prisoner stated he has participated in some programs and has worked hard on his job assignment. He is hopeful of parole.

### Disciplinary Infractions

**No. 1 - BOP Incident Report No. 123345**
    **Description of Behavior:** Use of Drugs: On 5/27/04 the subject tested positive for use of marijuana. He was found guilty by the DHO on 6/29/04 and received 60 days segregation, 60 days loss of commissary and 120 days loss of visiting privileges.
    **Prisoner's Response:** The subject admitted guilt.

**Exhibit ___I___**

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.
**Basis:** DHO finding of 6/29/04 and your admission.
**Rescission Guideline: 1-point.**

**Program Achievement:** As indicated above, the subject participates in the Cage your Rage Program and is considered a good participant. He is in the GED Preparation Program and has good reports from the Education Department. He works as Orderly in the Unit and receives good reports.

During the hearing Case Manager Carpenter stated that she feels subject is sincere in his education work and he strives to get along with other prisoners and staff. Ms. Carpenter stated that subject has been no problem for prison staff. She believes that the positive drug incident is very uncharacteristic of this prisoner and not likely to happen again.

**Release Plans:** The subject wants to live in Maryland with his daughter. She lives in the Metropolitan DC area. He can find employment.

**Guideline Parameters, Evaluation & Recommendation**

Prior Grid Score: ................1
Discipline: ..........................+1
Program Achievement: .......-1
Current Grid Score: ..............1

**Evaluation:** This prisoner has done very well in prison. The difficulty in making a parole decision is the serious nature of the current offenses and the risk he may pose to the community. He has served 23 years as of next month. As pointed out in the Prehearing Assessment, subject is serving for a robbery during which two people were shot and murdered that was a separate offense he committed. This examiner would not likely be willing to recommend parole before 30 years of prison time had been accomplished. The prisoner is viewed as a more serious risk for the same reasons provided on the last NOA.

**Recommendation:** Deny Parole. Continue for a Rehearing in December 2007, after the service of 36 months from your last hearing. Reasons for going outside the guidelines taken from NOA dated 1/18/02 – you were involved in a robbery which you shot two people and you were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money. The commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time.

**Conditions:** None.

**Statutory Interim Hearing:** None.

**Guideline Use:** A decision above the guidelines are warranted because see Recommendation Section above.
**Additional Text:** The decision to go outside the guidelines, that is, justified above relates to the rehearing guidelines and the point score guidelines. The normal rehearing range for a DC Case like this would be 12-months. The subject previously received the 36 months setoff so maintaining the 36-month setoff is the appropriate action at this time since parole is being denied.



**Executive Reviewer's Comments:**


JRH/PAH
December 14, 2004

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**Notice of Action**

| | | |
|---|---|---|
| Name: AUSTIN, Romes | Institution | :Atlanta USP |
| Register Number: 00070-000 | | |
| DCDC No: 180-934 | Date | :December 23, 2004 |

As a result of the hearing conducted on December 7, 2004, the following action was ordered:

Deny parole. Continue to a Three-Year Reconsideration Hearing in December 2007.

**REASONS:**

Your Grid Score at your last hearing was 1 point(s). You continue to be scored under the 1987 guidelines of the D.C. Board of Parole.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes 1 point for negative institutional behavior since your last hearing.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes -1 point for ordinary program achievement since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 1. You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. Those guidelines indicate that parole should be granted at this time. After consideration of all factors and information presented, a departure from the guidelines at this consideration is warranted because you were involved in a robbery, which you shot two people, and you were subsequently involved in a murder for hire in which you were paid to murder the husband of a woman for money. The commission of these multiple violent acts makes you a more serious risk to commit further violent behavior in the community if released at this time.

The decision to go outside the guidelines, that is, justified above relates to the rehearing guidelines and the point score guidelines. The normal rehearing range for a DC Case like this would be 12-months. The subject previously received the 36-months setoff so maintaining the 36-month setoff is the appropriate action at this time since parole is being denied.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:     CSS Data Management Group
        D.C. Court Services & Offender Supervision Agency
        300 Indiana Avenue, N.W., Suite 2070
        Washington, D.C. 20001

Clerk: ADC

Exhibit ___J___

# HEARING SUMMARY

**Name: Austin, Romes**                                        Reg No: **00070-000**

## Hearing Parameters

Hearing Format .............................: **Video Conferencing**

Hearing Type ...............................: **Rehearing (Initial Hearing Before 8/5/98)**

Hearing Date ................................: November 21, 2007

Examiner......................................: Donna A. McLean

Institution ....................................: Gilmer FCI

## Sentence Parameters

Sentence Type...............................: **DC Parole Eligible**

MR/Statutory Release .................: 5/29/2032

Full Term Date.............................: 1/18/2057

Months in Custody.......................: 310 months as of 11/18/2007

Fines/Restitution/Assessment ......: N/A

Detainer.......................................: None

**Additional text regarding the above parameters:  None**

---

## Prior Action & Institutional Factors

**Prior Action:**  Please refer to Prehearing Assessment dated November 8, 2007.

**Codefendants:**  The subject's file reflects two codefendants in the Assault with Intent to Commit Robbery while Armed Case, as referenced in the Prehearing dated 11/8/2007. This examiner inquired of the subject if he knew the status of his codefendants and he reported the following. He indicated that codefendant, John Bullock was the alleged victim shot in the case and it is his belief that that particular individual was not charged for the offense. He stated to the examiner codefendant Hawkins to his knowledge was convicted for Attempted Robbery and sentenced to 7 years confinement. Please note that there is no further information available regarding the aforementioned codefendants.

**Representative & Representative's Statement:  None.**

**Prisoner's Statement:**  Mr. Austin just expressed to this examiner that he was young hanging with the wrong people and living the street life. This pattern of behavior led to his involvement in the offenses in which he was convicted. He expressed to this examiner that in the Murder II Case; he was hired by a woman to kill her husband. He is the only one to his knowledge currently serving time for that offense. He indicated that his actual codefendant in that case was killed in another robbery prior to going to trial. He admitted to the examiner that the woman and another male friend of hers were charged in the case, but he is not sure of the official charges against her or the other male.

**Exhibit** __K__

Austin, Romes, Reg. No. 00070-000                       Page 1 of 3

**Disciplinary Infractions**

**No. 1 - BOP Incident Report No.** 1334812
    **Description of Behavior:** Using Intoxicants (Alcohol).
    **Prisoner's Response:** The subject indicated that he became depressed and overwhelmed with serving time and chose to drink the alcohol to suppress his depression.
    **Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.
    **Basis:** DHO finding and the subject's admission.
    **Rescission Guideline: N/A.**

**Program Achievement:** The subject indicated that he is currently employed in the area of UNICOR to the Assembly Line. He is actively involved in the GED Program and is still pursuing his GED.

**Release Plans:** Upon release the subject plans to reside with his daughter, Sarita Bullock, at 8214 Quentin Avenue, Hyattsville, MD 20786, telephone number (301) 614-9755. He further expressed that he plans to seek employment upon his return to the community.

**Guideline Parameters, Evaluation & Recommendation**

Prior Grid Score: ................1
Discipline: .........................+1
Program Achievement: ....... -0
Current Grid Score: .............2

**Evaluation:** Mr. Austin is currently 51 years old. As of 11/18/2007 he will have served 310 months confined on the offenses, which involved a Murder for Hire and a Robbery in which two individuals were shot. Since his last hearing he has incurred one new disciplinary infraction for the use of alcohol while confined. He has continued to participate in the GED Programming attempting to obtain his GED. The subject had a previous Grid Score of 1 and as of today's hearing he received a +1 for the new disciplinary behavior. Therefore, his current Grid Score is now 2.

It is noted that the offenses in which the subject stands convicted are viewed very serious as he participated in a Murder for Hire scheme and after committing this offense continued his criminal acts in the community in the commission of a Robbery in which the employee of the store was shot as well as his codefendant. It is due to this fact pattern of events that this examiner does not believe a release recommendation is warranted at this time. Therefore, it is the recommendation of this examiner that the subject is denied parole consideration at this time for a Rehearing in 36 months.

**Recommendation:** Deny Parole. Continue for a rehearing in November, 2010, after the service of 36 months from your last hearing.

**Conditions:** N/A.

**Statutory Interim Hearing:** N/A.

**Guideline Use:** A decision above the guidelines is warranted because your offense behavior involved the following aggravating circumstances in that you engaged in an offense involving a Murder for Hire.

 

After the commission of that offense you then committed other acts of violence in the community in your commission the Attempted Robbery of a convenience store in which two individuals were shot by you to include the store owner and your codefendant.

**Additional Text:**  None.

**I certify that I have reviewed this hearing summary.**

*Donna A. McLean*

Donna A. McLean, Hearing Examiner

DAS/PAH
December 1, 2007

**Executive Reviewer's Comments:**



U.S. Department of Justice                          **Notice of Action**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

---

| Name: AUSTIN, Romes | Institution: | Gilmer FCI |
|---|---|---|
| Register Number: 00070-000 | | |
| DCDC No: 180-934 | Date: | December 14, 2007 |

---

As a result of the hearing conducted on November 21, 2007, the following action was ordered:

Deny parole. Continue for a rehearing in November 2010, after the service of 36 months from your last hearing.

**REASONS**:

Your Grid Score at your last hearing was 1 point(s). You continue to be scored under the 1987 guidelines of the D.C. Board of Parole.

Under the guidelines for D.C. Code offenders, your current Total Point Score includes +1 point for negative institutional behavior since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 2. You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. Those guidelines indicate that parole should be granted at this time. After consideration of all factors and information presented, a departure from the guidelines at this consideration is warranted because your offense behavior involved the following aggravating circumstances in that you engaged in an offense involving a murder for hire. After the commission of that offense, you then committed other acts of violence in the community. In your commission the attempted robbery of a convenience store in which tow individuals were shot by you to include the store owner and your codefendant.

After consideration of all factors and information presented, a departure above the rehearing guidelines at this consideration is warranted for the same reasons provided above for denying parole.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:    CSS Data Management Group
       D.C. Court Services & Offender Supervision Agency
       300 Indiana Avenue, N.W., Suite 2070
       Washington, D.C. 20001

---

Exhibit ___L___

**DEPARTMENT OF JUSTICE**

**Parole Commission**

**28 CFR Part 2**

**Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the District of Columbia Code**

**AGENCY:** United States Parole Commission, Justice.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** The U.S. Parole Commission is incorporating into the Code of Federal Regulations, in amended and supplemented form, the regulations of the District of Columbia that govern the paroling jurisdiction that will be assumed by the U.S. Parole Commission on August 5, 1998. The paroling authority of the District of Columbia Board of Parole will be transferred to the U.S. Parole Commission under the National Capital Revitalization and Self-Government Improvement Act of 1997, which permits the Commission to amend and supplement the District's parole regulations pursuant to federal rulemaking procedures.

**DATES:** *Effective Date:* August 5, 1998. Comments must be received by December 1, 1998.

**ADDRESSES:** Send comments to Office of General Counsel, U.S. Parole Commission, 5550 Friendship Blvd., Chevy Chase, Maryland 20815.

**FOR FURTHER INFORMATION CONTACT:** Pamela A. Posch, Office of General Counsel, U.S. Parole Commission, 5550 Friendship Blvd., Chevy Chase, Maryland 20815, telephone (301) 492–5959.

**SUPPLEMENTARY INFORMATION:** Under Section 11231 of the National Capital Revitalization and Self-Government Improvement Act of 1997 (Public Law 105–33) the U.S. Parole Commission is required, not later than August 5, 1998, to assume the jurisdiction and authority of the Board of Parole of the District of Columbia to grant and deny parole, and to impose conditions upon an order of parole, in the case of any imprisoned felon who is eligible for parole or reparole under the District of Columbia Code. The Act requires the Parole Commission to exercise this authority pursuant to the parole laws and regulations of the District of Columbia. However, it also gives the Parole Commission the authority to amend or supplement any regulation interpreting or implementing the relevant parole laws of the District of Columbia,

provided that the Commission adheres to the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. 553, as applied to the Commission by 18 U.S.C. 4218.

After an extensive review of the relevant regulations of the Board of Parole of the District of Columbia, as currently set forth in the District of Columbia Code of Municipal Regulations, the Commission decided to republish them with appropriate revisions. The Commission decided not to leave these regulations in the D.C. Code of Municipal Regulations because the Revitalization Act makes parole for D.C. Code felons a federal function, and rules promulgated by federal agencies pursuant to the Administrative Procedure Act are required to be published in the Federal Register and the Code of Federal Regulations. Notice of this proposed rulemaking was published at 63 FR 17771 (April 10, 1998). Notice of the proposed transfer of these regulations was also published in 45 D.C. Register 2356 (April 17, 1998).

A complete set of regulations for District of Columbia felony prisoners is therefore being incorporated into the Code of Federal Regulations alongside the existing regulations that govern all other criminal offenders who fall under the Commission's jurisdiction. The regulations that govern the remaining functions of the Board of Parole of the District of Columbia will continue to be set forth in the D.C. Code of Municipal Regulations until the Commission assumes the remaining functions of the Board with respect to felons, on or before August 5, 2000.

The revised D.C. parole regulations that will take effect as interim rules effective August 5, 1998, fall into three categories.

First, the Board of Parole's procedural regulations have been amended and supplemented to clarify the procedures that the Commission will follow in considering District of Columbia prisoners for parole. The parole hearing and decisionmaking process will remain essentially the same as that of the D.C. Board of Parole, but in many instances modifications will promote both increased fairness and administrative efficiency in the discharge of the new function.

Second, other revisions reflect recently-enacted District of Columbia laws, such as the Medical and Geriatric Parole Act, which were not previously implemented through regulations.

Third, the Commission has supplemented the existing parole guidelines of the Board of Parole by adopting an improved point score system to replace the scoring system

that was removed from the Board's regulations by D.C. Law 10–255 (May 16, 1995). The continued use of this point score system by the D.C. Board of Parole has resulted in a high rate of upward departures from the guidelines. For example, in a random sample of 100 cases decided by the D.C. Board of Parole in 1997, the Commission found departures in more than half of the cases. Factors cited by the Board to justify departures most often appear to involve aspects of the prisoner's current offense or criminal history that indicate a risk of violent recidivism. See, *e.g.,* *Ellis* v. *District of Columbia,* 84 F.3d 1413 (D.C. Cir. 1996), *Smith* v. *Quick,* 680 A.2d 396 (D.C. App. 1996), and *McRae* v. *Hyman,* 667 A.2d 1356 (D.C. App. 1995). The guidelines set forth below retain the basic framework of the Board's guidelines, but incorporate factors that would otherwise be expected to result in decisions outside the guidelines. The Commission intends this improved point score system to serve the Board's original purpose of predicting violent crime and incapacitating offenders with a high probability of serious recidivism. It is also intended to reduce the potential for unwarranted disparity that can be produced by the frequent exercise of unguided discretion.

In this regard, the Parole Commission undertook a research study to identify factors related to current offense and criminal history that can be empirically correlated with repeat violent crime. The research was based on a statistical sampling of D.C. offenders released in 1992 (which provided a five-year follow-up period), as well as on comparative samples from larger federal and Connecticut data bases. The guideline table that is published at this time is based upon factors that were confirmed by the research data as correlated with violent recidivism. Whereas the current D.C. point score demonstrated a weak association with violent recidivism, the score adopted by the Commission at this time shows a significantly improved correlation. Moreover, the Connecticut data produced results that were remarkably consistent with the results obtained with the Commission's D.C. data.

In light of the research results, some factors were added to Category II of the proposed score, and others were dropped from the score as non-predictive. For example, distinguishing between "high level" and ordinary violence in the offender's prior record was found to reduce the predictive power of the score, as was the factor of "multiple current offenses." Therefore, these factors were deleted. Drug

Federal Register / Vol. 63, No. 139 / Tuesday, July 21, 1998 / Rules and Regulations

39173

trafficking in the current offense (without possession of a firearm) was also found to lower the prediction of violent recidivism, and was therefore deleted.

On the other hand, the basic assumption that a violent current offense predicts for future violence was confirmed, as was the assumption that a violent prior record adds to the predictability of future violence in such cases. The research also pointed to the conclusion that a record of prior violent crime is predictive even if the current offense did not involve violence, so this factor was added. Firearm possession was also found to be strongly predictive, so this item is retained from the original D.C. score. (The points assigned to each factor in Category II of the score reflect that factor's predictive strength relative to the other factors in that Category.)

Although the frequencies of extremely violent crimes (murder, rape, etc.) proved too small to yield empirical research results, the Commission decided that such cases present implied risk levels that would either justify repeated departures, or the inclusion of the relevant factors in the guideline system itself. The latter option was chosen. What constitutes "violent crime" in the current offense has therefore been given differentiation so that cases of "high level" violence receive appropriate point enhancements. This is consistent with past D.C. practice. The Board of Parole's current point score table assigns a one point enhancement for violence, regardless of the nature and seriousness of the crime, notwithstanding the factors at 28 DCMR 204.18. Departures are therefore frequent for cases of "unusual cruelty to victims," which appears to correlate with "high level violence" as defined by the Parole Commission in Category III of the revised point score. See, e.g., Hall v. Henderson, 672 A.2d 1047 (D.C. App. 1996).

Additionally, the research indicated that the predictive power of the Salient Factor Score (SFS), which is currently used by both the Parole Commission and the D.C. Board of Parole, would be significantly enhanced by increasing the weight given to Item C (age of the commencement of the current offense), from a maximum of 2 points to a maximum of 3 points. The SFS is therefore revised to differentiate better between offenders on the basis of their age at the commencement of the current offense. Taken together, age at the commencement of the current offense and the number of prior convictions and commitments function to predict recidivism by providing a measure of the rate of the offender's past criminal

conduct. An additional adjustment in Item C to the scoring of offenders with four prior commitments will further refine the SFS and increase its predictive power. Finally, the Commission has deleted Item F (heroin/opiate dependence), an item that predicts recidivism by itself but which does not add to the predictive power of the SFS once all the other items are taken into account. The Commission will thus avoid the scoring problems associated with the issue of heroin/opiate dependence (which are due to the inadequate background information maintained on many D.C. prisoners). The SFS will remain a ten-point score and the parole prognosis categories (as well as the scores that define these categories) will not be changed.

In sum, although some of the "type of risk" factors that indicate a prisoner's potential for violent recidivism are given increased weight in the new scoring system, this will render unnecessary the unstructured discretionary departures that were frequently ordered by the D.C. Board of Parole in the past to compensate for an inadequate violence prediction ("type of risk") scale. Moreover, increased weight is given to institutional performance, both by permitting program achievement to be balanced against any misconduct during the same period, and by assigning an additional point to superior program achievement. Positive achievement in prison programs, as well as negative institutional behavior, will therefore continue to produce significant adjustments to the "total point score" each time a prisoner who has been denied parole appears for a reconsideration hearing.

Finally, overcrowding in District prisons has long been a serious concern. However, the Commission's research indicates that adherence to the guidelines at § 2.80 will not increase overall prison time or produce more prison overcrowding. The rehearing guidelines at § 2.80(i) have been modified downward for prisoners with Base Point Scores of 7–10 to help keep the estimated average prison time served by D.C. prisoners within current levels. The Commission will continue to study the available data to determine whether the continuance ranges at § 2.80(j) should be further adjusted to avoid any unintended impact on the prison population, while ensuring that serious offenders will serve periods of imprisonment that are adequate to protect the public safety.

## Explanatory Comments By Section

*Comment to § 2.70:* This section sets forth the authority assigned to the

Parole Commission under the D.C. Revitalization Act and carries forth the provisions of 28 DCMR 100 with two exceptions. First, 28 DCMR 100.10 was not retained because the statutory authority upon which it was based has been repealed. Second, 28 DCMR 100.11 was not retained because it is redundant with paragraph (b) (derived from 28 DCMR 100.2), which sets forth the Commission's authority regarding committed youth offenders in a broader form. This proposed rule also reflects a 1993 amendment to the D.C. Code regarding geriatric and medical cases, and updates the references in 28 DCMR 100 regarding the Youth Corrections Act to take into account the Youth Rehabilitation Act Amendment of 1985.

*Comment to § 2.71:* This rule carries forth the provisions of 28 DCMR 102 with two modifications. First, youth offenders will have to complete a standard parole application form. Second, the rule provides that initial hearings are to be scheduled, where practicable, at least 180 days before the prisoner's eligibility date. Current D.C. Parole Board practice generally provides initial hearings about 60 days prior to the prisoner's eligibility date. It is expected that, on August 5, 1998, there will be a significant backlog of parole applicants for whom the 180 day deadline will have already passed. The Commission will hear these prisoners on successive dockets until compliance with this rule can be achieved.

*Comment to § 2.72:* This rule carries forth the provisions of 28 DCMR 103 with the following changes. First, it adds a requirement that the examiner discuss with the prisoner the pertinent file information. This will ensure that the prisoner is informed of the main information being considered by the Commission, and given an opportunity to respond. Second, although the rule retains the D.C. prohibition on representatives at parole hearings in District of Columbia facilities, it allows a prisoner to have a representative at a parole hearing in a federal facility, consistent with the procedure for federal prisoners. The same applies to prehearing disclosure of file documents, which likewise depends upon correctional staff resources that are not available in District facilities. Third, although 28 DCMR 103 permits a prisoner's supporters to visit the Board to discuss a case at any time, the interim rule requires a prisoner's supporters to request an office visit at least 30 days before the parole hearing so that their input can be included in the record that the examiner will consider at the hearing. Office visits at other times will be permitted only on a showing of good

cause. Fourth, the rights of victims as set forth in a 1989 amendment to D.C. law are spelled out and amplified. Victims of violent crimes are given the right to appear at the parole hearing, and to submit testimony or a written statement. Although current D.C. procedures permit only a written statement, federal practice permits victims to testify. See *Phillips v. Brennan*, 969 F.2d 384 (7th Cir. 1992) (victim permitted to testify at parole hearing without presence of offender). Office visits are also permitted for victims, subject to the same 30-day notice requirement that applies to supporters. Fifth, the rule follows federal law at 18 U.S.C. 4208(f) in allowing the prisoner to obtain a copy of the tape recording of his parole hearing.

*Comment to § 2.73:* This rule carries forth the statutory criteria for parole contained in 28 DCMR 200. In addition, it explains that the parole function for D.C. Code offenders rests on a premise somewhat different from that of the federal parole guidelines. See *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1004, n.6 (D.D.C. 1988). For D.C. Code offenders, the revised guidelines in § 2.80 of these rules treat the minimum term of imprisonment imposed by the court as the measure of basic accountability for the offense of conviction. Only in unusual cases is the seriousness of the offense a basis for denial of parole consideration. The normal function of parole consideration is to determine whether the prisoner would be "a responsible citizen if he is returned to the community" and whether "release on parole is consistent with the public safety." See *White v. Hyman*, 647 A.2d 1175 (D.C. App. 1994). Hence, this provision embodies the Commission's decision to maintain the existing purpose of parole for the District of Columbia.

*Comment to § 2.74:* This is a new rule. It requires the issuance of a statement of reasons for parole denial, a procedure not included in current District of Columbia Parole Board procedures. Federal practice under 18 U.S.C. 4206 is the model for this procedural reform, as well as for the 21-day time period for issuing the decision.

*Comment to § 2.75:* This rule carries forth the provisions of 28 DCMR 104, except that the policy of setting continuances for cases by reference to the length of the prisoner's sentence is replaced by reference to the new time ranges for rehearings that are set forth in § 2.80. In addition, the proposed rule prohibits the scheduling of a reconsideration hearing more than five (5) years from the date of the last

hearing. At present, the D.C. Parole Board may order a reconsideration hearing exceeding this limit if it departs from its guidelines. Finally, the proposed rule authorizes special reconsideration hearings for new and significant information, and spells out the continuing authority of the D.C. Parole Board to revoke parole and set rehearing dates.

*Comment to § 2.76:* This rule carries forth the provisions of 28 DCMR 201 regarding applications for a reduction of minimum term. In addition, it sets forth the arrangement the Commission has with the U.S. Attorney's Office regarding the presentation of applications for a reduction in a minimum term to the Superior Court.

*Comment to § 2.77:* This is a new rule that sets forth criteria and procedures for implementing the medical parole provisions at D.C. Code 24–261–64, 267.

*Comment to § 2.78:* This is a new rule that sets forth criteria and procedures for implementing the geriatric parole provisions at D.C. Code 24–261, 263–64, 267.

*Comment to § 2.79:* This rule carries forth the provisions of 28 DCMR 205 in a somewhat modified form to conform to the procedure set forth at § 2.8 of these rules. A minor substantive change is that the Commission will consider the underlying circumstances of the misconduct in setting a date for review hearing rather than set a parole date that is contingent on the restoration of forfeited good time by institutional officials.

*Comment to § 2.80:* This section carries forth the provisions of 28 DCMR 204 in modified form. This revision of the D.C. Board's guideline system retains its fundamental three-part structure (the salient factor score, the total point score, and the grant/denial policy). The guideline system continues to serve as a measurement of both the degree and seriousness of the risk to the public safety presented in each case. The policy of permitting parole to be granted at initial hearings for those who merit 0–2 points on the "total point score," and permitting parole to be granted at rehearings for those who merit 0–3 points, is also retained. However, the relevant factors listed in the point score as indicating "seriousness of the risk" have been revised substantially along with the number of points assigned to each relevant factor. The purpose of the revisions is to produce a score that better predicts the probability of violent offenses, and that differentiates between ordinary and extremely violent offenses (e.g., murder, rape, assault with serious bodily injury). Thus, the revised score

includes factors which appear to indicate an increased probability that recidivism (if it occurs) will be of a serious nature. At the same time, the possible points for superior program achievement in prison also are increased.

The primary intent is to protect the public safety, and to capture within the guidelines the many decisions that are now outside the guidelines because of the D.C. Board's well-founded concerns about the "seriousness of the risk." The Parole Commission itself has found it necessary to depart from the D.C. parole guidelines based on the same concerns. See *Duckett v. U.S. Parole Commission*, 795 F. Supp. 133 (M.D. Pa. 1992) (current offenses involved multiple separate crimes of violence not reflected by the point score).

The total point score thus revised permits (in the worst-case scenario) a repeat offender to receive as many as 10 points. However, point scores only go to this level if there are extraordinary aggravating factors (e.g., current murder with an extensive prior record of violent crimes) that would otherwise justify a guideline departure. If the offender's past record is less extensive, the total point score will be correspondingly lower and will permit parole based on good behavior over a sufficient period of time in prison. What constitutes a "sufficient period of time in prison" is determined by the need to incapacitate the offender according to the risk level he or she presents, as reflected in the Guidelines for Time to Rehearing at § 2.80(j).

*Comment to § 2.81:* This rule carries forth the provisions of 28 DCMR 202.2, but follows federal practice by permitting an effective date of parole up to 9 months in advance. The D.C. Parole Board rule does not specify any time period. The rule also provides that parole dates will be set no more than 6 months in advance if placement in a halfway house is not required. This policy will leave the Commission with the flexibility to ensure adequate release planning before any prisoner is released on parole. Difficulties in determining the adequacy of release plans, in the availability of necessary halfway house resources, and in the adequacy of basic supervision resources, are presently serious issues that can impede the releases of many D.C. Code prisoners.

*Comment to § 2.82:* This rule carries forth the provisions of 28 DCMR 208 regarding release planning. Express authority is added for the Commission to rescind a grant of parole if failure to produce an acceptable release plan persuades the Commission that the

release of the prisoner would lead to rapid failure in the community.

*Comment to § 2.83:* This rule carries forth that part of 28 DCMR 209 that concerns release to other jurisdictions.

*Comment to § 2.84:* This rule carries forth the provisions of 28 DCMR 207 pertaining to the conditions of parole.

*Comment to § 2.85:* This section carries forth the provisions of 28 DCMR 207 regarding release on parole and specifies when a parole becomes operative, based on 28 CFR § 2.29(a).

*Comment to § 2.86:* This rule carries forth the provisions of 28 DCMR 212.

*Comment to § 2.87:* This rule supplements the District of Columbia parole regulations by providing for the use of federal reparole guidelines (in the absence of a new D.C. Code standard). The current parole regulations of the District of Columbia include rehearing schedules for parole violators but do not provide policy guidance for the substantive decision to grant or deny reparole. Moreover, neither federal nor District of Columbia law mandates any difference in the basic purposes served by revocation and reparole. This rule will ensure that parole violators will receive consistent decisions, and will know from the date of their first rehearing how much time must be served to correct and sanction the parole failure.

*Comment to § 2.88:* This carries forth the operative provisions of 28 DCMR 101. It maintains the confidentiality of D.C. Board parole files while conforming the regulations to federal parole practice under the Privacy Act of 1974.

*Comment to § 2.89:* This rule sets forth the provisions from Part A of these rules that, except to the extent otherwise provided by law, shall also apply to District of Columbia Code prisoners.

*Comment to § 2.90:* This is a new rule that is necessary to clarify the status of prior orders of the D.C. Board (parole grants, denials, revocations, etc.) as of August 5, 1998. It maintains the Commission's longstanding practice of implementing prior D.C. Board orders when a D.C. Code offender enters federal jurisdiction, including rehearing dates, unless duly reconsidered and changed. See *Morgan v. District of Columbia,* 518 F. Supp. 754 (D.D.C. 1985).

**The Public Comment**

The D.C. Public Defender's Service and the D.C. Prisoners' Legal Services Project argue that the proposed regulations will "increase the measure of punishment" for D.C. offenders, and will therefore violate the *ex post facto* clause. However, it was also

acknowledged that the D.C. Board of Parole does not always follow its own rules. This acknowledgment, in effect, concedes the argument. Parole guideline changes, especially those that incorporate factors that are used to exceed the guidelines on a discretionary basis, do not offend the *ex post facto* clause. See, *e.g., Davis v. Henderson,* 652 A.2d 634 (D.C. App. 1995), *Warren v. U.S. Parole Commission,* 659 F.2d 183 (D.C. Cir. 1981), *Inglese v. U.S. Parole Commission,* 768 F.2d 932 (7th Cir. 1985), and *Yamamoto v. U.S. Parole Commission,* 794 F.2d 1294 (8th Cir. 1986). Moreover, the revised guidelines are intended only to structure the use of paroling discretion in a more consistent manner, and not to reduce the decisionmaker's authority to allow individual factors to determine the final outcome in every case. The objective of the Commission is to provide a rational, research-based framework for its decisions that is based on a sample of actual past D.C. Board of Parole decisions.

Other contentions are that the Commission has no authority to administer the Youth Rehabilitation Act (based on the proposition that YRA prisoners convicted of felony offenses under the D.C. Code are somehow not "imprisoned felons"), that the Salient Factor Score has no demonstrated validity as a predictor of recidivism for D.C. offenders, that the United States Attorney should not be permitted to object when the Commission proposes to petition the sentencing court for reduction of a D.C. prisoner's minimum sentence, that prisoners should not be required to undergo the "needless formality" of a parole application, and that there should be representatives at parole hearings in D.C. facilities. The revised version of the Salient Factor Score has proved valid for D.C. Code offenders. The comment about representatives is understandable, but it appears that the D.C. Department of Corrections historically has been unwilling (or unable) to handle the security problems posed by outside representatives. Objections by the U.S. Attorney often bring to light new information which should be reviewed prior to filing with the court. An application for parole provides important information and provides evidence, at least, of the prisoner's ability to meet the reporting requirements of parole supervision.

Other commentary was devoted to pointing out discrepancies between the proposed rules at §§ 2.77 and 2.78, and the Medical and Geriatric Parole statute. These comments were very helpful, and the Commission has made revisions

accordingly. There was praise for the Commission's proposal to conduct initial parole hearings within 180 days of eligibility, which should reduce average prison stays for offenders with scores of 0–2 (indicating parole at eligibility) by 5 to 9 months. How soon the Commission can accomplish this goal will be dependent, in large measure, on the D.C. Department of Corrections, and its ability to provide needed inmate file information in a timely manner.

Finally, the Public Defender Service objected to crime victims being permitted to testify at parole hearings, on the theory that because D.C. Code 23–103 does not guarantee victims this right, permitting them to do so would be *ultra vires.* This is an erroneous argument because it would reduce the victim to the status of a mere "opponent" of parole. A victim is more than that. A victim is both the primary witness to the crime and its impact, and no less a participant in the criminal justice process than the eligible prisoner. Moreover, D.C. Code 23–103A was intended to guarantee minimum rights and not to set limits on the Board of Parole's authority to consider relevant evidence. The Commission has clarified § 2.72(e) accordingly.

There were a few comments from individual prisoners, whose concerns chiefly appear to be to receive the same opportunities as federal prisoners, and not to be subjected to anything required by the National Capital Revitalization Act that would make them serve more time in prison.

**Implementation**

The regulations set forth below will be made effective as interim rules on August 5, 1998, with a further period for public comment. The rules are applicable only to prisoners serving sentences imposed under the District of Columbia Code, except that the revised Salient Factor Score (SFS–98) in § 2.20 will be applied to U.S. Code prisoners at all hearings held on or after August 5, 1998, pursuant to the Commission's standard retroactivity policy.

The Commission will evaluate the interim rules in the light of further public comment and operational experience before adopting final rules. The interim rules will govern all D.C. Code parole hearings and related matters coming before the Commission on or after August 5, 1998, with the exception of the guidelines at § 2.80, which will be applied only to D.C. Code prisoners who are given initial parole hearings on or after August 5, 1998. See § 2.80(e). Prisoners serving aggregated U.S./D.C. Code sentences will continue

to be evaluated under (redesignated) § 2.65.

**Good Cause Finding**

The Commission is making these interim rules effective less than 30 days from the date of this publication for good cause pursuant to 5 U.S.C. 553(d)(3). First, August 5, 1998, is the deadline established by the National Capital Revitalization Act for the Commission to assume the function governed by the regulations. Second, the empirical research found necessary by the Commission to validate its proposed guidelines as a reliable prediction device for violent recidivism, and to verify the likely impact of these guidelines on prison population levels, proved more complex and difficult to accomplish than originally anticipated. Final results were not available for the Commission's review until June 30, 1998, and this delayed final voting by the Commission until July 9, 1998.

**Executive Order 12866 and Regulatory Flexibility Statement**

The U.S. Parole Commission has determined that this interim rule is not a significant rule within the meaning of Executive Order 12866, and the interim rule has, accordingly, not been reviewed by the Office of Management and Budget. The interim rule will not have a significant economic impact upon a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 605(b).

**List of Subjects in 28 CFR Part 2**

Administrative practice and procedure, Probation and parole, Prisoners.

**The Amendment**

Accordingly, the U.S. Parole Commission is adopting the following amendments to 28 CFR Part 2.

**PART 2—[AMENDED]**

1. The authority citation for 28 CFR Part 2 continues to read as follows:

Authority: 18 U.S.C. 4203(a)(1) and 4204(a)(6).

**Subpart A—United States Code Prisoners and Parolees**

2. Section 2.62 is redesignated as § 2.68.

3. Sections 2.1 through 2.67 (except 2.62) are designated as subpart A, and §§ 2.63 through 2.67 are redesignated as §§ 2.62 through 2.66. The heading for subpart A is added as set forth above.

4. Section 2.20 is amended by removing Item F from the Salient Factor Scoring Manual (HISTORY OF

HEROIN/OPIATE DEPENDENCE), and by redesignating Item G (OLDER OFFENDERS) as Item F. In addition, Item C is revised to read as follows:

**§ 2.20   Paroling policy guidelines; Statement of general policy.**

* * * * *

**ITEM C. AGE AT COMMENCEMENT OF THE CURRENT OFFENSE/PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS (ADULT OR JUVENILE)**

C.1   If the subject was 26 years of age or more at the commencement of the current offense and has 3 or fewer prior commitments, score 3; if four prior commitments, score 2; if five or more prior commitments, score 1.

C.2   If the subject was 22–25 years of age at the commencement of the current offense and has three or fewer prior commitments, score 2; if four prior commitments, score 1; if five or more prior commitments, score 0.

C.3   If the subject was 20–21 years of age at the commencement of the current offense and has three or fewer prior commitments, score 1; if four or more prior commitments, score 0.

C.4   If the subject was 19 years of age or less at the commencement of the current offense, score 0.

C.5   Definitions (a) Use the age of the commencement of the subject's current offense behavior, except as noted under the special instructions for probation/parole/confinement/escape status violators.

(b) Prior commitment is defined under Item B.

* * * * *

**Subpart B—Transfer Treaty Prisoners and Parolees**

5. Redesignated § 2.68 is designated as subpart B. Section 2.69 is added to Subpart B and reserved. The heading for subpart B is added as set forth above.

6. Subpart C is added to consist of §§ 2.70 through 2.89 to read as follows:

**Subpart C—District of Columbia Code Prisoners and Parolees**

Sec.
2.70   Authority and functions of the U.S. Parole Commission with respect to District of Columbia Code offenders.
2.71   Application for parole.
2.72   Hearing procedure.
2.73   Parole suitability criteria.
2.74   Decision of the Commission.
2.75   Reconsideration proceedings.
2.76   Reduction in minimum sentence.
2.77   Medical parole.
2.78   Geriatric parole.
2.79   Good time forfeiture.
2.80   Guidelines for D.C. Code offenders.
2.81   Effective date of parole.
2.82   Release planning.
2.83   Release to other jurisdictions.
2.84   Conditions of release.
2.85   Release on parole.
2.86   Mandatory release.

2.87   Reparole.
2.88   Confidentiality of parole records.
2.89   Miscellaneous provisions.
2.90   Prior orders of the Board of Parole.

**Subpart C—District of Columbia Code Prisoners and Parolees**

**§ 2.70   Authority and functions of the U.S. Parole Commission with respect to District of Columbia Code offenders.**

(a) The U.S. Parole Commission shall exercise authority over District of Columbia Code offenders pursuant to Section 11231 of the National Capital Revitalization and Self-Government Improvement Act of 1997, P.L. 105–33, and D.C. Code 24–209. The rules in this Subpart shall govern the operation of the U.S. Parole Commission with respect to D.C. Code offenders and are the pertinent parole rules of the District of Columbia as amended and supplemented pursuant to Section 11231(a)(1) of the Act.

(b) The Commission shall have sole authority to grant parole, and to establish the conditions of release, for all District of Columbia Code prisoners who are serving sentences for felony offenses, and who are not otherwise ineligible for parole by statute, including offenders who have been returned to prison upon the revocation of parole or mandatory release, wherever confined. (D.C. Code 24–208). The above authority shall include youth offenders who are committed to prison for treatment and rehabilitation based on felony convictions under the D.C. Code. (D.C. Code 24–804(a)).

(c) The Commission shall have authority to recommend to the Superior Court of the District of Columbia a reduction in the minimum sentence of a District of Columbia Code prisoner, if the Commission deems such recommendation to be appropriate (D.C. Code 24–201(c)).

(d) The Commission shall have authority to grant parole to a prisoner who is found to be geriatric, permanently incapacitated, or terminally ill, notwithstanding the minimum term imposed by the sentencing court (D.C. Code 24–263 through 267).

(e) The Board of Parole of the District of Columbia will continue to have jurisdiction over District of Columbia Code offenders who have been released to parole or mandatory release supervision, including the authority to return such offenders to prison upon an order of revocation. The jurisdiction and authority of the Board over such offenders will be transferred to the U.S. Parole Commission by August 5, 2000, pursuant to Section 11231(a)(2) of the Act.

Federal Register / Vol. 63, No. 139 / Tuesday, July 21, 1998 / Rules and Regulations    39177

(f) When the D.C. Board of Parole has issued a warrant for a parolee who has been confined in a federal prison to serve a new U.S. or D.C. Code sentence, the U.S. Parole Commission shall have jurisdiction to revoke parole and to determine the disposition of such warrant. (D.C. Code 24–209.)

§ 2.71  Application for parole.

(a) A prisoner (including a committed youth offender) desiring to apply for parole shall execute an application form as prescribed by the Commission. Such forms shall be available at each institution and shall be provided to a prisoner who is eligible for parole consideration. The Commission may then conduct an initial hearing or grant an effective date of parole on the record. A prisoner who receives an initial hearing need not apply for subsequent hearings.

(b) To the extent practicable, the initial hearing for an eligible prisoner who has applied for parole shall be held at least 180 days prior to the prisoner's date of eligibility for parole.

(c) A prisoner may knowingly and intelligently waive any parole consideration on a form provided for that purpose. A prisoner who declines either to apply for or waive parole consideration shall be deemed to have waived parole consideration.

(d) A prisoner who waives parole consideration may later apply for parole and be heard during the next visit of the Commission to the institution at which the prisoner is confined, provided that the prisoner has applied for parole at least 60 days prior to the first day of the month in which such visit of the Commission occurs. In no event, however, shall such prisoner be heard at an earlier date than that set forth in paragraph (b) of this section.

§ 2.72  Hearing procedure.

(a) Each eligible prisoner who has applied for parole shall appear in person for a hearing before an examiner of the Commission. The examiner shall review with the prisoner the guidelines at § 2.80, and shall discuss with the prisoner such information as the examiner deems relevant, including the prisoner's offense behavior, criminal history, institutional record, health status, release plans, and community support. If the examiner determines that the available file material is not adequate for this purpose the examiner may order the hearing to be postponed to the next docket so that the missing information can be requested.

(b) Parole hearings may be held in District of Columbia facilities (including District of Columbia contract facilities) and federal facilities (including federal contract facilities).

(c) A prisoner appearing for a parole hearing in a District of Columbia facility shall not be accompanied by counsel, any relative or friend, or any other person (except a staff member of that facility). A prisoner appearing for a parole hearing in a federal facility may have a representative pursuant to § 2.13(b) of this part.

(d) Rehearing disclosure of file material will be available to prisoners and their representatives only in the case of prisoners confined in federal facilities, and pursuant to § 2.55 of this part.

(e) A victim of a crime of violence, as defined in D.C. Code 23–103a(a)(3), or a victim of any other crime, or a representative from the immediate family of a victim if the victim has died, shall have the right

(1) To be present at the parole hearings of each offender who committed the crime, and

(2) To testify and/or offer a written or recorded statement as to whether or not parole should be granted, including information and reasons in support of such statement. A written statement may be submitted at the hearing or provided separately. The prisoner may be excluded from the hearing room during the appearance of a victim or representative who gives testimony. A victim or representative may also request permission to appear for an office hearing conducted by an examiner (or other staff member) in lieu of appearing at a parole hearing. Whenever new and significant information is provided under this rule, the hearing examiner will summarize the information at the parole hearing and will give the prisoner an opportunity to respond. Such summary shall be consistent with a reasonable request for confidentiality by the victim or representative.

(f) Attorneys, family members, relatives, friends, or other interested persons desiring to submit information pertinent to any prisoner may do so by forwarding letters or memoranda to the offices of the Commission prior to a scheduled hearing. Such persons may also request permission to appear at the offices of the Commission to speak to a Commission staff member, provided such request is received at least 30 days prior to the scheduled hearing. The purpose of this office visit will be to supplement the Commission's record with pertinent factual information concerning the prisoner, which shall be placed in the record for consideration at the hearing.

(g) An office visit at a time other than set forth in paragraph (f) of this section may be authorized only if the Commission finds good cause based upon a written request setting forth the nature of the information to be discussed. See § 2.22 of this part. Notwithstanding the above restriction on office visits, written information concerning a prisoner may be submitted to the offices of the Commission at any time.

(h) A full and complete recording of every parole hearing shall be retained by the Commission. Upon a request pursuant to § 2.56, the Commission shall make available to any eligible prisoner such record as the Commission has retained of the hearing.

§ 2.73  Parole suitability criteria.

(a) In accordance with D.C. Code 24–204(a), the Commission shall be authorized to release a prisoner on parole in its discretion after he or she has served the minimum term of the sentence imposed, if the following criteria are met:

(1) The prisoner has substantially observed the rules of the institution;

(2) There is reasonable probability that the prisoner will live and remain at liberty without violating the law; and

(3) In the opinion of the Commission, the prisoner's release is not incompatible with the welfare of society.

(b) It is the policy of the Commission with respect to District of Columbia Code offenders that the minimum term imposed by the sentencing court presumptively satisfies the need for punishment in respect to the crime of which the prisoner has been convicted, and that the responsibility of the Commission is to account for the degree and the seriousness of the risk that the release of the prisoner would entail. This responsibility is carried out by reference to the Salient Factor Score and the Point Assignment Table at § 2.80 of this part. However, in unusual cases, parole may be denied based upon the gravity of the offense.

§ 2.74  Decision of the Commission.

(a) Following each initial or subsequent hearing, the Commission shall render a decision granting or denying parole, and shall provide the prisoner with a notice of action that includes an explanation of the reasons for the decision. The decision shall ordinarily be issued within 21 days of the hearing, excluding weekends and holidays.

(b) Whenever a decision is rendered within the applicable guideline established by these rules, it will be

**39178** Federal Register / Vol. 63, No. 139 / Tuesday, July 21, 1998 / Rules and Regulations

deemed a sufficient explanation of the Commission's decision for the notice of action to set forth how the guideline was calculated. If the decision is a departure from the guidelines, the notice of action shall include the reasons for such departure.

(c) Relevant issues of fact shall be resolved by the Commission in accordance with § 2.19(c) of this part.

### § 2.76 Reconsideration proceedings.

(a) If the Commission denies parole, it shall establish an appropriate reconsideration date in accordance with the provisions of § 2.80. The prisoner shall be given a rehearing during the month specified by the Commission, or on the docket of hearings immediately preceding that month if there is no docket of hearings scheduled for the month specified. If the prisoner's mandatory release date will occur before the reconsideration date deemed appropriate by the Commission pursuant to § 2.80, the Commission may order that the prisoner be released by the expiration of his sentence less good time ("continue to expiration"). The first reconsideration date shall be calculated from the prisoner's eligibility date; any subsequent reconsideration dates shall be calculated from the date of the last hearing. However, when the prisoner has waived the initial hearing, the first reconsideration shall be calculated from the initial hearing date.

(b) Notwithstanding the provisions of paragraph (a) of this section, the Commission shall not set a reconsideration date in excess of five years from the date of the prisoner's last hearing, nor shall the Commission continue a prisoner to the expiration of his or her sentence, if more than five years remains from the date of the last hearing until the prisoner's scheduled mandatory release.

(c) The scheduling of a reconsideration date does not imply that parole will be granted at such hearing.

(d) Prior to the parole reconsideration date, the Commission shall review the prisoner's record, including an institutional progress report which shall be submitted 60 days prior to the hearing. Based on its review of the record, the Commission may grant an effective date of parole without conducting the scheduled in-person hearing.

(e) Notwithstanding a previously established reconsideration date, the Commission may also reopen any case for a special reconsideration hearing, as provided in § 2.28, upon the receipt of new and significant information concerning the prisoner.

(f) Upon entering an order revoking parole, the Board of Parole of the District of Columbia may grant an immediate reparole, or order the parole violator to be returned to prison. In the latter case, the Board will order a reconsideration date pursuant to its regulations. The Commission shall have sole authority to grant or deny reparole to an offender who has been returned to prison upon an order revoking parole.

### § 2.76 Reduction in minimum sentence.

(a) A prisoner who has served three (3) or more years of the minimum term of his or her sentence may request the Commission to file an application with the sentencing court for a reduction in the minimum term pursuant to D.C. Code 24-201c. The prisoner's request to the Commission shall be in writing and shall state the reasons that the prisoner believes such request should be granted. The Commission shall require the submission of a progress report before approving such a request.

(b) Approval of a prisoner's request under this section shall require the concurrence of a majority of the Commissioners. *(c) new*

(d) If the Commission approves a prisoner's request under this section, an application for a reduction in the prisoner's minimum term shall be forwarded to the U.S. Attorney for the District of Columbia for filing with the sentencing court. If the U.S. Attorney objects to the Commission's recommendation, the U.S. Attorney shall provide the government's objections in writing for consideration by the Commission. If, after consideration of the material submitted, the Commission declines to reconsider its previous decision, the U.S. Attorney shall file the application with the sentencing court.

(d) If a prisoner's request under this section is denied by the Commission, there shall be a waiting period of two (2) years before the Commission will again consider the prisoner's request, absent exceptional circumstances.

### § 2.77 Medical parole.

(a) Upon receipt of a report from the institution in which the prisoner is confined certifying that the prisoner is terminally ill, or is permanently and irreversibly incapacitated by a physical or medical condition that is not terminal, the Commission shall determine whether or not to release the prisoner on medical parole. Release on medical parole may be ordered by the Commission at any time, whether or not the prisoner has completed his or her minimum sentence. Consideration for medical parole shall be in addition to

any other parole for which a prisoner may be eligible.

(b) A prisoner may be granted a medical parole on the basis of terminal illness if:

(1) The institution's medical staff has provided the Commission with a reasonable medical judgment that the prisoner is within six months of death due to an incurable illness or disease; and

(2) The Commission finds that:

(i) The prisoner will not be a danger to himself or others; and

(ii) Release on parole will not be incompatible with the welfare of society.

(c) A prisoner may be granted a medical parole on the basis of permanent and irreversible incapacitation only if the Commission finds that:

(1) The prisoner's condition is such as to render the prisoner incapable of continuing his criminal career;

(2) The prisoner will not be a danger to himself or others; and

(3) Release on parole will not be incompatible with the welfare of society.

(d) The seriousness of the prisoner's crime shall be considered in determining whether or not a medical parole should be granted.

(e) A prisoner, or the prisoner's representative, may apply for a medical parole by submitting an application to the institution medical staff, who shall forward the application accompanied by a medical report and any recommendations within 15 days. The Commission shall render a decision within 15 days of receiving the application and report.

(f) A prisoner, the prisoner's representative, or the institution may request the Commission to reconsider its decision on the basis of changed circumstances.

(g) Notwithstanding any other provision of this section—

(1) A prisoner who has been convicted of first degree murder or who has been sentenced for a crime committed while armed under D.C. Code 22-2903, 22-3202, or 22-3204(b), shall not be eligible for medical parole. (D.C. Code 24-267); and

(2) A prisoner shall not be eligible for medical parole on the basis of a physical or medical condition that existed at the time the prisoner was sentenced (D.C. Code 24-262).

### § 2.78 Geriatric parole.

(a) Upon receipt of a report from the institution in which the prisoner is confined that a prisoner who is at least 65 years of age has a chronic infirmity,

Federal Register / Vol. 63, No. 139 / Tuesday, July 21, 1998 / Rules and Regulations    39179

illness, or disease related to aging, the Commission shall determine whether or not to release the prisoner on geriatric parole. Release on geriatric parole may be ordered by the Commission at any time, whether or not the prisoner has completed his or her minimum sentence. Consideration for geriatric parole will be in addition to any other parole for which a prisoner may be eligible.

(b) A prisoner may be granted a geriatric parole if the Commission finds that:

(1) There is a low risk that the prisoner will commit new crimes; and

(2) The prisoner's release would not be incompatible with the welfare of society.

(c) The seriousness of the prisoner's crime, and the age at which it was committed, shall be considered in determining whether or not a geriatric parole should be granted prior to completion of a prisoner's minimum sentence.

(d) A prisoner, or a prisoner's representative, may apply for a geriatric parole by submitting an application to the institution medical staff, who shall forward the application accompanied by a medical report and any recommendations within 30 days. The Commission shall render a decision within 30 days of receiving the application and report.

(e) In determining whether or not to grant a geriatric parole, the Commission shall consider the following factors:

(1) Age of the prisoner;

(2) Severity of illness, disease, or infirmities;

(3) Comprehensive health evaluation;

(4) Institutional behavior;

(5) Level of risk for violence;

(6) Criminal history; and

(7) Alternatives to maintaining geriatric long-term prisoners in traditional prison settings.

(D.C. Code 24–265(c)(1)–(7)).

(f) A prisoner, the prisoner's representative, or the institution, may request the Commission to reconsider its decision on the basis of changed circumstances.

(g) Notwithstanding any other provision of this section—

(1) A prisoner who has been convicted of first degree murder or who has been sentenced for a crime committed while armed under D.C. Code 22–2903, 22–3202, or 22–3204(b),

shall not be eligible for geriatric parole (D.C. Code 24–267); and

(2) A prisoner shall not be eligible for geriatric parole on the basis of a physical or medical condition that existed at the time the prisoner was sentenced (D.C. Code 24–262).

**§ 2.79  Good time forfeiture.**

Although a forfeiture of good time will not bar a prisoner from receiving a parole hearing, D.C. Code 24–204 permits the Commission to parole only those prisoners who have substantially observed the rules of the institution. Consequently, the Commission will consider a grant of parole for a prisoner with forfeited good time only after a thorough review of the circumstances underlying the disciplinary infraction(s) and if the Commission is satisfied that the parole date set has required a period of imprisonment sufficient to outweigh the seriousness of the prisoner's misconduct.

**§ 2.80  Guidelines for D.C. Code offenders.**

(a) *Introduction.* In determining whether an eligible prisoner should be paroled, the Commission shall apply the guidelines set forth in this section. The guidelines assign numerical values to the pre- and post-incarceration factors described in the Point Assignment Table set forth in paragraph (f) of this section. Decisions outside the guidelines may be made, where warranted, pursuant to paragraph (m) of this section.

(b) *Salient factor score and criminal record.* The prisoner's salient factor score shall be determined by reference to the salient factor scoring manual in § 2.20 of this part. The salient factor score is used to assist the Commission in assessing the probability that an offender will live and remain at liberty without violating the law. The prisoner's record of criminal conduct (including the nature and circumstances of the current offense) shall be used to assist the Commission in determining the probable seriousness of the recidivism that is predicted by the Salient Factor Score.

(c) *Disciplinary infractions.* The Commission shall assess whether the prisoner has been found guilty of committing disciplinary infractions while under confinement for the current offense. The Commission shall refer to the offense classification tables of the D.C. Department of Corrections or the Bureau of Prisons, as applicable, in

determining whether the prisoner's disciplinary record should be counted on the point score. The Commission's general policy shall be that a single Class I or Code 100 offense, or two or more Class II or Code 200 offenses, shall be counted as negative institutional behavior at all hearings. A persistent record of lesser offenses may also be counted as negative institutional behavior, whether at an initial hearing or a rehearing. At initial hearings, an infraction free period of at least three years preceding the date of the hearing may be considered by the Commission as sufficient to exclude from consideration a previous record of Class I (or Code 100) or Class II (or Code 200) offenses, provided that such offenses would result in not more than one point added to the prisoner's score.

(d) *Program achievement.* The Commission shall assess whether the prisoner has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense. Where prison programs and work assignments are limited or unavailable, the Commission may exercise discretion based on the prisoner's record of behavior. Points may be deducted for program achievement regardless of whether points have been added for negative institutional behavior during the same period.

(e) *Implementation.* These guidelines shall be applied to all prisoners who are given initial parole hearings on or after August 5, 1998. For prisoners whose initial hearings were held prior to August 5, 1998, the Commission shall render its decisions by reference to the guidelines applied by the D.C. Board of Parole. However, when a decision outside such guidelines has been made by the Board, or is ordered by the Commission, the Commission may determine the appropriateness and extent of the departure by comparison with the guidelines in this section. The Commission may also correct any error in the calculation of the D.C. Board's guidelines.

(f) *Point assignment table.* Add the applicable points from Categories I–III to determine the base point score. Then add or subtract the points from Categories IV and V to determine the total point score.

**39180**     Federal Register / Vol. 63, No. 139 / Tuesday, July 21, 1998 / Rules and Regulations

## POINT ASSIGNMENT TABLE

| Category I: Risk of Recidivism | (Salient factor score) |
|---|---|
| 10–8 (Very Good Risk) | +0 |
| 7–6 (Good Risk) | +1 |
| 5–4 (Fair Risk) | +2 |
| 3–0 (Poor Risk) | +3 |

| Category II: Current or Prior Violence | (Type of Risk) |
|---|---|
| Note: Use the highest applicable subcategory. If no subcategory is applicable, score = 0. | |
| A. Violence in current offense, and any felony violence in two or more prior offenses | +4 |
| B. Violence in current offense, and any felony violence in one prior offense | +3 |
| C. Violence in current offense | +2 |
| D. No violence in current offense and any felony violence in two or more prior offenses | +2 |
| E. Possession of firearm in current offense if current offense is not scored as a crime of violence | +2 |
| F. No violence in current offense and any felony violence in one prior offense | +1 |

| Category III: Death of Victim or High Level Violence | |
|---|---|
| Note: Use highest applicable subcategory. If no subcategory is applicable, score = 0. | |
| A. Current offense was high level or other violence with death of victim resulting | +3 |
| B. Current offense involved attempted murder | +2 |
| C. Current offense was other high level violence | +1 |
| Base Point Score (Total of Categories I–III) | |

| Category IV: Negative Institutional Behavior | |
|---|---|
| Note: Use the highest applicable subcategory. If no subcategory is applicable, score = 0. | |
| A. Negative institutional behavior involving: (1) assault upon a correctional staff member, with bodily harm inflicted or threatened, (2) possession of a deadly weapon, (3) setting a fire so as to risk human life, (4) introduction of drugs for purposes of distribution, or (5) participating in a violent demonstration or riot | +2 |
| B. Other negative institutional behavior | +1 |

| Category V: Program Achievement | |
|---|---|
| Note: Use the highest applicable subcategory. If no subcategory is applicable, score = 0. | |
| A. Acceptable institutional behavior with no program achievement | 0 |
| B. Acceptable institutional behavior with ordinary program achievement | −1 |
| C. Acceptable institutional behavior with superior program achievement | −2 |

Total Point Score (Total of Categories I–V)

(g) *Definitions and instructions for application of point assignment score.*

(1) *Salient factor score* means the salient factor score set forth at § 2.20 of this part.

(2) *High level violence* in Category III means any of the following offenses—

(i) Murder;

(ii) Voluntary manslaughter;

(iii) Arson of an occupied (or potentially occupied) building;

(iv) Forcible rape or forcible sodomy (first degree sexual abuse);

(v) Kidnapping, hostage taking, or any armed abduction of a victim during a carjacking or other offense;

(vi) Burglary of a residence while armed if a victim was in the residence at the offense;

(vii) Obstruction of justice through violence or threats of violence;

(viii) Any offense involving sexual abuse of a person less than sixteen years of age;

(ix) Any felony resulting in mayhem, malicious disfigurement, or other *serious bodily injury* (See Definition No. 3);

(x) Any offense defined below as *other violence* in which the offender intentionally discharged a firearm;

(3) *Serious bodily injury* means bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

(4) *Other violence* means any of the following felony offenses that does not qualify as *high level violence*—

(i) Robbery;

(ii) Residential burglary;

(iii) Felony assault;

(iv) Felony offenses involving a threat, or risk, of bodily harm;

(v) Felony offenses involving sexual abuse or sexual contact.

(5) Attempts, conspiracies, and solicitations shall be scored by reference to the substantive offense that was the object of the attempt, conspiracy, or solicitation; except that Category IIIA shall apply only if death actually resulted.

(6) *Current offense* means any criminal behavior that is either:

(i) Reflected in the offense of conviction, or

(ii) Is not reflected in the offense of conviction but is found by the Commission to be related to the offense of conviction (i.e., part of the same course of conduct as the offense of conviction).

(7) Category IIE applies whenever a firearm is possessed by the offender during, or used by the offender to commit, any offense that is not scored under Category IIA, B, C, or D. Category IIE also applies when the current offense is felony unlawful possession of a firearm and there is no other current offense. Possession for purposes of Category IIE includes constructive possession.

(8) Category IIIA applies if the death of a victim is:

(i) Caused by the offender, or

(ii) Caused by an accomplice and the killing was planned or approved by the offender in furtherance of a joint criminal venture.

(9) In some cases, negative institutional behavior that involves violence will result in a higher score if scored as an additional current offense under Categories II and/or III, than if scored under Category IVA. In such cases, the prisoner's point score is recalculated to reflect the conduct as an additional current offense under Categories II and/or III, rather than as a disciplinary infraction under Category IVA. For example, the attempted murder of another inmate will result in a higher score when treated as an additional current offense under Categories II and III, if the offense of conviction was scored under Category IIC only as violence in current offense. If negative institutional behavior is treated as an additional current offense, points may still be assessed under Category IVA or B for other disciplinary infractions.

(10) *Superior program achievement* means program achievement that is beyond the level that the prisoner might ordinarily be expected to accomplish.

The Commission may, in its discretion, grant more than a 2 point deduction in the most clearly exceptional cases.

(h) *Guidelines for decisions at initial hearing—Adult offenders.*

In considering whether to parole an adult offender at an initial hearing, the Commission shall determine the offender's total point score and then consult the following guidelines for the appropriate action:

| Total Points | Guideline recommendation |
|---|---|
| (1) If Points =0 ............... | Parole at initial hearing with low level of supervision indicated. |
| (2) If Points =1 ............... | Parole at initial hearing with high level of supervision indicated. |
| (3) If Points =2 ............... | Parole at initial hearing with highest level of supervision indicated. |
| (4) If Points =3+ ............. | Deny parole at initial hearing and schedule rehearing in accordance with §2.75(c) and the time ranges set forth in paragraph (j) of this section: |

(i) *Guidelines for decisions at initial hearing—Youth offenders.* In considering whether to parole a youth offender at an initial hearing, the Commission shall determine the youth offender's total point score and then consult the following guidelines for the appropriate action:

| Total points | Guideline recommendation |
|---|---|
| (1) If Points = 0 ............... | Parole at initial hearing with conditions established to address treatment needs; |
| (2) If Points = 1+ ............. | Deny parole at initial hearing and schedule a rehearing based on estimated time to achieve program objectives or by reference to the time ranges in paragraph (j) of this section, whichever is less. |

(j) *Guidelines for time to rehearing adult offenders.* (1) If parole is denied or rescinded, the time to the subsequent hearing for an adult offender shall be determined by the following guidelines:

| Base point score (Categories I through III) | Months to Rehearing |
|---|---|
| 0–4 ......................................... | 12–18 |
| 5 .............................................. | 18–24 |
| 6 .............................................. | 18–24 |
| 7 .............................................. | 18–24 |
| 8 .............................................. | 18–24 |
| 9 .............................................. | 22–28 |

| Base point score (Categories I through III) | Months to Rehearing |
|---|---|
| 10 ............................................ | 26–32 |

(2) The time to a rehearing shall be determined by the prisoner's base point score, and not by the total point score at the current hearing, which indicates only whether parole should be granted or denied. *Exception:* In the case of institutional misconduct deemed insufficiently serious to warrant a change in the prisoner's total point score, the Commission may nonetheless deny or rescind parole and render a decision based on the guideline ranges at §2.36 of this part.

(k) *Guidelines for decisions at subsequent hearing—Adult offenders.* In determining whether to parole an adult offender at a rehearing or rescission hearing, the Commission shall take the total point score from the initial hearing or last rehearing, as the case may be, and adjust that score according to the institutional record of the candidate since the last hearing. The following guidelines are applicable:

| Total Points | Guideline recommendation |
|---|---|
| If Points = 0–3 ............... | Parole with highest level of supervision indicated. |
| If Points = 4+ ................ | Deny parole at rehearing and schedule a further rehearing in accordance with §2.75(c) and the time ranges set forth in paragraph (j) of this section. |

(l) *Guidelines for decisions at subsequent hearing—Youth offenders.* (1) In determining whether to parole a youth offender appearing at a rehearing or rescission hearing, the Commission shall take the total point score from the initial hearing or last rehearing, as the case may be, and adjust that score according to the institutional record of the candidate since the last hearing. The following guidelines are applicable:

| Total Points | Guideline recommendation |
|---|---|
| If Points = 0–3 ............... | Parole with highest level of supervision indicated. |
| If Points = 4+ ................ | Deny parole and schedule a rehearing based on estimated time to achieve program objectives or by reference to the time ranges in paragraph (j) of this section, whichever is less. |

(2) Prison officials may in any case recommend an earlier rehearing date than ordered by the Commission if Commission's program objectives have been met.

(m) *Decisions outside the guidelines—All offenders.*

(1) The Commission may, in unusual circumstances, waive the Salient Factor Score and the pre- and post-incarceration factors set forth in this section to grant or deny parole to a parole candidate notwithstanding the guidelines, or to schedule a reconsideration hearing at a time different from that indicated in paragraph (j) of this section. Unusual circumstances are case-specific factors that are not fully taken into account in the guidelines, and that are relevant to the grant or denial of parole. In such cases, the Commission shall specify in the notice of action the specific factors that it relied on in departing from the applicable guideline or guideline range.

(2) Factors that may warrant a decision above the guidelines include, but are not limited to, the following:

(i) *Poorer parole risk than indicated by salient factor score:* The offender is a poorer parole risk than indicated by the salient factor score because of—

(A) Repeated failure under supervision (pretrial release, probation, or parole);

(B) Lengthy history of criminally related substance (drug or alcohol) abuse; or

(C) Unusually extensive prior record (sufficient to make the offender a poorer risk than the "poor" prognosis category).

(ii) *More serious parole risk:* The offender is a more serious parole risk than indicated by the total point score because of—

(A) Extensive record of violence beyond that taken into account in the guidelines;

(B) Current offense aggravated by extraordinary criminal sophistication orleadership role;

(C) Unusual cruelty (beyond that accounted for by scoring the offense as high level violence), or predation upon extremely vulnerable victim;

(D) Unusual degree of violence attempted or committed in relation to type of current offense; or

(E) Unusual magnitude of offense in terms of multiple victims, money, drugs, weapons, or other commodities involved.

(3) Factors that may warrant a decision below the guideline include, but are not limited to, the following:

(i) *Better parole risk than indicated by salient factor score.* The offender is a better parole risk than indicated by the

salient factor score because of (applicable only to offenders who are not already in the very good risk category)—

(A) a prior criminal record resulting exclusively from minor offenses;

(B) a substantial crime-free period in the community for which credit is not already given on the salient factor score;

(C) a change in the availability of community resources leading to a better parole prognosis;

(ii) *Other factors:*

(A) Substantial cooperation with the government that has not been otherwise rewarded;

(B) Substantial period in custody on other sentence(s) or additional committed sentences sufficient to warrant a finding that the offender meets the criteria for parole.

**§ 2.81  Effective date of parole.**

(a) A parole release date may be granted up to nine months from the date of the hearing in order to permit placement in a halfway house or to allow for release planning. Otherwise, a grant of parole shall ordinarily be effective not more than six months from the date of the hearing.

(b) Except in the case of a medical or geriatric parole, a parole that is granted prior to the completion of the prisoner's minimum term shall not become effective until the prisoner becomes eligible for release on parole.

**§ 2.82  Release planning.**

(a) All grants of parole shall be conditioned on the development of a suitable release plan and the approval of that plan by the Commission. A parole certificate shall not be issued until a release plan has been approved by the Commission. In the case of mandatory release, the Commission shall review each prisoner's release plan to determine whether the imposition of any special conditions should be ordered to promote the prisoner's rehabilitation and protect the public safety.

(b) If a parole date has been granted, but the prisoner has not submitted a proposed release plan, the appropriate correctional or supervision staff shall assist the prisoner in formulating a release plan for investigation.

(c) After investigation by offender supervision staff, the proposed release plan shall be submitted to the Commission 30 days prior to the prisoner's parole or mandatory release date.

(d) The Commission may retard a parole date for purposes of release planning for up to 120 days without a hearing. If efforts to formulate an

acceptable release plan prove futile by the expiration of such period, or if the Offender Supervision staff reports that there are insufficient resources to provide effective supervision for the individual in question, the Commission shall be promptly notified in a detailed report. If the Commission does not order the prisoner to be paroled, the Commission shall suspend the grant of parole and conduct a reconsideration hearing on the next available docket. Following such reconsideration hearing, the Commission may deny parole if it finds that the release of the prisoner without a suitable plan would fail to meet the criteria set forth in § 2.73 of this part. However, if the prisoner subsequently presents an acceptable release plan, the Commission may reopen the case and issue a new grant of parole.

(e) The following shall be considered in the formulation of a suitable release plan:

(1) Evidence that the parolee will have an acceptable residence.

(2) Evidence that the parole will be legitimately employed as soon as released; provided, that in special circumstances, the requirement for immediate employment upon release may be waived by the Commission.

(3) Evidence that the necessary aftercare will be available for parolees who are ill, or who have any other demonstrable problems for which special care is necessary, such as hospital facilities or other domiciliary care; and

(4) Evidence of availability of, and acceptance in, a community program in those cases where parole has been granted conditioned upon acceptance or participation in a specific community program.

**§ 2.83  Release to other jurisdictions.**

The Commission, in its discretion, may parole any individual from a facility of the District of Columbia, to live and remain in a jurisdiction other than the District of Columbia.

**§ 2.84  Conditions of release.**

(a) Parole is granted subject to the conditions imposed by the Commission as set forth in the certificate of parole. These conditions shall include, but not be limited to, the following. The parolee must:

(1) Obey all laws;

(2) Report immediately upon release to his or her assigned supervision office for instructions;

(3) Remain within the geographic limits fixed in the parole certificate unless official approval is obtained;

(4) Refrain from visiting illegal establishments;

(5) Refrain from possessing, selling, purchasing, manufacturing or distributing any controlled substance, or related paraphernalia;

(6) Refrain from using any controlled substance or drug paraphernalia unless such usage is pursuant to a lawful order of a practitioner and the parolee promptly notifies the Commission and his or her supervision officer of same;

(7) Be screened for the presence of controlled substances by appropriate tests as may be required by the Board of Parole or the Supervision Officer;

(8) Refrain from owning, possessing, using, selling, or having under his or her control any firearm or other deadly weapon;

(9) Find and maintain legitimate employment, and support legal dependents;

(10) Keep the supervision officer informed at all times relative to residence and work, and report all arrests;

(11) Refrain from entering into any agreement to act as an informer or special agent for a law enforcement agency without permission from the supervision authority; and

(12) Cooperate with the officials responsible for his or her supervision and carry out all instructions of his or her supervision officer and such special conditions as may have been imposed.

(b) The Commission may add to, modify, or delete any condition of parole at any time prior to the release of the offender. Following delivery of the parole or mandatory release certificate, such jurisdiction is vested in the Board of Parole of the District of Columbia until that jurisdiction is transferred to the Commission on or before August 5, 2000.

§ 2.85   Release on parole.

(a) When a parole effective date has been set, actual release on parole on that date shall be conditioned upon the individual maintaining a good conduct record in the institution or prerelease program to which the prisoner has been assigned.

(b) The Commission may reconsider any grant of parole prior to the prisoner's actual release on parole, and may advance or retard a parole effective date or rescind and deny a parole previously granted, based upon the receipt of any new and significant information concerning the prisoner, including disciplinary infractions. The Commission may retard a parole date for disciplinary infractions (e.g., to permit the use of graduated sanctions for drug

treatment program infractions) for up to 120 days without a hearing.

(c) After a prisoner has been granted a parole effective date, the institution shall notify the Commission of any serious disciplinary infractions committed by the prisoner prior to the date of actual release. In such case, the prisoner shall not be released until the institution has been advised that no change has been made in the Commission's order granting parole.

(d) A grant of parole becomes operative upon the authorized delivery of a certificate of parole to the prisoner, and the signing of that certificate by the prisoner, who thereafter becomes a parolee subject to the jurisdiction of the Board of Parole of the District of Columbia.

§ 2.86   Mandatory release.

(a) When a prisoner has been denied parole at the initial hearing and all subsequent considerations, or parole consideration is expressly precluded by statute, the prisoner shall be released at the expiration of his or her imposed sentence less the time deducted for any good time allowances provided by statute.

(b) Any prisoner having served his or her term or terms less deduction for good time shall, upon release, be deemed to be released on parole until the expiration of the maximum term or terms for which he or she was sentenced, except that if the offense of conviction was committed before April 11, 1987, such expiration date shall be less one hundred eighty (180) days. Every provision of this part relating to an individual on parole shall be deemed to include individuals on mandatory release.

(c) Each prisoner released in accordance with this section shall be subject to parole supervision upon the authorized delivery of a certificate of mandatory release.

§ 2.87   Reparole.

Each decision to grant or deny reparole shall be made by reference to the Commission's reparole guidelines at § 2.21 of this part, which shall include the establishment of a presumptive or effective release date pursuant to § 2.12(b) and interim hearings pursuant to § 2.14. However, if the prisoner is also eligible for parole on a new D.C. Code felony sentence that has been aggregated with the prisoner's parole violation term, the guidelines at § 2.80 shall be applied in lieu of such provisions. Reparole hearings shall be

conducted according to the procedures set forth in § 2.72 of this part.

§ 2.88   Confidentiality of parole records.

(a) Consistent with the Privacy Act of 1974 (5 U.S.C. 552(b)), the contents of parole records shall be confidential and shall not be disclosed outside the Commission except as provided below.

(b) Information that is subject to release to the general public without the consent of the prisoner shall be limited to the information specified in § 2.37(c) of this part.

(c) Information other than as described in paragraph (b) may be disclosed without the consent of the prisoner only pursuant to the provisions of the Privacy Act of 1974 (5 U.S.C. 552(b)). See § 2.56 of this part.

§ 2.89   Miscellaneous provisions.

Except to the extent otherwise provided by law, the following sections in subpart A of this part are also applicable to District of Columbia Code offenders:

2.5   Sentence aggregation.
2.7   Committed fines and restitution orders.
2.8   Mental competency procedures.
2.10   Date service of sentence commences.
2.16   Parole of prisoner in State, local, or territorial institution.
2.19   Information considered.
2.22   Communication with Commission.
2.23   Delegation to hearing examiners.
2.32   Parole to local or immigration detainers.
2.34   Rescission of parole.
2.56   Disclosure of Parole Commission file.
2.66   Aggregated U.S. and D.C. Code sentences.

§ 2.90   Prior orders of the Board of Parole.

Any prior order entered by the Board of Parole of the District of Columbia shall be accorded the status of an order of the Parole Commission unless duly reconsidered and changed by the Commission at a regularly scheduled hearing. It shall not constitute grounds for reopening a case that the prisoner is subject to an order of the Board of Parole that fails to conform to a provision of this part.

Dated: July 15, 1998.

Michael J. Gaines,

Chairman, U.S. Parole Commission.

[FR Doc. 98–19356 Filed 7–20–98; 8:45 am]

BILLING CODE 4410–31–P